# Mark Zelig, Ph.D., ABPP, LLC

Board Certified by the American Board of Professional Psychology in
Forensic Psychology, Police & Public Safety Psychology, and Clinical Psychology
Alta Psychological Services, Inc.
Licensed in Alaska, Colorado, Hawaii, Nevada, Utah, & Wyoming

| | | |
|---|---|---|
| 6925 Union Park Center, Suite 550<br>Cottonwood Heights, Utah 84047-6527<br>801-273-3365 | Facsimile (toll free) 866-907-2822<br>email: markzelig@markzelig.com<br>website: www.markzelig.com | 4325 Laurel St, Suite 297<br>Anchorage, Alaska 99508-5365<br>907-561-4141 |

7 February 2025

Dylan L. Hitchcock-Lopez
Ashburn & Mason, P.C.
1227 West 9th Avenue, Suite 200
Anchorage, AK 99501

Re:   Estate of Jayson Vinberg v. United States of America
      District of Alaska, United States District Court
      Case #3:22-cv-00135-HRH

Dear Mr. Hitchcock-Lopez:

At your request, I reviewed Dr. Ornish's report, which was published on 19 December 2024. Dr. Ornish conducted a psychological autopsy[1] on Mr. Vinberg. Dr. Ornish reviewed Jayson's life history going back to the challenges he encountered when he was a teenager. Jayson spent much of his teenaged years at the McLaughlin Youth Center, a detention facility in Anchorage. This is the facility where he met Becky – his future wife – who was 11 years older than he. Becky was a staff member at this facility. Jayson continued to have encounters with law enforcement, and in the meantime became a chronic user of methamphetamine and other illicit drugs. Dr. Ornish paints a high-risk lifestyle that exposed Jayson to various perils. In the course of reviewing the history that Dr. Ornish provided in his lengthy report, I incorporated the history collected by Dr. Ornish on a timeline that depicts critical life events in tabular form (See attached).

Dr. Ornish's analysis is further informed by reference to articles describing victim-precipitated homicide – referred to in this context as *suicide by cop (SBC)*. Dr. Ornish concluded:

> In summary, based on the evidence, Jayson went to the Naval Special Warfare Cold Weather Detachment to commit suicide by cop by engaging in aggressive and threatening behavior intended to precipitate the use of deadly force by Bradley Udell -- the Officer of the Day/Duty Watchstander . . . . The evidence is highly compelling that Jayson entered the base with a plan to provoke a serviceman into believing that his life was threatened, and to kill him in self defense, as a means of committing suicide by cop, and from a forensic psychiatric perspective, this is not a close call. (p. 81).

---

[1] Defined by one authority as "nothing less than a thorough retrospective investigation of the intention of the decedent."  Reference: Shneidman E. S. (1981) The psychological autopsy.  *Suicide and Life Threatening Behavior, 11,* 325-340.

I do not agree that the data from this case file justifies the certainty echoed in the above paragraph. In the following discussion, I will argue that there is also evidence that Jayson's decision to provoke Mr. Udell was made within the context of his interaction with Mr. Udell and not before that time. Furthermore, Mr. Udell may have been able to avert the outcome had he received additional training that is commonly provided to law enforcement officers in North America. The perspective I bring to this case is based on my knowledge of the scientific literature, and as a retired police commander who has personally encountered individuals who were motivated to end their lives by forcing police to use deadly force.

<u>Misapplication of professional literature.</u> Dr. Ornish's theory heavily relies on articles that have catalogued signs that a subject is motivated to provoke a law enforcement officer to kill them. Beginning with Lindsay & Lester (2008), Dr. Ornish references the 17 clues Dr. Lindsay extracted from his office files. The authors clearly pronounced this publication as an exploratory study – an appropriate caveat given their reliance on a convenience sample.[2]

Dr. Ornish notes that the average subject in this study who engaged in suicide by cop had an average of 12.9 of the clues and Jayson had 12.5 out of 17 possible clues. (I do not know how Jayson obtained a fractional score.)

Mohandie & Meloy (2000) provided a literature review of previously published articles. From their review, the authors listed 18 clues of suicidal intent within the context of a police encounter. These included the clues that are listed on page 80 of Dr. Ornish's report. Dr. Ornish indicates that 7 clues were present; 11 were not.

The clues manifested by Jayson include the following:
1. Demonstrative with weapon.
2. Points loaded or unloaded weapon or apparent weapon at police.
5. Reaching for a weapon or apparent weapon with police present.
9. Forces confrontation with police.
10. Advances on police when told to stop.
17. No demands.
18. Getting intoxicated with "chemical courage".

The clues that were <u>absent</u> in Jayson's case include the following:
3. Clears a threshold in a barricade situation in order to fire weapon.
4. Shooting at the police.
6. Attaches weapon to body.
7. Countdown to kill hostage or others with police present.
8. Assaulting or harming hostages or others with police present.
11. Suspect calls the police him/herself to report crime in progress.
12. Continues hopeless acts of aggression even after incapacitation by gunfire.

---

[2] A random sample -- the gold standard in medical and psychological research – is obtained by randomly choosing subjects or cases for scientific analysis. A convenience sample is not random, and in many cases is necessary because it is the only sample available or ethically permissible. As such, research based on convenience samples is best regarded as being quasi-experimental.

13. Self-mutilation with police present.
14. Pointing weapon at self with police present.
15. Refuses to negotiate.
16. No escape demands.

These lists published by these authors provide tools that are helpful in identifying people with risk – especially when used in training for individuals who are entrusted with firearms, but they cannot be used as an interval scale – that is, to conclude that someone who scores 12, for example, is at greater or lesser risk than someone who scores 5 or 15.[3] I would also note that while suicide by cop in a well-accepted construct to understand why suicidal people may act this way, it is not a clinical diagnosis, and therefore was not an appropriate item to include on the list of diagnoses that Dr. Ornish gave to Jayson (Ornitz, p. 52).

In terms of asserting that Mr. Vinberg entered the detachment with the desire to have a service member kill him, it is helpful to look at a paper published by Mohandie and Meloy (2009), as well as some facts that weaken this hypothesis.

Mohandie & Meloy (2009) drew upon a convenience (not random) sample to examine 707 officer-involved shooting cases and determined that 36% of these cases involved victim-assisted homicide (referred to as suicide by cop). One of the strengths of this study is that the authors compared the SBC subjects with the subjects who were not motivated by suicide. The mean age of all of their subjects was 35 (Standard Deviation =10). 95% were male and 41% were Caucasian (p. 3). A majority of the SBC subjects had a documented mental health history. This study offers a large number of statistical findings about the SBC group. What is most relevant in the instant case are the following findings:

- In general, this research supported the presence of the clues published earlier by Lindsay & Lester (2008) and Mohandie & Meloy (2000).

- In the present study, 176 (72%) of the SBC incidents were over in less than an hour. Most were concluded within 30 minutes (62%).

- 118 subjects (46%) were at their residence, 97 subjects (38%) were in a public or open air environment, and 27 events (11%) occurred at a business (p. 3). Of the subjects who possessed a firearm, it was loaded and operational 86% of the time -- and either unloaded or inoperable the remainder of the time (p. 3).

- The next most common weapon was knives (26%).

---

[3]An interval scale contains values that indicate magnitude and equal intervals between measurements. Accordingly, the scale used by Lindsay & Lester (2008) is an ordinal – not interval scale. Accordingly, you can say that an individual who has 10 clues has more cues than someone who has 5 clues. You cannot say, however, that a person with 10 clues has twice the suicide risk as someone who has 5 clues. This is why caution should be used to use such a scale to differentiate low from high risk.

- Of this sample, 51% were killed during the SBC encounter; 40% were injured; others committed suicide themselves. Overall, 97% of these subjects had an injury or death.

- The authors indicate that 206 subjects (81%) who were involved in incidents did not plan their demise the day of their deaths. That is, most deaths were *"unplanned and spontaneous (subject did not apparently choose to initiate the incident that day but rather became acutely suicidal in response to intervention and circumstances)"* (p. 4). Of those who communicated suicidal intent, most of them did so on the same day of the incident.

In the instant case, it is important to note several factors that argue against the theory that Mr. Vinberg entered the detachment with suicidal intent. Consider the following:

- According to witnesses, Mr. Vinberg was future-oriented. He vocalized plans to return to his aunt's house the following day to finish working on her deck. There is a significant literature that future orientation in depressed individuals is a protective factor – a factor that decreases the probability of a suicide attempt (e.g., Hirsch et al, 2007).

- The fact that Becky filed for divorce three days prior to his death in Utah is not as ominous as it sounds. Jayson reportedly encouraged the filing, hoping that Becky could find someone "better than" him (Becky Vinberg's Deposition at p. 102). He hoped to use his time in Kodiak to become more independent and get his act together. When he was advised of Utah's requirement to take an online course on how divorce affects children, he completed the course on the same day that he was advised of the requirement (p. 95). He maintained frequent communication with Becky, and their children, even on the day of his death (p. 97).

- If someone was contemplating police assisted suicide, the detachment is not a good choice. How could one reasonably expect that a man dressed in plain clothes would have access to a firearm? There is an Alaska State Trooper substation nearby, and plenty of public places nearby in which he could enter and provoke a situation in which police are called. Indeed, returning to the Mohandie & Meloy's (2009) study, 95% of the encounters occurred at the subject's residence, business, or in public. There was not a single instance of a person in their study who entered a semi-secured government reservation or any other secure facility.

- After reviewing the autopsy and crime scene pictures, I noted Mr. Vinberg's wardrobe. At the time he was hit by the first bullet, he was wearing the following:

    - Heavy Jacket
    - T-shirt
    - Camouflaged pants
    - Levis
    - Gloves
    - Long Underwear

- Socks
- Sneakers
- Insulated vest (Bates 1889, AST report, also see pictures Bates 1933-2261)

Indeed, Trooper Pages, who interviewed Jayson's mother, Donna, the day following his death, wrote the following:

> I was able to gather that sometime during early evening hours on 06/13/2020 there had been a sort of disagreement between Jayson and his mother over an unknown topic. During the disagreement Jayson became upset, *dressed himself for the outdoors*, loaded his cargo pants pockets with beers from the refrigerator and left the apartment on foot and did not speak anything about where he was going (emphasis added, AST report, Bates 1808).

Based on the information I have reviewed thus far, I strongly disagree with the theory that Mr. Vinberg entered the detachment with the goal of engaging in a victim-precipitated homicide. It is far more likely that Mr. Vinberg left his mother's house after an apparent argument, dressed with the goal of spending some time alone, outside, rather than searching for someone to kill him. The decision to provoke Mr. Udell likely occurred after his initial contact with Mr. Udell at the detachment, and probably not until he encountered Mr. Udell on the second occasion, moments before he was shot to death. Such an interpretation is consistent with the research published by Mohandie and Meloy (2009), discussed *supra,* that indicates that most of these individuals make a same-day, spur-of-the-moment decision to kill themselves.

<u>Mr. Udell's training and preparation as an employee entrusted with a firearm.</u> The second issue that I believe is appropriate to address is Mr. Udell's preparation for this event. In making these comments, I am not faulting Mr. Udell's actions.

I do not claim that I know the specific standard of care for watch standers who are entrusted with a firearm. I am aware, however, of the training that is generally provided to law enforcement officers. A major advantage of <u>repeated</u> training for people who are entrusted with firearms to protect themselves or others, is that training increases the odds of survival, and also gives the entrusted person more options to neutralize the threat without using deadly force.[4] Without training, the entrusted person must rely on intuition, which can be a dangerous thing because the entrusted person does not know what they do not know. More specifically:

- Allowing someone entrusted with a firearm to carry a .380 is virtually unheard of in municipal law enforcement as a primary weapon. It is underpowered compared to other munitions carried by municipal law enforcement, thus placing the officer in jeopardy. Such a liberal policy calls into question if Mr. Udell's leadership really considered the possibility that he might encounter a deadly force situation.

---

[4] Because I left my law enforcement agency in good standing, I took advantage of Senate Bill H.R. 218, and requalify annually for renewal of my federally-recognized carry and conceal permit. This requires yearly training and range qualification.

- AST Long did an interview with Troy Button, who is also assigned to the detachment. Trooper Long quoted Mr. Button as stating "If an intruder is on the site, we would not dial 911 . We would look into it and solve the issue ourselves. I'm not aware of any policy for intruders on the site and the discretion is left to the watch stander. (AST Report, Bates 1806). While I appreciate Mr. Button's candor, this means that either leadership and/or the culture at this facility is not willing to avail themselves to the benefit of involving experienced law enforcement officers, who are available within five minutes, and who would undoubtedly arrive equipped with options of using less-lethal alternatives to neutralize the threat. I can assure the reader that when I was the commander of the field training officer program, if we had a recruit who refused to request assistance in a dangerous situation, and refused to correct their thinking, that he or she would not remain employed. Such an officer not only places themselves at risk, but they inevitably place the officers who must come and rescue them at risk because of their bad judgment.

- The high frequency of individuals who choose victim-assisted suicide justifies training in SBC, and how awareness of that behavior can avert some of the deaths and injuries to such people.

- Another area of applicable training important for those entrusted with a firearm is the importance of utilizing cover during the encounter. Mr. Udell exited the cover and protection of the building and encountered the decedent outside of the door at which he had directed Jayson to meet him.

- One leading manual on officer safety has an entire chapter devoted to "cover awareness." [5] Cover provides protection from rounds fired by an armed suspect. It grants additional time to evaluate a situation and consider alternatives. Many training programs stress the importance of always being aware of where your cover is whenever you exit your vehicle or approach a subject in case a transaction becomes dangerous (Remsberg, et al. 2018).

*Mark Zelig PhD ABPP*

**Mark Zelig, Ph.D., ABPP**
**Licensed Psychologist**

---

[5]This chapter is prefaced with the adage "If your shooting stance is good, you're probably not moving fast enough or using cover correctly."

References not cited in footnotes:

Hirsch, J. K., Duberstein, P. R., Conner, K. R., Heisel, M. J., Beckman, A., Franus, N., & Conwell, Y. (2007). Future orientation moderates the relationship between functional status and suicide ideation in depressed adults. *Depression and Anxiety, 24*, 196-201.

Lindsay, M. & Lester D. (2008). Criteria for suicide-by-cop incidents. *Psychological Reports, 102*, 603-605.

Mohandie, K., & Meloy, J. R. (2000). Clinical and forensic indicators of "suicide by cop". *Journal of Forensic Sciences, 45*, 384-389.

Mohandie, K., Malloy, J. R. & Collins, P. I. (2009). Suicide by cop among officer-involved shooting cases. *Journal of Forensic Science, 54,* 1-7.

Remsberg, C., Marcou, D. & Glennon, J. (2018). *Street survival II: Tactics for deadly force encounters*. Glen Ellyn, IL: Calibre Press.