STEVEN A. ORNISH, M.D.

4705 Mayapan Dr.

La Mesa, CA 91941

TEL: 619 300 2117

FAX: 619 442 5818

E-mail: steven.ornish@gmail.com

*Distinguished Fellow, American Psychiatric Association*

*Diplomate American Board of Psychiatry and Neurology*

*Diplomate in the Subspecialty of Forensic Psychiatry*

December 19, 2024

Ms. Marie Scheperle
Assistant United States Attorney
Chief, Civil Unit
United States Attorney's Office
227 West Seventh Ave., #9, Room 253
Anchorage, Alaska 99513-7567

Re:     ***Estate of Jayson Vinberg v. United States of America,*** **Forensic Psychiatric Evaluation**
        **Date of Birth:  7/20/1989 (30 years old when died)**
        **Date and Time of Incident: 6/13/2020 (Saturday)**
             **9:20 PM first detected by security video at the Naval Special Warfare Cold
                Weather Detachment (NSWCWD).**
             **9:55 PM Jayson shot and killed.**
        **Case No.: 3:22-cv-00135-HRH**

Dear Ms. Scheperle:

Pursuant to your request, I have completed my forensic psychiatric evaluation to better understand the events that transpired, and Jayson Vinberg's state of mind, that culminated in his shooting death on 6/13/2020.

**SYNOPSIS**

At the time of his death, Jayson was a 30-year-old, separated, male with a long history of intermittent alcohol abuse, cannabis abuse, crack cocaine abuse, and intravenous cocaine and crystal methamphetamine abuse.  His alcohol and cannabis abuse and cigarette smoking dates back to age twelve, which he paid for by stealing from his mother, and at approximately age eighteen he started smoking crack cocaine and methamphetamine.  He subsequently began injecting methamphetamine and cocaine intravenously during his binges,[1] and had struggled with addiction and methamphetamine use since age eighteen.[2]

---

[1] NAVY-PLTF 96, 126.
[2] NAVY-PLTF 126.

Jayson was incarcerated at the McLaughlin Youth Center from approximately age fifteen to seventeen for a burglary conviction, where he met his future wife, Becky Vinberg, during that time. Jayson's step-mother, Esther Furio, testified that he was incarcerated at the McLaughlin Youth Center, after Jayson and a small group of teens broke into a small grocery store that sold alcohol.[3]

According to the 7/3/2020 interview of Michael Nielsen, Becky Vinberg's step-father, in or about 2008, while on parole in Alaska for a burglary conviction, at age seventeen Jayson began a sexual relationship with his parole officer, Becky, who was twenty-eight year old -- eleven years his senior.[4]  Becky testified that their "*romantic relationship*" began during the summer of 2007 while Jayson was out on parole,[5] although Jayson told KANA addiction counselor, Hope Rustemeyer, that their "*emotional relationship*" began while he was still housed at the McLaughlin detention center, and that their romantic relationship began after he was released to transitional housing.[6]

After his incarceration at the McLaughlin Youth Center, Jayson was sent to the AK Baptist Family Center for close to a year.  Jayson was noted to be in juvenile detention through much of high school,[7] and at some point he was expelled from school and sent back to McLaughlin Youth Center where he "*timed out.*"[8]

When their relationship was discovered, Becky lost her job, and she and Jayson relocated together to Utah.[9]  Sometime in the summer/fall 2007, Jayson and Becky moved in together, and on 5/17/2008 they were married.[10]  She testified that she learned she was pregnant with their first son the Sunday before their wedding.[11]

Becky was physically abusive towards Jayson early in their marriage.[12]  Becky testified that between 2007 and 2014, there was domestic violence in their relationship, with periods whereby she would punch or hit him, while he would just sit there, a couple of times per month.[13]  She also testified that Jayson used cocaine and ecstasy when they first started dating during the summer 2007.

---

[3]Page 24.
[4]NAVY 4662, NAVY-PLTF 94.
[5]Page 69.
[6]NAVY-PLTF 94.
[7]NAVY-PLTF 94.
[8]NAVY-PLTF 94.
[9]NAVY 4663.
[10]Becky Vinberg transcript, pages 68-74.
[11]Page 74.
[12]NAVY-PLTF 96.
[13]Page 140.

Exhibit B
(Forensic Psychiatric Evaluation:  Personal and Confidential)    Page 2 of 82
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 2 of 82

Jayson had been living in Utah for the previous seventeen years with his wife, Becky Vinberg, and their two sons, ages 5 and 11 years-old.[14] His polysubstance addiction had disrupted his family life many times over the previous twelve years, whereby every six to twelve months, he would leave for about a week to smoke and or inject cocaine or meth. Between 2008 and February 2020, Jayson lived in Utah. Approximately four years ago, he went on his longest binge for four to six months long whereby he was injecting methamphetamine and cocaine. This binge led to him filing bankruptcy.[15] Becky testified that in February 2017, they separated because Jayson had relapsed, was abusing drugs, and for six months he was living on the streets.[16] She further testified that in April 2018, they separated because of Jayson's struggles with drug addiction.[17] Becky and their children moved in with her mother in Utah, while Jayson lived with various coworkers and friends in Syracuse, Utah and subsequently moved to South Ogden, Utah, where he lived with some roommates in Utah.[18]

In or about February 2020, Jayson further separated from Becky, moved to Kodiak, Alaska, and at the time of his death was living with his mother, Donna Vinberg.[19] Since moving back to Kodiak in February 2020, Jayson was noted in the medical records to be consistently using drugs and binging [20] with use of methamphetamine daily,[21] with repeated periods of binging, and with no plans or motivation to stop or to participate in a drug treatment program.[22] Jayson's psychiatric state deteriorated, and he developed psychotic symptoms primarily characterized by auditory hallucinations of voices due to his active methamphetamine addiction (intravenous and smoking), alcohol abuse, and cannabis abuse.

On 6/8/2020, Becky, who was living in Bountiful, Utah with her step-father, Michael Nielsen, signed divorce papers for which she had petitioned, and on 6/10/2020, three days before Jayson's death, filed the petition for divorce.[23]

---

[14]NAVY 4662. Per Petition for Divorce, DOB for Eaen Tyler Vinberg 1/12/2009 and for Duncan Neil Vinberg 8/27/2014. NAVY-PLTF 96 erroneously indicates their two sons are 9 and 11 years old, which is incorrect.

[15]NAVY-PLTF 96.

[16]Page 77.

[17]Page 77.

[18]Pages 59-60.

[19]NAVY 4703. Also see deposition of Becky Vinberg, page 59.

[20]NAVY-PLTF 83.

[21]NAVY-PLTF 83.

[22]NAVY-PLTF 79, 104.

[23]NAVY 4663; NAVY-PLTF 23; DCU 5793.

Exhibit B
(Forensic Psychiatric Evaluation:   Personal and Confidential)    Page 3 of 82
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 3 of 82

The Naval Special Warfare Cold Weather Detachment (NSWCWD)[24] is a training center
that covers fifty-five acres on Spruce Cape and is used to train Navy SEALs.[25] Technically,
the NSWCWD is a detachment, and not a base, but throughout the discovery provided to me
it was commonly referred to as a "base". States SO1 Luke Brown, *"They just call us -- like,
it's a SEAL base, basically."*[26] Therefore, for readability purposes, in the instant report I
'will also be referring to the detachment as a "base."

The base is surrounded by a ten-foot-high chain-link fence topped with three strands of
barbed wire, as well as secured on one side by a body of water with cliffs with steep jagged
rocks. The perimeter is marked with *"No Trespassing,"*[27] *"No Trespassing US
Government"*[28], and *"Authorized Personnel Only"*[29] signs.

[30]

Sometime during early evening hours on 06/13/2020, there was an argument between Jayson
and his mother, Donna Vinberg, with whom he was living, over an unknown topic. During the
disagreement Jayson became upset, dressed himself for the outdoors, loaded his cargo pants
pockets with beers from the refrigerator, left the apartment on foot, and did not tell his
mother where he was going. Jayson was unable to be reached by cell phone according to
family, and he never returned home that evening (since he was shot and killed).[31] When
Donna was asked by Trooper Beaver if she knew why Jayson was on the Navy Base, Donna
replied:

> *"Him and I got into an argument last night and he loaded his pockets up with
> beer and took off out the door, so I don't know where he went."*[32]

On 6/13/2020, at approximately 9:20 PM, security video first captured Jayson along the
exterior gate of the base, then he disappeared off camera view.[33] On 6/13/2020, also at
approximately 9:20 PM, surveillance video captured Jayson within the fenced area of the

---

[24]Also abbreviated "NSW."
[25]Wikipedia.
[26]Interview transcript, page 47. Also see transcript of Stacy Virgin interview, USAO 7142.
[27]NAVY 1838
[28]NAVY 1848-1850.
[29]NAVY 4573.
[30]NAVY 4777.
[31]NAVY 4519.
[32]Transcript of Trooper Audio Excerpts, page 3. Also see Navy 7795 audio recording.
[33]NAVY 4804.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential)     **Page 4 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 4 of 82

NSWCWD, having snuck on the base.[34] ███████████████████████████

███████████████████

Jayson was wearing camouflaged pants, a dark jacket, and black gloves and armed with four kitchen knives. Bradley Udell, a Special Warfare Boat Operator, First Class (SB1), was on duty as the Officer of the Day/Duty Watchstander armed with his personally owned Walther PPK .380 handgun -- consistent with the NSWCWD firearms policy permitting Navy personnel on the base to carry either a government issued firearm or their own personal one.

According to the surveillance video, Jayson is first observed walking north down the main road towards the main building.[36] He is observed walking around the building and down the road past the buildings north of the main building. He appeared to have a difficult time walking in a straight line, and meandered side to side.[37]

Jayson walked to the back door vestibule of the main building, up two flights of stairs, and was at the metal second floor egress door yelling something unintelligible through the door and pounding on it. Mr. Udell could not hear what Jayson was yelling.[38] Mr. Udell opened the door, and asked who he was and how he got on the compound, to which Jayson replied, "*I snuck on.*" He never buzzed the front gate to gain access. Mr. Udell told him he was not authorized to be on the installation and directed him to go down to the front door.[39] Mr. Udell texted his fellow Navy personnel in their chat group that "*Some random dude just got on the compound.*" and they replied that backup was on their way.[40] At some point the second floor work phone rang, and Mr. Udell spoke to SOC[41] Troy Button and informed him of the intruder, who told him that he was on the way.[42]

Mr. Udell walked downstairs toward the main entrance of the main building, where he observed Jayson through the glass window pacing and yelling, "*Come on!*" He observed Jayson place his hands in his jacket pockets and remove two knives, who began banging aggressively and tapping the double pane reinforced window with knives yelling, "*Come on!*" and trying to goad Mr. Udell to exit the building. Jayson brandished the knives and replaced

---

[34]NAVY 4573.

[35]NAVY 4777.

[36]The "main building" is also referred in the discovery as the "headquarters building" (Navy 4503), (Navy 4515) or the "office building," and the entrance is referred to as the "quarterdeck" (deposition of Bradley Udell, pages 166-167).

[37]NAVY 4521.

[38]NAVY 4517.

[39]NAVY 4723.

[40]Navy 1769.

[41]Special Operations Chief.

[42]Navy 4724.

**Exhibit B**
(Forensic Psychiatric Evaluation: **Personal and Confidential**) **Page 5 of 82**
Case 3:22-cv-00135-SLG   Document 154-3   Filed 08/25/25   Page 5 of 82

them in his front jacket pocket, and pulled the knives back out on at least three occasions, continued to pace, and yelling "*Come on!*" and other inaudible things to entice Mr. Udell to come outside, but Mr. Udell remained inside.[43]

Jayson turned around and walked from the main entryway of the main building towards the road that leads to the main gate. Mr. Udell exited the main building to maintain visual contact with Jayson. Mr. Udell stated that Jayson must have heard the interior main building door close, for Jayson turned around and began walking towards him with what appeared to be a knife in his right hand,[44] although later it was determined that all three knives -- two inexpensive steak knives and a paring knife -- were in Jayson's pockets at the time he was shot and killed.[45]

Mr. Udell verbally directed Jayson to leave, but he did not comply; rather, he continued to walk towards Mr. Udell undeterred.[46] Mr. Udell held out his outstretched left hand in the universal stopping sign, and with his handgun in a low ready position again commanded Jayson to stop at least two or three times, including commanding, "*Stop coming towards me!*" and "*Don't come any closer!*" but Jayson continued to advance, repeatedly responding, "*Or what?*" Mr. Udell observed Jayson reach for his right front jacket pocket, where he knew Jayson had a knife, remove his hand from his pocket and continue to advance towards him. When Jayson was approximately six feet away, Mr. Udell fired all seven rounds of his handgun into Jayson, killing him.[47] Mr. Udell removed two black-handled knives from Jayson's pockets, 911 was called, and CPR was performed.[48] A third knife was removed by Trooper Tilley.[49] Various Law Enforcement databases/agencies revealed that Jayson had a history of disorderly conduct, resisting arrest, failure to identify himself with assaultive behavior towards law enforcement and other responders during prior contacts with law enforcement.[50] Those incidents appeared to have originated outside of the state of Alaska.

Record checks also revealed Jayson was arrested multiple times in California and Utah. Jayson was convicted on one felony charge: battery against a police officer, as well as arrested for several theft related misdemeanors (receipt of stolen property, shoplifting, etc).[51]

---

[43]NAVY 4724. Deposition of Bradley Udell, page 96.
[44]NAVY 4521.
[45]NAVY 4515; NAVY 4526; NAVY 1968; Deposition of Bradley Udell, page 126.
[46]Deposition of Bradley Udell, pages 117-118.
[47]NAVY 4724.
[48]Deposition of Bradley Udell, page 126.
[49]NAVY 4515.
[50]NAVY 4519.
[51]NAVY 4861; NAVY 4919.

Exhibit B
(Forensic Psychiatric Evaluation: Personal and Confidential)   Page 6 of 82
Case 3:22-cv-00135-SLG   Document 154-3   Filed 08/25/25   Page 6 of 82

On May 26, 2017, Jayson pled guilty to felony theft by receiving stolen property.[52] During an arrest in 2017, Jayson admitted to using methamphetamine.[53]

Jayson's postmortem pericardial blood alcohol level was 0.111 g/100 ml. His postmortem toxicology was also positive for cannabinoids, with a Δ-9 THC level of 23 ng/ml, consistent with cannabis intoxication at the time of his death.[54]

Jayson's aunt Sandra Vinberg told the investigator that the day after the incident Donna had told her:

> "*Just, I saw her [Donna], DJ was holding her [Donna] and -- she said 'DJ, why, why?' What did she say? 'He just snapped.' Something about him snapping, and -- she said, 'If you're gonna be like that,' something like that, 'If you're gonna be that way, get out of here,' something like that. Only because she was crying to DJ.*"[55]

## RECORDS REVIEWED

| Bates # | Source | Description |
|---|---|---|
| 1-30 | NAVY-PLTF | SF95 + Corr. |
| 31-34 | NAVY | Denial Letter 3-7-2022. |
| 56 | NAVY-PLTF | Death Certificate. |
| 57-72 | NAVY-PLTF | State Of Alaska Autopsy Report. |
| 73-106 | NAVY-PLTF | Outpatient Clinic records of Jayson Vinberg from Kodiak Area Native Association (KANA). |
| 107-145 | NAVY-PLTF | Emergency Room of Jayson Vinberg from Providence Kodiak Island Medical Center. |
| 146 | NAVY-PLTF | Burial Expenses. |
| 147-223 | PLTF | Medical Records (duplicate of NAVY-PLTF 73-106 & 107-145). |

---

[52]Page 138-139, deposition of Becky Vinberg.
[53]NAVY 4919.
[54]NAVY-PLTF 57, NAVY 2139.
[55]Bates 1712, Time index 32:45. "DJ" is John Donald Vinberg, Jason's uncle.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential)    Page 7 of 82
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 7 of 82

| 224-234 | PLTF | SF95 Corr. |
|---|---|---|
| 235-841 | PLTF | SOA Investigation & Autopsy (includes forensics and crime scene photos). |
| 842-938 | PLTF | Duplicate health service and medical records. |
| 842-938 | PLTF | SF95 SUPP INFO |
| 939-962 | NAVY | N-71 South Porch Images 2nd Export. |
| 963-995 | NAVY | N-71 South Port Images Export. |
| 996-1031 | NAVY | N-71 Vestibule 2-102. |
| 1032-1067 | NAVY | N-71 Vestibule Images Export. |
| 1068-1162 | NAVY | Shooting Images. |
| 1163-1170 | NAVY | South Porch 2-101. |
| 1171-1270 | NAVY | Vestibule 2-102. |
| 1271 | NAVY | South Porch Video Clip. |
| 1272 | NAVY | Vestibule Video Clip. |
| 1273-1274 | NAVY | Final Letter. |
| 1275-1276 | NAVY | Supplemental Release. |
| 1277-1278 | NAVY | Initial Response. |
| 1279-1649 | NAVY | Investigation reports and exhibits (redacted). |
| 1650-1655 | NAVY | Watch-stander guide. |
| 1656 | NAVY | Spruce Cape 911 call. |
| 1657 | NAVY | Bayside Fire Dept Recording. |
| 1658 | NAVY | Interview Joseph Birkmeyer (transcript reviewed instead of audio). |

| | | |
|---|---|---|
| 1659 | NAVY | Interview IT1 Avery Storm Interview (transcript reviewed instead of audio). |
| 1660 | NAVY | Interview Sbc Daniel Bronner (transcript reviewed instead of audio). |
| 1661 | NAVY | Interview Jeffery Welch. |
| 1662 | NAVY | Interview So1 Zachary Castonguay (transcript reviewed instead of audio). |
| 1663 | NAVY | Interview Soc Troy Button 6/19/2020 (transcript reviewed instead of audio). |
| 1664 | NAVY | Interview Troy Button 6/14/2020 (transcript reviewed instead of audio). |
| 1665 | NAVY | Photos of texts HM2 Birkmeyer. |
| 1666-1668 | NAVY | Photos of texts HM2 Birkmeyer. |
| 1669-1670 | NAVY | Photos of texts HM2 Birkmeyer. |
| 1671-1672 | NAVY | Photos of Texts IT1 Storm. |
| 1673-1675 | NAVY | Photos of Texts IT1 Storm. |
| 1676-1677 | NAVY | Photos of Texts IT1 Storm. |
| 1678 | NAVY | Photos of Texts SBC Bronner. |
| 1679-1682 | NAVY | Photos of Texts SBC Bronner. |
| 1683-1684 | NAVY | Photos of Texts SBC Bronner. |
| 1685 | NAVY | Photos of Texts SO1 Welch. |
| 1686-1688 | NAVY | Photos of Texts SO1 Welch. |
| 1689-1690 | NAVY | Photos of Texts SO1 Welch. |
| 1691 | NAVY | Photos of Texts SO1 Castonguay. |

| | | |
|---|---|---|
| 1692-1694 | NAVY | Photos of Texts SO1 Castonguay. |
| 1695-1697 | NAVY | Photos of Texts SO1 Castonguay. |
| 1698 | NAVY | Photos of Texts Button. |
| 1699-1704 | NAVY | Photos of Texts Button. |
| 1705-1707 | NAVY | Photos of Texts Button. |
| 1708 | NAVY | Video recording of interview with Brad Udell (Watch Stander). |
| 1709 | NAVY | Audio recording of interview with Carolyn Merrigan (aunt). |
| 1710 | NAVY | Audio of interview with Abner Nelson (friend) (transcript reviewed instead of audio). |
| 1711 | NAVY | Audio recording of interview with Anthony Furio (biological father). |
| 1712 | NAVY | Audio recording of interview with Sandra Vinberg (aunt). |
| 1713 | NAVY | Audio recording of interview with Stacey Virgin (Officer in charge) (transcript reviewed instead of audio). |
| 1714 | NAVY | Audio recording of interview with Jared Holforty (Deputy Officer) (transcript reviewed instead of audio). |
| 1715 | NAVY | Audio recording of interview with Jonathan Cox (Special Officer, USN) (transcript reviewed instead of audio). |
| 1716 | NAVY | Audio recording of interview with Luke Brown (Special Officer, USN) (transcript reviewed instead of audio). |
| 1717 | NAVY | Audio recording of interview with Bradley Udell & Troy Button. |

| | | |
|---|---|---|
| 1718-1721 | NAVY | Photos of Texts 19Jun20 |
| 1722-1725 | NAVY | Photos of Texts 19Jun20 |
| 1726 | NAVY | Photos of Texts S01 Brown. |
| 1727-1753 | NAVY | Photos of Texts S01 Brown. |
| 1754 | NAVY | Photos of Texts SO1 Cox. |
| 1755-1758 | NAVY | Photos of Texts SO1 Cox. |
| 1759-1760 | NAVY | Photos of Texts SO1 Cox. |
| 1761 | NAVY | Text Message. |
| 1762-1765 | NAVY | Text Message. |
| 1766-1768 | NAVY | Text Message. |
| 1769-1771 | NAVY | Text Message. |
| 1772-1775 | NAVY | Text Message. |
| 1776-1778 | NAVY | Text Message. |
| 1779-1781 | NAVY | Text Message. |
| 1782-1784 | NAVY | Text Message. |
| 1785-1786 | NAVY | Text Message. |
| 1787-1862 | NAVY | 1 SPECWAR NSW Detachment Main Gate Photographs. |
| 1863-1865 | NAVY | 2 SPECWAR NSW Detachment Main Gate Photographs. |
| 1866-2015 | NAVY | Release AST Scene Photos (Part 1). |
| 2016-2017 | NAVY | SPECWAR AST Scene Photos (Part 1). |
| 2018-2106 | NAVY | SPECWAR AST Scene Photos (Part 1-2). |

| | | |
|---|---|---|
| 2107-2142 | NAVY | FARO Report Data and Video (Unable to review since requires proprietary software). |
| 2143 | NAVY | N-71 South Porch Images.HTML (Bates 963-995). |
| 2144 | NAVY | N-71 South Porch Images 2ND.HTML (Bates 939-962). |
| 2145 | NAVY | N-71 Vestibule Images.HTML (Bates 996-1031, 1032-1067). |
| 2146 | NAVY | Vestibule and South Porch.HTML (Bates 2147-2156). |
| 2147-2156 | NAVY | Vestibule And South Porch Export. |
| 2157-2413 | NAVY | Omnivore-Vestibule 2-102 Images (1) |
| 2414-2671 | NAVY | Omnivore-Vestibule 2-102 Images (2). |
| 2672-2928 | NAVY | Omnivore-Vestibule 2-102 Images (3) |
| 2929-3186 | NAVY | Omnivore-Vestibule 2-102 Images (4). |
| 3187-3470 | NAVY | Omnivore-South Porch 2-101 Images. |
| 3471-3755 | NAVY | Omnivore-South Porch 2-101 Images. |
| 3756 | NAVY | Unedited Video: 2020-06-18 09.37 (porch). |
| 3757 | NAVY | Unedited Video: 2020-06-18 10.59 (vestibule). |
| 3758 | NAVY | Audio recording of interview with Bradley Udell on 6-19-2020 (duplicate of Bates 1708 video recording). |
| 3759 | NAVY | Duplicate recording of audio recording of interview with Bradley Udell & Troy Button (Bates 1717). |
| 3760 | NAVY | Audio recording of interview with Donna Vinberg & family. |

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 12 of 82**
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 12 of 82

| 3761 | NAVY | DS506045 (transcript instead of audio reviewed). |
| 3762 | NAVY | Troy Button on 6-19-2020 (transcript instead of audio reviewed). |
| 3763 | NAVY | Audio recording of interview with Jeffrey Welch, Daniel Bronner, & Zachary Castonguay. |
| 3764 | NAVY | Duplicate recording of audio recording of interview with Donna Vinberg & family (Bates 3760). |
| 3765 | NAVY | 48 seconds of Donna Vinberg interview). |
| 3766 | NAVY | TST15688. |
| 3767-4025 | NAVY | Autopsy Photos. |
| 4026-4027 | NAVY | DNA Report. |
| 4028-4039 | NAVY | Latent Examination. |
| 4040-4051 | NAVY | Latent Processing. |
| 4052 | NAVY | Fingerprint Report. |
| 4053-4058 | NAVY | Firearm Notes. |
| 4059 | NAVY | Firearm. |
| 4060-4062 | NAVY | Walther PPK-S Recall. |
| 4063-4216 | NAVY | Death Scene Photographs. |
| 4217-4410 | NAVY | Images. |
| 4411-4426 | NAVY | Photographs Property. |
| 4427-4436 | NAVY | Phone Exam Photos |
| 4437-4919 | NAVY | Unredacted investigation reports. |

Exhibit B
(Forensic Psychiatric Evaluation:   Personal and Confidential)  Page 13 of 82
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 13 of 82

| 4920-4998 | NAVY | Duplicate pages of unredacted investigation reports. |
| 4999-5207 | PLTF | Taxes 2010-2022. |
| 5793-5817 | DCU | Divorce Petition and Dismissal (filed 6/10/2020). |
| 5818-5842 | USAO | Transcription of 1658 NAVY HM2 J Birkmeyer - 19Jun20_4PP_HC_Redacted.pdf[56] |
| 5843-5915 | USAO | Transcription of 1658 NAVY HM2 J Birkmeyer - 19Jun20_F.HC_Redacted.pdf |
| 5916-5943 | USAO | Transcription of 1659 NAVY 711 AM Storm - 19Jun20_4PP_HC_Redacted.pdf |
| 5944-6023 | USAO | Transcription of 1659 NAVY 711 AM Storm - 19Jun20_F_HC_Redacted.pdf |
| 6024-6044 | USAO | Transcription of 1660 NAVY SBC DR Bronner - 19Jun20_4PP_HC_Redacted.pdf |
| 6045-6102 | USAO | Transcription of 1660 NAVY SBC DR Bronner - 19Jun20_F_HC_Redacted.pdf |
| 6103-6129 | USAO | Transcription of 1661 NAVY S01JS Welch - 19Jun20_4PP_HC_Redacted.pdf |
| 6130-6207 | USAO | Transcription of 1661 NAVYS01 JS Welch - 19Jun20_F_HC_Redacted.pdf |
| 6208-6231 | USAO | Transcription of 1662 NAVY S01 ZP Castonguay - 19Jun20_4PP_HC_Redacted.pdf |
| 6232-6299 | USAO | Transcription of 1662 NAVY S01 ZP Castonguay - 19Jun20_F_HC_Redacted.pdf |
| 6300-6332 | USAO | Transcription of 1663 NAVY SOC 7 Button - 19Jun20_4PP_HC_Redacted.pdf |

---

[56]Both condensed and non-condensed transcriptions were provided for USAO 5818-7636.

| | | |
|---|---|---|
| 6333-6430 | USAO | Transcription of 1663 NAVY SOC T Button - 19Jun20_F_HC_Redacted.pdf |
| 6431-6435 | USAO | Transcription of 1664 NAVY SOC 7 Button - 14Jun20_4PP_HC.pdf |
| 6436-6444 | USAO | Transcription of 1664 NAVY SOC 7 Button - 14Jun20_F_HC.pdf |
| 6445-6499 | USAO | Transcription of 1708 NAVY SB1 BJ Udell - 19Jun20_4PP_HC_Redacted.pdf |
| 6500-6667 | USAO | Transcription of 1708 NAVY SB1 BJ Udell - 19Jun20_F_HC_Redacted.pdf |
| 6668-6693 | USAO | Transcription of 1709 NAVY CM Merrigan - 23Jun20_4PP_HC_Redacted.pdf |
| 6694-6771 | USAO | Transcription of 1709 NAVY CM Merrigan - 23Jun20_F_HC_Redacted.pdf |
| 6772-6786 | USAO | Transcription of 1710 NAVY AL Nelson III - 24Jun20_4PP_HC_Redacted.pdf |
| 6787-6826 | USAO | Transcription of 1710 NAVY AL Nelson III - 24Jun20_F_HC_Redacted.pdf |
| 6827-6870 | USAO | Transcription of 1711 NAVY A&E Furio - 20Jun20_4PP_HC_Redacted.pdf |
| 6871-7001 | USAO | Transcription of 1711 NAVY A&E Furio - 20Jun20_F_HC_Redacted.pdf |
| 7002-7023 | USAO | Transcription of 1712 NAVY SL Vinberg - 24Jun20_4PP_HC_Redacted.pdf |
| 7024-7086 | USAO | Transcription of 1712 NAVY SL Vinberg - 24Jun20_F_HC_Redacted.pdf |
| 7087-7108 | USAO | Transcription of 1713 NAVY SA Virgin - 22Jun20_4PP_HC_Redacted.pdf |

Exhibit B
(Forensic Psychiatric Evaluation: Personal and Confidential) Page 15 of 82
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 15 of 82

| | | |
|---|---|---|
| 7109-7166 | USOA | Transcription of 1713 NAVY SA Virgin - 22Jun20_F_HC_Redacted.pdf |
| 7167-7195 | USAO | Transcription of 1714 NAVY JC Holforty - 20Jun20_4PP_HC_Redacted.pdf |
| 7196-7278 | USAO | Transcription of 1714 NAVY JC Holforty - 20Jun20_F_HC_Redacted.pdf |
| 7279-7296 | USAO | Transcription of 1715 NAVY JH Cox - 19Jun20_4PP_HC_Redacted.pdf |
| 7297-7348 | USAO | Transcription of 1715 NAVY JH Cox - 19Jun20_F_HC_Redacted.pdf |
| 7349-7371 | USAO | Transcription of 1716 NAVY S01 LA Brown - 19Jun20_4PP_HC_Redacted.pdf |
| 7372-7439 | USAO | Transcription of 1716 NAVY S01 LA Brown - 19Jun20_F_HC_Redacted.pdf |
| 7440-7450 | USAO | Transcription of 1717 NAVY Law Enforcement Audio - 13Jun20_4PP_HC.pdf |
| 7451-7476 | USAO | Transcription of 1717 NAVY Law Enforcement Audio - 13Jun20_F_HC.pdf |
| 7477-7487 | USAO | Transcription of 3760 NAVY Law Enforcement Audio - No Date_4PP_HC.pdf |
| 7488-7516 | USAO | Transcription of 3760 NAVY Law Enforcement Audio - No Date_F_HC.pdf |
| 7517-7535 | USAO | Transcription of 3761 NAVY Law Enforcement Audio - 14Jun20_4PP_HC_Redacted.pdf |
| 7536-7589 | USAO | Transcription of 3761 NAVY Law Enforcement Audio - 14Jun20_F_HC_Redacted.pdf |
| 7590-7600 | USAO | Transcription of 3763 NAVY Law Enforcement Audio - 13Jun20_4PP_HC_Redacted.pdf |

Exhibit B
(Forensic Psychiatric Evaluation: Personal and Confidential) Page 16 of 82
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 16 of 82

| | | |
|---|---|---|
| 7601-7627 | USAO | Transcription of 3763 NAVY Law Enforcement Audio - 13Jun20JLHC_Redacted.pdf |
| 7628-7630 | USAO | Transcription of 3765 NAVY Law Enforcement Audio - No Date_4PP_HC.pdf |
| 7631-7636 | USAO | Transcription of 3765 NAVY Law Enforcement Audio - No Date_F_HC.pdf |
| 7696-7794 | PLTF | PLTF response to DFDT 3rd set of Discovery Request (VB1672-1770). (Includes divorce papers, Facebook postings, text messages). |
| 7795 | DPS | Audio recording interview with Donna Vinberg and family. |
| 7796 | DPS | Supplemental report. |
| 7834-7846 | USAO | Trooper Audio Excerpts_6-14-2010_Donna Vinberg. |
| 8059 | PLTF | Navy photos of knives. |
| 8060-8566 | PLTF | PLTF Second Supplemental Disclosures, Incident Report. |
| 8588-8722 | PLTF | Opposition Expert M. Reiner Discovery & 4th Supplemental Discovery. |
| 8723-8736 | AMAZON | AMAZON Jayson VINBERG Payroll - Production, 12.27.23_Redacted.pdf |
| 8737-8737 | BPD | BPD Bountiful Police Dept, CAD Call 2035521_Redacted.pdf |
| 8738-8776 | GRANITE | GRANITE VINBERG, JAYSON J. D. EE No. 940189 Redacted.1 of 2_Redacted.pdf |
| 8777-8823 | GRANITE | GRANITE VINBERG, JAYSON J. D. EE No. 940189 Redacted.2 of 2.pdf |
| 8824-8864 | KANA | KANA Records_Redacted.pdf |

Exhibit B
(Forensic Psychiatric Evaluation: Personal and Confidential) Page 17 of 82
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 17 of 82

| | | |
|---|---|---|
| 8865-8867 | KPD | KPD 28 Kodiak Police Report_Redacted.pdf |
| 8868 | KPD | KPD Kodiak Police Dept. Donna Vinberg Contact Card_Redacted.pdf |
| 8869-8897 | KTC | KTC Kodiak Trial Courts Furio v. Vinberg 3KO-08-222CI_Redacted.pdf |
| 8898-8914 | PKIMC | PKIMC Providence Kodiak Island Medical Center - JV Medical Records_Redacted.pdf |
| 8915-8925 | SRP | SRP Shamrock Plumbing, Jayson Vinberg_Redacted.pdf |
| 8926-8929 | SSC | SSC Southeast Stevedoring Corp., New Hire Forms_Redacted.pdf |
| 8930-8930 | SSC | SSC Southeast Stevedoring Corp., VINBERG, JAYSON CHECK 90964_Redacted.pdf |
| 8931-8931 | SSC | SSC Southeast Stevedoring Corp., Vinberg, Jayson Timecard Notes.pdf |
| 8932-8946 | UPD | UPD Unified Police Greater Salt Lake 2018-68440_Redacted.pdf |
| 8947-8951 | UTCOURTS | UTCOURTS 2nd District re Domestic Relations Injunction.pdf |
| 8952-8952 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg 2nd Appearance.pdf |
| 8953-8954 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg Appearance.pdf |
| 8955-8958 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg Change of Plea_Redacted.pdf |
| 8959-8962 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg Information_Redacted.pdf |
| 8963-8963 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg Notice of Hearing.pdf |

| | | |
|---|---|---|
| 8964-8965 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg Order to Release_Redacted.pdf |
| 8966-8966 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg PC_Redacted.pdf |
| 8967-8971 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg Progress Report_Redacted.pdf |
| 8972-8977 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg Req Discovery.pdf |
| 8978-8980 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg SJC_Redacted.pdf |
| 8981-8982 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg SOD.pdf |
| 8983-8983 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg Warrant_Redacted.pdf |
| 8984-8991 | UTCOURTS | UTCOURTS 3rd District Crim Records Vinberg_Redacted.pdf |
| 8992-9016 | UTCOURTS | UTCOURTS Utah Layton District Crim Records Vinberg_Redacted.pdf |
| 9017-9023 | WVCPD | WVCPD West Valley City Police 17I010447 Report, JV_Redacted.pdf |
| 9024-9027 | WVCPD | WVCPD West Valley City Police 20I012783 Report, JV_Redacted.pdf |
| 9028-9916 | PLTF | Opposition Expert Disclosures. |

Miscellaneous:
• Vinberg Response to US First Discovery Requests.
• Supplemental Response to US First Discovery Requests.
• Plaintiff's Responses To U.S. First Set Of Discovery Requests.
• Plaintiff's Supplemental Responses To U.S. First Set Of Discovery Requests.
• 12/28/23: Vinberg response to USA's 3rd Discover Request.
• 2422.ave-2436.ave, Survey videos.
• 8613.pdf-8646.pdf, Fence images.

**Exhibit B**
**(Forensic Psychiatric Evaluation: Personal and Confidential) Page 19 of 82**
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 19 of 82

- 8662, image.
- 8659.mov-8699.mov, videos.
- USAfx External DOJ User Guide.
- USAfx Expert Witness User Guide.
- South Lake Tahoe Police Department.
- South Lake Tahoe Police Department: Custodian Declaration, signed.

Deposition transcripts and Exhibits:
- Bradley Udell
- Becky Vinberg
- Anthony Furio
- Esther Furio
- Troy Button
- Stacey Virgin

Excerpts are as follows:

8/29/2013:    South Lake Tahoe Police Department Narrative Report signed by Officer C. Webber: *"On 8/29/2013, at approximately 2128, I responded to the area of Stateline Ave near Harvey's Casino on a report of a vehicle pulled over with a subject lying on the ground possibly being kicked. Officer Rider and I arrived on scene [at approximately 2129 hours. Upon arrival, I observed a silver sedan stopped on Stateline Ave (facing northbound), with the rear right passenger door open and a male subject lying on the ground (sidewalk area) with his head and upper body resting up against the right rear tire of the sedan. The male subject, later identified as Jayson John Donald Vinberg, displayed the following objective signs and symptoms of being under the influence of an alcoholic beverage; a strong odor of an alcoholic beverage on his breath and about his person and very slow, deliberate movements."*[57]

*"Jayson screamed at first responders to 'get off me,' however he was already under arrest for the battery to Officer Rider. Becky attempted to calm Jayson by telling him it was okay and that we were helping him. Jayson then screamed, 'Fuck you!' Jayson then stated something similar to, 'I will kill every single one of them.' Jayson stated, 'Fuck them, fuck every single one of them!' Jayson stated something similar to, 'I will kill every single one of you and your kids.' Jayson also stated, 'Fuck you and your kids.' Jayson then stated, 'I'm gonna kill'em, that's right, it takes four of you!' Jayson threatened first responders that he was going to kill us and our children. Becky was crying throughout Jayson's threats and told him that he did not mean that. I took these threats from Jayson seriously after he had already battered Officer Rider at the scene. I felt that if Jayson was not secured in*

---

[57]Page 1.

handcuffs, he might attempt to harm or injure other first responders. Jayson was eventually secured and handcuffed to the gurney. Jayson was placed in the ambulance and transported to Barton Hospital by Medic 1."[58]

*"I was unable to overcome Jayson's active resistance. Fearing that Jayson would connect with a head-butt to the ER nurse (who was standing next to his upper body) and attempting to prevent any other first responders from getting hurt, I punched Jayson on the left side of his head (near his left eye) with a closed right fist. I then forced Jayson's head down on the bed. It took both of my hands to hold Jayson's head down on the bed. After I punched Jayson, I noticed almost immediately that Jayson had bruising around his left eye."*[59]

"On 08/29/2013, Becky and Jayson were at Straw Hat Pizza inside of Harvey's Casino watching the Utah State vs University of Utah college football game. *While at Straw Hat Pizza, Becky stated that Jayson drank approximately 3 pitchers of Coors Light.* Becky said this large amount of alcohol concerned her because Jayson rarely drinks alcohol and he last consumed alcohol back in June, 2013."[60]

"'We were gonna walk back to Best Western.' As Becky and Jayson exited Harvey's casino onto Stateline Ave, Becky related that Jayson jumped over a railing at Harvey's and landed on his feet on the sidewalk of Stateline Ave. Becky said Jayson then passed out in some bushes near Harvey's. Becky attempted to wake up Jayson but to no avail. Becky explained that she walked all the way back to Best Western hotel to get their car, leaving Jayson passed out in the bushes. Becky estimated it took her approximately ten minutes to walk back to the hotel. Becky said she drove back to Stateline Ave. Becky was able to drag Jayson out of the bushes and onto the sidewalk. Becky was crying and stated, 'I tried to get him in the car.' Becky said she slapped Jayson in the face to wake Jayson up. Becky said Jayson would not wake up. That was when officers arrived on scene."[61]

"I asked Officer Rider how he felt after getting hit. Officer Rider said he felt sick to his stomach and felt 'pressure' throughout his whole head. Officer Rider felt 'dizzy.' Officer Rider went to Barton Hospital to get checked out and learned that he had two fractures on the left side of his face. *The two fractures were his orbital (eye socket) and one zygomatic (cheek bone). Officer Rider was informed that he had a partial concussion as a result of Jayson's punch.* Initially, Jayson was not

---

[58]Page 3.
[59]Page 4.
[60]Page 5.
[61]Page 6.

Exhibit B
(Forensic Psychiatric Evaluation: Personal and Confidential)    Page 21 of 82
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 21 of 82

saying anything. Officer Rider then heard Jayson said he was going to, 'kill us,' and 'kill all of our kids.' Officer Rider said that Becky was standing next to Officer Rider trying to calm Jayson down. Jayson continued to scream....*I learned from Barton ER staff that Jayson had a blood alcohol content of .233%.*"[62]

8/30/2013: South Lake Tahoe Police Department Supplemental Report signed by Officer P. Williams: "*On 8-29-13, at about 2150 hrs., I heard Sgt. Laney advise over the radio that Officer Rider had been injured and was on his way to Barton Hospital. The suspect that had injured Officer Rider, A/Vinberg, was also enroute [sic] to the hospital via ambulance. I responded to Barton Hospital to meet the officers there.*"[63]

"*When I arrived at Barton Hospital I saw that Officer Rider and A/Vinderg were being treated in different rooms. I saw that A/Vinberg was actively resisting and attempting to lash out and strike the treating medical personnel and the officers that were trying to help him A/Vinberg was trying to strike with his hands, kick with his feet, and use his head to head butt those that were trying to help him. Officer Webber and Sergeants Laney and Reagan were assisting the medical personnel by trying to hold A/Vinberg down. The medics were trying to put soft restraints on A/Vinberg's legs without being kicked in the process. I held one of Vinberg's legs down to prevent him from kicking as the restraints were being applied.*"

9/1/2013: South Lake Tahoe Police Department Supplemental Report signed by Officer J. Adler:

"*Becky told me this was their first night in Tahoe. Jayson is an alcoholic but still thinks he is able to drink once in awhile. Prior to last night Jayson had been sober for two months. When Becky was driving Jayson home from the hospital in Reno, she said Jayson didn't remember leaving the sports bar they had been at or the incident involving Officer Rider. Prior to the officers arrival she and Jayson were going to shower and dress and then contact the Police Department to see if he needed to turn himself in.*

*During the incident Jayson had passed [out] resulting in paramedics being called. Jayson was loaded onto the gurney and was being moved from the sidewalk to the ambulance when he suddenly awoke and started 'freaking out' and 'flailing'. Everyone was holding Jayson down and got him restrained so he could be transported to the hospital. Becky followed the medics to the hospital in her vehicle.*

[62]Page 7.
[63]No Bates number assigned. Page 1.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) Page 22 of 82
Case 3:22-cv-00135-SLG Document 154-3 Filed 08/25/25 Page 22 of 82

*Becky arrived at Barton Hospital and was in the waiting room when one of the officers came out to speak with her. Becky said the officer told her that Jayson had started 'freaking out' again and he had 'head butted one guy' and punched another officer as well.*

*I asked Becky if she had seen Jayson punch the officer while at Stateline and she said she didn't see that. Becky only saw 8 or 10 people trying to restrain Jayson which included firefighters and officers. Becky was trying to get Jayson to calm down while one of the officers was trying to handcuff Jayson to the gurney 'so he couldn't hurt anybody'. I confirmed that the only thing Becky saw was everyone trying to restrain Jayson by holding his arms and legs. Becky never saw anyone throw any punches."[64]*

5/27/2017:    West Valley City, Utah Police Department Incident Report by Jeffrey Zzth [sic]: Jayson arrested at a Super 8 Hotel for: 1) theft by receiving stolen property (a Black Honda Civic); and 2) Unlawful possession of another person's identification documents (a Utah drivers license), which he said he picked up off the ground.[65]

*"While traveling to ADC Jayson openly spoke with me about a recent addiction he has developed with methamphetamine. Jayson stated that he has been out of his home and on the streets for the past few weeks. Jayson stated that his wife and kids still live in the residence listed on his driver license. Jayson was unable to provide me any information regarding the identity of the female who had been driving the vehicle. Jayson was booked into ADC without incident."[66]*

7/18/2017:    3rd District Court, Salt Lake County, State of Utah: In a plea bargain, Jayson pled guilty to Obtain/assist: Obtaining An Identifying Document of Another - Class A Misdemeanor.[67] He was sentenced to 365 days, with a 31 day credit for time served.[68]He was placed on probation with various conditions, including to abstain from all drugs and alcohol.[69]

5/6/2018:    *"On May 6, 2018, at approximately 1059 hours, I responded on a shoplifting investigation to the Walgreens at 4668 S Redwood Rd. Information stated that a male had stolen a box of syringes and ran from the store and then returned 10 minutes later to reclaim the ID he had left on the pharmacy counter. The male was*

[64]Pages 1-2.
[65]WVCPD 9020 - 9021; UTCOURTS 8960.
[66]WVCPD 9021.
[67]UTCOURTS 8964.
[68]UTCOURTS 8978.
[69]UTCOURTS 8967-8968.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential) **Page 23 of 82**
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 23 of 82

*now wandering the store wearing a black hoody, jeans, and a neon green hat. The name on the ID the male left behind was Jayson Vinberg.*

*I arrived at the above address and made contact with the store manager. As I spoke with her, a male matching the description provided by both dispatch and the manager approached the front doors. I confronted him placed him in custody before escorting him to the store break room. Backing officers arrived to assist with securing the male, who identified himself as Jayson Vinberg. Jayson refused to answer any questions about the theft. While speaking with him, it became apparent that Jayson was under the influence of something due to his slurred speech, unsteady gait and having trouble staying awake, however, he denied this fact, stating that he was merely tired. When questioned further he admitted to using narcotics in the past, but claimed to be clean and sober. A search incident to arrest revealed no narcotics or paraphernalia, nor any other merchandise. No cash, cards, nor any other means to make purchases were found on his person.*

*I made contact with the witness/employee, Hollie Link, and she explained that Jayson had approached her at the pharmacy desk and requested a box of 30 gauge needles. She in turn asked for his ID which he surrendered and she then grabbed the syringes. After studying the box and handing it back, Jayson appeared to think and then asked to see them again. When told no, he snatched the box off of the counter and walked away, leaving his ID with Hollie. He returned a short time later and demanded that they return his ID and when told no, began to wander the store.*

*Jayson was cited for retail theft (E10922545) and trespassed from the store. Officers remained on scene for a short while, as Jayson continued to loiter in the area after told to leave. All merchandise was recovered and returned."*[70]

3/3/2020:     Adam Colton, DO: KANA:[71] Outpatient Clinic Note: "*30 y/o M with history of polysubstance abuse presenting to re-establish care after being in Utah for the last several years. He just moved back to Kodiak for first time since high school and is staying with his mother currently. Wants to speak with someone in regards to KANA resources for job training and helping him get back on his feet now that he is back in town. Takes no medications. No allergies.*

*Is still currently married to his wife in Utah and has a child as well who live there. 'Had an opportunity to take a break from all of it, so I took it.' Declines to elaborate on the decision making with his personal life at this time. Wants to get a job and get things back together here in Kodiak.*

---

[70] UPD 8941-8942.
[71] Kodiak Area Native Association. Dr. Colton is a family practitioner.

Exhibit B
(Forensic Psychiatric Evaluation:   Personal and Confidential)   Page 24 of 82
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 24 of 82

*Longstanding issues with polysubstance abuse inclusive of cocaine and methamphetamine. Has issues with his living in Utah and went a bender over the last week on his way back to Kodiak. Stopped in Anchorage for 1 week and has been 'partying quite a bit' inclusive of regular use of meth (inclusive of IV use) and cocaine. Has hx of heroin long ago however did not like it.*

*Occasional ETOH user.*

*Has not been recently tested for STI but would be interested May be interested in speaking with BHS re: addiction resources. Denies depression or SI.*"

"*Assessment/Plan: 30 y/o male with polysubstance abuse presenting to establish care after recent move back to Kodiak.*"

"*1. Polysubstance abuse: Ongoing issues with polysubstance abuse in setting of recent separation from his wife and child. Encouraged patient to speak with BHS which he is willing.*"

"*2. IVDA (intravenous drug user). Encouraged cessation. Will speak with BHS when available. HIV and HCV screening performed today.*"[72]

3/16/2020:    Hope Rustemeyer: KANA: (Addiction Counselor): Behavior Health Assessment: "*Client reports mother having drug and alcohol addiction problems throughout his life....Client reports he was in Juvenile Detention for most of his high school years. He reports getting in trouble for breaking into Cost Savers and stealing alcohol and cigarettes. He also reports an MIP.*[73]  *In 2017 he was charged with false identification and stolen vehicle in Salt Lake City, Utah. The stolen vehicle charges were dropped. In Lake Tahoe, CA he was also charged with a felony assault....Client reports no domestic violence in the home but distinctly remembers after his parents separated and [sic] incident where his mother beating on the door at his father house and his father grabbing his mother, eventually taking the children in and mother was still beating on the door. He reports his own behavior was more extreme than his should have been, when things went bad he always made it worse. He stated he wasn't sure if it was depression or anger....Client was sentenced to a McLaughlin Youth Center at 15 years old. After McLaughlin he was sent to AK Baptist Family Center for close to a year, he is unsure if he completed or was sent home due to getting in trouble. He was a poor historian for this timeline. He went back to Kodiak and was expelled from high school and sent back to McLaughlin where he 'timed out'. He was released to transitional housing at 17 but was still in the Department of*

---

[72]NAVY-PLTF 86-87.
[73]Minor in possession.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential)   **Page 25 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 25 of 82

*Juvenile Justice. Client reports at this time starting a relationship with a female correctional officer 11 years his senior, they had started an emotional relationship while he was still in the detention center. They were married when he was 19 years old.* He reports at that time they stayed in Anchorage for a year, moved to Kodiak for a month and then to Salt Lake City and have been there since."

"He reports he was using meth straight out of McLaughlin, leaving for week long benders. His wife smoked marijuana and drank alcohol but no heavy drugs when they were first together. *He reports that his wife was physically abusive as well. <u>In Salt Lake City, client reports that every 6 months to a year he would go on benders and that he is a chronic cheater as well.</u>* He reports that his wife is now patient and relaxed with him after being admitted to the ER for being suicidal about five or 6 years ago, after she [sic] was placed on meds.[74]

*Roughly three to four years ago client reports leaving his home for about four to six months, he starting using needs [sic] <u>to inject methamphetamines</u> and was doing coke, living in a trap house and racked up about $50,000 in debt. He filed bankruptcy at that time.* He moved out of the family home about a year ago, he still talks to his wife daily. He did go to OP treatment at East End Family Treatment Center in Salt Lake City for about 3 months in 2019 and was clean during that time. He moved back to Kodiak, AK February, 2020. He had a week long layover in Anchorage and spent this time on a binge before getting to Kodiak, client reports last use of meth on March 1st, 2020. His goal is to get his life together, get sober and reunite with his family."

"He has a friend that he made in recovery in East End Recovery but they haven't been in contact much since he's been using drugs again."

"Client lost an apprenticeship job recently as a heavy equipment operator, he was especially disappointed because it was a union job. He say it was alcohol that and drugs that cause him to lose the job. He is currently awaiting a callback for a job here in Kodiak."

"Mental Health History and Current Status: Client reports he saw Dr. Jensen in Kodiak when he was in 7th and 8th grade. He reports hating it and that he had nothing in common and that he hated it. He was put on Concerta but it did not help so he stopped taking it. *Client shared that his wife was physically abusive early in the marriage.* He also was in outpatient residential for 3 months in 2019, he spoke of a counselor that he related to but didn't keep in regular contact once

---

[74]Becky Vinberg testified on page 41 that her violence towards Jayson from 2007-2014 stopped after she was admitted to LDS hospital for approximately one week and started seeing a therapist.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential)   Page 26 of 82
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 26 of 82

*he went back to drinking and drugs. He also attempted to go to KAMP here in Kodiak recently but did not enjoy it due to the religious aspect. Client was visibly distressed by inability to figure out timeline during assessment. No reported S/I or H/I."*

*"Drug and Alcohol History and Current Status: Client reports first trying alcohol, cigarettes, and marijuana when he was 12 years old. He drank did all three when he could steal it from his mother, marijuana was favored over alcohol. After being in McLaughlin and a group home in Anchorage he got out at 17 he started drinking alcohol and moved onto smoking crack cocaine and methamphetamines. Client said smoking meth was his immediate preferred high. Client reports every 6 months to a year he would leave his family and binge for up to a week smoking meth, he reports smoking at first and then injecting a gram and a half of meth daily when he binged. The longest binge lasted four to six months about a [sic] 4 years ago, he started using needles to inject meth and cocaine on this binge. He also racked up $50,000 in debt and had to file bankruptcy during that binge. This pattern continued until a year ago when he went to outpatient in Salt Lake City. He was clean for about three months and then started using drugs again. Client last used meth on his way to Kodiak from Salt Lake, he had a four day layover in Anchorage and binged on meth and cocaine, has been clean since March 1st, 2020."*

*"The client experiences functional impairment in the relational and vocational realms. The client's use of chemicals has caused repeated relationship struggles and an inability to manage employment at times."*

*"SUD Assessment: Client has a long history of binging on methamphetamines and cocaine. His addiction has disrupted his family life many times in the last 12 years, leaving every 6 months to a year for about a week to smoke and or inject cocaine or meth. Four years ago he went on his longest binge, four to six months long where he started injecting meth an cocaine, the binge led to filing bankruptcy. <u>Client moved out of his home about a year ago but speaks to his wife daily in hopes of reunification of the family</u>. He was in outpatient for three months in 2019 but only stayed clean for the three months he was engaged. He moved from Salt Lake City to Kodiak in early March, 2020. He is highly motivated to have a fresh start and have his family visit this summer."*

Clinical Impression:
**1. Stimulant Use Disorder, Severe.**

Recommendations: Intensive Outpatient Treatment.[75]

---

[75]NAVY-PLTF 93-98.

4/6/2020:        Hope Rustemeyer: (Phone): *"Client stated he had been using methamphetamines for the last week, having stopped 4/4/2020. Client also reported he did not sleep during this time and that he was close to losing his job."*[76]

4/8/2020:        Hope Rustemeyer: (Phone): *"Client was reporting that he needed a 'psych eval', when asked to elaborate client stated the voice he hears were telling him he needed to quit his job and get a psychiatric evaluation. I made sure the client was not a threat to himself or others and asked if it would be ok if I made a phone call for a medical appointment for same day, client agreed. I made a same day with Dr. Colton. I told the client if the voice were threatening in anyway, to himself or others to go to the emergency room.*

*Client stated he had been hearing the voices for about three months. He stated he is struggling to drown them out now, that he had come to Kodiak to get away from the voices but they had followed him from Utah. He did not report them as being threatening, only telling him to get a psychiatric evaluation and to quit his job. Client reported never having been on antipsychotic medication before. Client reports no drug use still since 4/4/2020 at this time."*[77]

4/8/2020:        Adam Colton, DO: Outpatient Clinic Note: *"History: 30 y/o male with polysubstance abuse presenting for complaints of 3 months of auditory hallucinations that he believes have been there since before he started using drugs frequently. Was previously living in Utah at a time of when they [sic] symptoms started and has been consistently using illicit drugs since moving back to Alaska over a month ago. These voices are familiar and recognizes them as the voices of his friends and family that are telling him to do certain things in his life such as 'go to rehab', 'get a divorce' etc. There is no threatening nature of these voices and denies any suicidal or homicidal ideations. Understand these voices are not real and wants to get them to go away.*

*Has been binging on meth since moving back to Kodiak 1 month ago and just got off a week of being awake most of the time and last meth use was on Saturday. Feeling quite irritable with mild withdrawal symptoms still and is hoping to get something that may help with sleep. Doesn't feel voices have gotten any worse with meth usage. Was seen by Hope at Carolyn Street recently but aside from that did not receive any treatment for mental health in the past. No family history of schizophrenia."*

---

[76]NAVY-PLTF 105.
[77]NAVY-PLTF 105.

Diagnosis:
1. **Auditory hallucinations.**
2. **Methamphetamine abuse.**

"*1. Unclear if patient showing signs of schizophrenia as concurrent polysubstance abuse likely etiology.*

*2. Educated patient of the likelihood of symptoms being caused or at least worsened by his meth use. He verbalizes understanding of this but disagrees it has changed anything. Open to starting medication.*

*3. Plans to continue outpatient therapy at Carolyn Street.*

*4. EKG today with QTc 405ms with NSR at 63bpm. ok for antipsychotic trial.*

*5. 1 week trial of low dose Zyprexa 5mg at bedtime. Follow-up in 1 week to discuss medications and ongoing sobriety.*"[78]

4/9/2020:          Providence Kodiak Island Medical Center Emergency Department:

Rebecca Echols, RN: Triage Notes: "***Patient states having thoughts of harming himself for about 'few months'.*** *Denies thoughts of harming others. States having past inpatient stay 'years ago'. States not having a plan, 'but if I have to have one I guess it would be a needle.' States has not had any ETOH in a 'few days'.*"

Christine Foster, Mental Health Specialist: "*SYMPTOMS RELATED TO COMPLAINT: anxiety depression substance abuse related.*

*PRESENTING RISK: not present moderate.* ***Patient stated hearing voices telling him to get a Covid-19 test so used statement of suicidal tendencies to get into the hospital for testing.***

*PRESENTING PROBLEM (Nature of Crisis): Patient stated voices told him to come to the ER to get tested for Covid-19 and said he used the term 'suicidal tendencies' to get admitted and tested.* ***Patient states he has felt suicidal when using Meth or drinking but reported last use of Meth Saturday or Sunday without recent thoughts of suicide.*** *Patient reports having auditory hallucinations telling him to 'get a divorce', 'get tested for Covid-19' or 'go get help'. Patient raised in Kodiak but has been away for 10 years and only returned this last month and staying with his mother. He has been living in Utah with his wife and two young sons and feels bad he hasn't been a better father and husband. He feels he should*

─────────────
[78]NAVY-PLTF 83-84.

be leaning on his wife but isn't. He reports Meth use intermittently quitting and starting sporadically. Patient is seeing a substance abuse counselor at KANA's Carolyn St location and has a regular appointment scheduled weekly, as well as a scheduled Psychological evaluation within the next week or so. He is also scheduled to start an addiction program within the next month, an intensive outpatient program twice a week'. He reported the voices he hears have been steadily getting worse over the last several months and make him very angry. He feels he needs anger management and a psych evaluation. He states having only heard voices one other time in his life but cant remember exactly when. Patient states the voices are very annoying and constantly 'making noise all the time, no matter where I live' although they don't ever tell him to do bad things. Patient doesn't state recognizing or noticing any correlation between drug/alcohol use and hearing voices. Patient contracted for safety and listed several people who can support him including his counselor, Hope, and several members of his addiction support group.

ASSESSMENT (Recipient's mental, emotional & behavioral status/functioning in relation to crisis. Include multiaxial diagnosis/mental Status exam (following if appropriate) & service/treatment recommendations):

Patient was assessed using C-SSRS scale and contracted for safety. Patient also assessed for level of support stating he has family here but will mainly seek support from his counselor and staff. He lives with his mother right now and has set into motion several support factors including a mental health assessment and treatment for substance use. His mother was brought into the hospital this morning with a broken arm so will be staying at the hospital which allows him to have the house to his self. Client was reserved but made eye contact and was cooperative and oriented. He showed insight concerning his need for help with the auditory hallucinations and substance use. **Patient has struggled with addiction and meth use since he was 18 years old, stopping and starting over the years** and although he doesn't know exactly why he came back to Kodiak, he thinks its because he needed help."[79]

Stephen Burnside, M.D.: "*Jayson J. Vinberg is a 30 y.o. male who presents for suicidal ideation. His initial complaint was either obtaining a COVID-19 test or 'suicidal tendencies.' He states he is hearing voices*. He states he has been hearing voices 'all the time', which he finds very bothersome. He has history of the same, years ago. He is not on any medications. He was unsure of diagnosis. Voices were telling him to come and get tested for COVID, get a divorce and seek treatment. **He has thoughts of hurting himself. If he would do it he would do it with a 'needle',**

---

[79]NAVY-PLTF 126.

Exhibit B
(Forensic Psychiatric Evaluation:   Personal and Confidential) Page 30 of 82
Case 3:22-cv-00135-SLG      Document 154-3      Filed 08/25/25      Page 30 of 82

*implying an overdose of methamphetamines. Does not have narcotics. Denies any recent attempts or overdose. States he does not currently want to die.*

*He admits to using amphetamines for a weeks time and then would stop. <u>Last used Saturday, 4 to 5 days ago.</u> He has also been drinking he describes as moderately, was his last but [sic] 3-5 beers 2-3 times a week; last used 3 to 4 days ago.*

*Denies COVID-19 symptoms including fever chills cough shortness of breath recent travel. He had been living in Utah but returned to Kodiak 1 month ago. He left his wife and 2 sons in Utah. He states his wife is upset with him. He thinks he might regret if he were to divorce her. He states he was 'screwing up,' in Utah, intermittently working. Upon return to Kodiak he had a job for 2 weeks working for North Pacific fuel but then quit. He states he quit because he was 'using'. States he is not sure Kodiak is going to work out well for him."*

**Columbia Suicide Severity Rating Scale (C-SSRS):**

1. In the past month, have you wished you were dead or wished you could go to sleep and not wake up?: **Yes.**

2. In the past month, have you actually had any thoughts of killing yourself?: **Yes.**

3. Have you been thinking about how you might kill yourself?: **Yes**

4. Have you had these thoughts and had some intention of acting on them?: **Yes.**

5. Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?: No.

6. Have you EVER done anything, started to do anything, or prepared to do anything to end your life?: No.[80]

**Urine toxicology positive for cannabinoids.[81]**

Blood alcohol level < 5 ng/dl.

---

[80]NAVY-PLTF 118.
[81]NAVY-PLTF 110.

Assessment:
1. Auditory hallucinations.
2. Methamphetamine use.

"*Plan: Patient was evaluated by myself and mental health. **Neither of us feel he is imminent risk for self-harm. His auditory hallucinations/psychosis likely secondary to recent methamphetamine use.** He contracts for safety. He has follow-up for mental health evaluation and treatment scheduled to KANA. He is provided prescription for Risperdal to help suppress hopefully his auditory hallucinations. Reviewed this is for temporary use only. Counseled regarding effects of methamphetamines and to forego any major decisions, such as divorced [sic] until has a completed treatment.*"[82]

4/13/2020:    Adam Colton, DO: Outpatient Clinic Note: "*History: 30 y/o male with polysubstance abuse previously evaluated 5 days ago for auditory hallucinations presenting for ER followup after being seen at ER 4 days ago after having worsening auditory hallucinations and feeling out of sorts. He never picked up the zyprexa prescription.*

*Has seen in PKIMC ER for auditory hallucinations, had normal lab workup and apparently was having suicidal ideations but then left without further evaluation. **Today patient denies reported suicidal ideations and that he went to ER because 'I don't really know, I wasn't feeling right'.** At that time he was prescribed Risperdal and patient went to pharmacy and was denied pickup due to having two concurrent antipsychotic prescriptions.*

***Still continues to complain of not sleeping well and is concerned he needs repeat lab testing because he was sharing needles about 1 week ago when shooting up Meth. Denies using meth since then and is feeling quite irritable.***

*Open to following up at Carolyn Street for addiction therapy. Unsure if continuing to live in Kodiak is gonna work out for him. His wife back in Utah thinks he should go on the medications. Understands that meth use may be worsening his symptoms of hallucinations. **Currently denies SI/HI.** Interested in starting the medications today.*

*Currently living with his mother which is safe, however he does not know how long that's gonna last.*"

---

[82] NAVY-PLTF 107-139.

**Exhibit B**
(Forensic Psychiatric Evaluation:  Personal and Confidential)  **Page 32 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 32 of 82

Diagnosis:
1. Auditory hallucinations.
2. IVDU (intravenous drug user)

*"Plan to start trial of Zyprexa tonight and will have followup appointment with me in 1 week. If he desires may refer to Dr. Ni psychiatry in the coming weeks after medication initiation.*

*Has phone appointment with Hope at Carolyn Street today at noon and then with James on Wednesday*

*Encouraged cessation of illicit substances."*[83]

4/13/2020:   Hope Rustemeyer: (Phone): *"Client reported at that time he had not taken any medication because he had not picked it up at the pharmacy and was waiting for a new prescription. He reported he had gone to the ER the following week because the voices had told him he needed to get checked for COVID-19. **The ER report states suicidal thoughts but client reported this not being the case, he only wanted to get tested.**"*[84]

4/20/2020:   Adam Colton, DO: Outpatient Clinic Note: History: *"30 y/o male with polysubstance abuse who has been reporting auditory hallucinations for last several months presenting for f/u reporting that he tried the Zyprexa which made him feel sluggish and loopy. Does not feel it really helped his sleep all that much but maybe has helped with the voices slightly. Not sure about continuing this medications [sic]. Requesting Trazodone to help him with sleep as he has used this in the past. Believes insomnia is likely the main issue right now.*

***Continued to use meth daily and has no plans on stopping.*** *Has been following up with Carolyn Street but does not see much of the point of this anymore as he does not plan on quitting - feels he is wasting everyone's time.*

*Still unsure about whether he is going to stay in Kodiak and reports he 'needs to figure some things out'. Not interested in seeing psychiatrist at this time.*

*30 y/o M with polysubstance abuse presenting for f/u on auditory hallucinations and insomnia with **ongoing daily use of methamphetamine.***

*No significant improvement with use of low dose Zyprexa. although does help with the voices patient does not like side effect profile and prefers to d/c.*

---

[83]NAVY-PLTF 81-82.
[84]Jayson 105.

*Reasonable to try trazodone for insomnia as this has helped in the past, however I advised that unlikely for insomnia to improve with still regularly use methamphetamines. Until he cuts down/quits his sleep patterns is always going to be severely disrupted and sleep aides unlikely to be affective. Patient understood this but plans to continue using. Will give short course of Trazodone.*

*Declined referral to Psych.*

*Encouraged to continued to f/u with Carolyn Street [clinic]."*[85]

4/20/2020:     Hope Rustemeyer: (Phone): **"Client requested to cut all contact at this time, he had left the Salvation Army and <u>was actively using meth again</u>.** He stated at this point the voices were no [sic] bothering him. I asked if I could keep calling for a bit to check in on him, client agreed to it."[86]

4/22/2020:     Hope Rustemeyer (Phone): **"The client was asked how ready he was to make a change regarding his drug use and he stated that he goes in and out of using and that he is not very motivated to receive any help at this time.** He validated what his counselor had stated in that he is vacillating between asking for and then turning down help. When asked what had changed from the previous week when he was said he had changed his mind about seeking help he stated 'Honestly, I don't know that anything has changed'. The client stated that the voices he has been reporting are not distressing to him, he denied delusions. He was seeking detox from meth and was informed that there are no inpatient detox options for meth but that KANA medical can help him with comfort meds, he inquired about residential and was informed that due to COVID-19 precautions they were not processing intakes at this time. He was offered the support of IOP[87] groups, he declined stating that he really just wanted to be able to leave, acknowledging that he was looking for a TX[88] option that would get him off the island. The client denied SI/HI or any intent of harm to self or others. He was validated for being able to access services (he has recently been in the ER, admitted to SA[89] transitional housing but decided not to stay, and he is able to set and keep appointments. **He was encouraged to call should his motivation change.***

**Plan: The client was directed back to his PCP and counselor, no follow up was made as he is not seeking available services at this time."**[90]

---

[85]NAVY-PLTF 79-80.
[86]NAVY-PLTF 105.
[87]Intensive outpatient program.
[88]Therapy.
[89]Substance abuse.
[90]NAVY-PLTF 104.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential)   **Page 34 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 34 of 82

4/22/2020:    Hope Rustemeyer (Phone): *"Client stated Friday 4/24 he would like to start IOP."*[91]

5/11/2020:    Hope Rustemeyer (Phone): *"He reported he is still hearing voices but it had been about 4 days since his last use, besides marijuana. Client stated he is no longer interested in detox or residential. I will try to keep contact by checking in weekly but client is unsure if he would like to remain in KANA services."*[92]

5/22/2020:    Adam Colton, DO: Outpatient Clinic Note: *"History 30 y/o M with polysubstance abuse with auditory hallucinations for last several months presenting for f/u insomnia and request for refill of Trazodone. Stopped using Zyprexa last month and has not continued it. Trazodone has been very helpful when he needs to get some sleep. Does not use it every night but would like longer script if possible. Overall feels much better and hopeful.*

*Living with his mother and planning on moving into transitional housing soon. Still continues to hear voices but doesn't mind them much and prefers to not be on medications for it. Continues to use meth regularly but not as frequently as previously.*

*Plans to f/u with Hope at Carolyn Street next week.*

*Still unsure about whether he is going to stay in Kodiak and reports he 'needs to figure some things out'.*

*Not interested in seeing psychiatrist at this time."*

Diagnoses:
1. Auditory hallucinations.
2. Insomnia.
3. Methamphetamine abuse.

*"30 y/o male presenting for f/u on insomnia improved with Trazodone. Refill provided.*

*Still with regularly auditory hallucinations. Unclear whether underlying schizophrenic tendencies or whether this continues to be result of ongoing methamphetamine abuse. Declines further treatment for hallucinations or further BHS care at present."*[93]

---

[91]NAVY-PLTF 104.
[92]NAVY-PLTF 104.
[93]NAVY-PLTF 77-78.

Exhibit B
(Forensic Psychiatric Evaluation:  Personal and Confidential)  Page 35 of 82
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 35 of 82

→6/13/2020:       **Shooting Incident.**

Var. dates:       "*1. On various dates, Reporting Agent (RA) and Participant Agent(PA) SSA Jeff
                  PETERSON, made attempts to interview Donna VINBERG (D.VINBERG),
                  who is the **biological mother** of V/VINBERG, regarding her knowledge of the
                  circumstances surrounding the death of her son. **The investigation revealed
                  D.VINBERG might have been the last person to see V/VINBERG alive.**"*

                  "*3. On 24Jun20, RA contacted D.VINBERG, whom related that she
                  currently did not have the time for an interview as she was on her way to the
                  airport and was flying out to Anchorage, Alaska. D.VINBERG advised she
                  would be returning to Kodiak around 1900, 25Jun20. D.VINBERG related she
                  would contact RA upon her return.*"

                  "*4. On 26Jun20, after D.VINBERG did not call RA on 25Jun20, RA
                  telephonically contacted D.VINBERG in attempts to set up an interview. **After
                  RA verbally identified himself, D.VINBERG immediately said, 'Mom said I do
                  not need to speak with you and that is where I want to leave it.' RA made a
                  comment about writing her response in the case notes, at which time
                  D.VINBERG said, 'Not on my time, unless you have answers for me, which I
                  have a lot of' and D.VINBERG disconnected the call.*"*

                  "***5. On 27Jun20, PA telephonically contacted D.VINBERG to confirm that
                  she did not want to speak with NCIS, to which D.VINBERG said, 'No.'***"

                  "*6. On 08Jul20, RA received a telephone call from D.VINBERG, who said
                  she was trying to figure out who the owner of a telephone number was on her
                  phone, as she did not recognize the number.  RA verbally identified himself.
                  The short call ended when D.VINBERG hung up the phone. D.VINBERG
                  never asked or made any comments about captioned investigation.*"[94]

6/16/2020:        **Autopsy Report: Final Diagnoses:**
                  I.  Multiple Gunshot Wounds of Trunk and Extremities, Indeterminate-Range.
                      A.  Abraded and minimally abraded, non-blackened gunshot wounds of
                          trunk and arms.
                      B.  Perforations of heart, pericardial sac, left lung, small intestine and
                          mesentery.
                      C.  Blood clots of pericardial sac and left hemothorax, 500 mL, residual.
                      D.  Mild pallor of viscera.
                      E.  Exit wounds of trunk and arms.
                      F.  Bullet recovery of trunk.

---

[94]NAVY 4845.

**Exhibit B**
(Forensic Psychiatric Evaluation:  Personal and Confidential) **Page 36 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 36 of 82

## II. Postmortem Toxicological Examination:

A. Postmortem pericardial blood ethanol concentration 0.111 g/100 mL.
B. Postmortem pericardial blood 11-Hydroxy Delta-9 THC concentration 1.5 ng/mL and Delta-9 Carboxy THC 16 ng/mL and Delta-9 THC 23 ng/mL.
C. Presumptive presence of cannabinoids in postmortem urine.

## III. Mild fatty streaks of coronary arteries and aorta.

**Cause of Death:** Hemopericardium and hemothorax due to: gunshot wounds of trunk and arms with multiple skeletal and viscera injuries.[95]

→6/19/2020:    **Interview of SB1[96] Bradley Udell (Officer of the Day/Duty Watchstander):[97]**

"*3. UDELL related at an unknown time around 2100 - 2200, 13Jun20 he was sitting at his desk, which is located on the second deck of the Headquarters Building N-71, NSW Detachment, when he heard a banging on the exterior second deck staircase door. UDELL further related he walked over and opened the door and observed an unknown male, later identified and will be documented as V/VINBERG, and asked, Who are you?* **How did you get on the compound? To which, V/VINBERG responded 'I snuck on.'** *UDELL also related V/VINBERG was not authorized to be on the installation. UDELL instructed V/VINBERG to go down to the front door. UDELL added the second deck staircase door cannot be accessed from the outside.*"

"*4. UDELL advised upon closing the door he texted a message to a group NSW thread saying there was an unknown person on the compound. Included in this group thread is SOC Troy BUTTON, USN; SO1 Zachary CASTONGUAY, USN; SO1 Jonathan COX, USN; SO1 Luke BROWN, USN; SBC Daniel BRONNER, USN; IT1 Avery STORM, USN; HM2 Joseph BIRKMEYER, USN; Dane OLSON, USN; Benjamin OLDS, USN; SO1 Jeffrey WELCH, USN. UDELL related he next walked downstairs towards the main entrance to the Headquarters building where he observed V/VINBERG through the glass window pacing around yelling 'Come On.' UDELL recalled at one point in time the second floor work phone rang, at which time UDELL answered the phone and spoke to BUTTON. UDELL related BUTTON asked who the person was and what does he want, to which UDELL responded he*"

---

[95]NAVY-PLTF 5768.
[96]Special Warfare Board Operator First Class.
[97]NAVY 4723-4726. Mr. Udell is a Special Boat Operator Petty Officer First Class (NAVY 4782).

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential) **Page 37 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 37 of 82

did not know. According to UDELL, BUTTON replied that he was on his
way to the base. UDELL could not recall the time, but after hanging up the
phone with BUTTON he walked back downstairs, looked out the window and
saw V/VINBERG standing in front of the window, at which UDELL waved
his arm at V/VINBERG and verbally told him to leave. UDELL added he
observed V/VINBERG putting his hands in his front jacket pockets and
removing two knives wherein V/VINBERG started tapping the knives on the
glass window located next to the main entry/exit way, while V/VINBERG
continued to say 'Come On.' UDELL related while observing V/VINBERG
wielding two knives he felt in fear for his life. UDELL added during the
incident, V/VINBERG displayed the knives and replaced them in his front
jacket pockets on at least three occasions, continued pacing around and
wanted UDELL to come outside."

"5. UDELL recalled V/VINBERG continue to pace around, while walking further
away from the main entry/exit way of the HQ building and towards the road
that leads to the main gate. UDELL further recalled V/VINBERG being near
the Kodiak Detachment sign, when UDELL exits the doors to the HQ
Building to maintain visual of V/VINBERG; wherein UDELL was able to
stand on the front terrace to continue watching V/VINBERG. UDELL further
added V/VINBERG must have heard the first door of the building close, as
UDELL never said anything, at which time V/VINBERG turned around and
saw UDELL and started to walk towards him. UDELL said at this time he
verbally directed V/VINBERG to leave, to which V/VINBERG did not comply
and continued to walk towards UDELL. UDELL advised he placed his left
hand up in a stopping motion and verbally again told V/VINBERG to stop;
however, V/VINBERG again did not comply and continued to approach UDELL
while verbally saying 'Or What.' UDELL related he verbally told V/VINBERG
to stop at least 2 or 3 times, wherein V/VINBERG would not comply, continue to
walk towards UDELL saying 'Or what.'"

"6. UDELL advised at one point in time he removed his .380 personally owned
and registered pistol, from the holster on his right hip, which UDELL had
chambered a round while upstairs after the first contact with V/VINBERG, as
UDELL normally does not carry his weapon with a round in the chamber.
UDELL further advised he originally was presenting the weapon at the low
ready then pointed the weapon at V/VINBERG, as UDELL wanted V/VINBERG
to stop walking towards him. UDELL recalled V/VINBERG's hands were
outside of his pockets when UDELL presented his pistol and told V/VINBERG
to 'stop coming towards me,' and 'don't come any closer,' to which V/VINBERG
did not comply, continued advancing and saying 'Or What.' UDELL added at
one point he observed V/VINBERG's right hand in his front jacket pocket,
where UDELL knew a knife was located and even observed the knife in the

Exhibit B
(Forensic Psychiatric Evaluation: Personal and Confidential) Page 38 of 82
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 38 of 82

pocket. UDELL added V/VINBERG removed his hand from his pocket and continued moving towards UDELL until V/VINBERG was about 6 feet away. UDELL related the event felt like one fluid motion. According to UDELL, he continued to tell V/VINBERG not to come any closer. UDELL further related at this point in time, due to V/VINBERG having knives in his possession, UDELL feared for his life and while trying to stay alive defended himself by using deadly force and shooting V/VINBERG. **UDELL also related he fired all seven rounds that were loaded into his pistol after he observed V/VINBERG's hands reaching into his jacket pocket.**"

"7. UDELL recalled V/VINBERG falling to the ground near the flag pole with his head pointing in the direction of the water, which is located in front of the HQ Building. UDELL further recalled realizing what just happened, sets his pistol down on the grass near the vestibule, and approaches V/VINBERG whom he believed was positioned face down or on his side and placed V/VINBERG's hands behind his back and **removed two knives from V/VINBERGS [sic] jacket pockets and tossed them near the HQ Building.** UDELL later recovered and holstered his pistol."

"8. UDELL advised BUTTON arrived at the same time that the incident was occurring and asked UDELL what happened, wherein UDELL responded 'He came at me with a knife.' UDELL further advised upon realizing V/VINBERG was no longer a threat, he walked into the HQ Building, prior to BUTTON instructing UDELL to start CPR on V/VINBERG, to which UDELL checked and felt a weak pulse. UDELL advised V/VINBERG did not move or say anything while CPR was being performed. UDELL further advised at one point BRONNER arrived and possibly took over CPR from UDELL. UDELL believes he walked back into the HQ Building and walked around completely stressed out, while BUTTON was on the phone. UDELL walked back outside and again took over administering CPR to V/VINBERG."

"11. UDELL advised the knives that V/VINBERG possessed appeared to be kitchen knives. UDELL also related he did not sustain any physical injuries during the incident. UDELL further related based on authorization from VIRGIN and the Coast Guard Land Property Instruction he was authorized to carry his personally owned weapon while standing duty. UDELL also related during the incident he was dressed in blue jeans and a blue sweatshirt. UDELL recalled V/VINBERG was wearing a black hat, a black Grunden Jacket. UDELL was not sure how V/VINBERG gained access to the NSW Base and was positive that at no time did he open the gate and grant V/VINBERG access, which means V/VINBERG was on base illegally. UDELL identified there are no specific Rules of Engagement outside of the right to self-defend as a normal Navy Watch stander. UDELL could not

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential) **Page 39 of 82**
Case 3:22-cv-00135-SLG      Document 154-3      Filed 08/25/25      Page 39 of 82

*recall hearing about people illegally gaining access to the NSW since his
posting. UDELL related prior to the incident and while conducting base
security checks he did not observe V/VINBERG on the base. UDELL
believed BUTTON was responsible for calling 911. 12. UDELL related on
the Monday following the incident, ITl STORM showed the surveillance
video to UDELL. UDELL was confident that he did not take any
photographs or videos of the incident nor did he witness any other NSW
member taking photographs. UDELL reported he has never been involved in
an incident like this in the past. UDELL advised at the time of the incident
the sky was still light, it was not raining and had a visual of V/VINBERG.
**UDELL further advised he was worried V/VINBERG would attack and kill
him with the knives.** UDELL also advised he did not possess any additional
weapons, vice [sic] a box cutter knife, on his person. UDELL further related
he did not remove anything from the scene after the incident. 13. UDELL
knew the first round that he fired hit as V/VINBERG's body jolted, but did
not look like it affected him, at which point in time UDELL fired the rest of
his rounds, which caused V/VINBERG to stumble backwards. UDELL
related that he did not retreat back into the building as he was worried about
fellow NSW members arriving and did not want them to be ambushed by
V/VINBERG. Additionally, UDELL advised retreating back into the building
is not part of Watch Stander orders to protect US Government property."[98]*

6/20/2020:  Interview of Anthony Furio (Jayson's biological father):

*"3. FURIO related V/VINBERG had left Kodiak circa 2005 timeframe for
Anchorage where he met his wife and later moved to Utah. FURIO related
V/VINBERG's wife and children currently reside at 1064 Woodmoor Dr
Bountiful, UT (801) 633-2275. FURIO further related V/VINBERG moved
back to reconnect with Alaska, as V/VINBERG still considered Kodiak home.
**FURIO advised V/VINBERG was in the process of trying to find a job and
wanted to move his family to Kodiak. FURIO further related V/VINBERG would
speak with his wife 2 or 3 times a day.** FURIO knew in early March 2020,
V/VINBERG worked at the Petro Fuel Docks for 3 or 4 weeks prior to
quitting. FURIO said V/VINBERG moved back to Kodiak just before the
COVID19 outbreak and was living with his mom."*

*"4. FURIO advised the last time he saw V/VINBERG was at the end of May,
maybe 7-10 days prior to the incident."*

*"FURIO did report V/VINBERG had a drug and alcohol problem and was
seeing a sobriety coach at KANA Native Health Clinic. FURIO said*

---

[98]NAVY 4723-4726.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 40 of 82**
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 40 of 82

*V/VINBERG was respectful, not an aggressive person and even bought his kindergarten teacher a bouquet of flowers. FURIO never saw or heard of V/VINBERG wanting to hurt anyone or himself. FURIO never knew of V/VINBERG carry weapons."*

*"6. FURIO believed the last time he spoke to V/VINBERG was 4-8 days prior to the incident and had not seen him during the quarantine. FURIO did not know why V/VINBERG was on the NSW Base."*

*"7. According to FURIO, V/VINBERG spoke to his wife on the day of the incident. FURIO was unaware of any issues between V/VINBERG and Law Enforcement except for one occasion in Tahoe, CA; wherein V/VINBERG drank like three pitchers of beer, passed out prior to being woke by Law Enforcement and a scuffle ensued resulting in V/VINBERG being restrained."[99]*

6/21/2020:     Interview of Richard Borton (Petro Star North Pacific Fuel employer):

*"3. BORTON related while working for North Pacific Fuel V/VINBERG was always early for work every day. BORTON added towards the end of V/VINBERG's employment with North Pacific Fuel BORTON saw V/VINBERG becoming more reserved and was not as talkative; however, continued to do his job. BORTON added something was not right. BORTON also recalled about four or five days before V/VINBERG resigned BORTON and V/VINBERG were speaking and V/VINBERG made a comment that he was in a bad spot and needed to figure life out, to which BORTON told V/VINBERG to get himself into KANA Medical Facility and see a counselor. BORTON added, V/VINBERG said he was hanging with the wrong crowd. According to BORTON, V/VINBERG said he was going to try and get into KANA, but BORTON did not know if V/VINBERG ever started to see a counselor. BORTON further added, V/VINBERG was not sure if he was going to stay in Kodiak or go back to UTAH."*

*"4. BORTON believed V/VINBERG was involved with drugs, as BORTON had asked v/VINBERG if he would pass a urinalysis screening, to which V/VINBERG replied, no he would not pass. BORTON added at this time BORTON did not see any red flags that led him to believe V/VINBERG was under the influence of drugs or alcohol at that time so he did not remove him from his job. BORTON added it was only a couple days later when V/VINBERG resigned."[100]*

---

[99] NAVY 4757-5758.
[100] NAVY 4770.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential) **Page 41 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 41 of 82

6/19/2020:   Interview of Zachary Castonguay, USN: **"*CASTONGUAY stated people come to the detachment to either conduct business or pick a fight, saying Navy Seals have a persona and sometimes tough guys want to challenge them. SOI CASTONGUAY relayed that they have also had drunk individuals at the front gate previously. When asked about policy in regards to threats, SOI CASTONGUAY stated the policy is 'escalation of force' and intruders are asked to leave."*[101]**

6/22/2020:   Interview of LS2 Gerald Schleinz, USN: "*3. SCHLEINZ related since the incident, UDELL appears more stressed out, but still completes his daily work. SCHLEINZ described UDELL as quiet, confident but humble, very loyal and a good person who you can count on to have your back. SCHLEINZ had never observed UDELL become angry or aggressive nor has he ever heard UDELL to get into trouble.*"[102]

6/22/2020:   Interview of CWO Stacey Virgin, USN:

"*9. VIRGIN reported since he has been assigned to NSW Detachment Kodiak he has not had any previous incidents wherein an unknown person has illegally gained access to the base. VIRGIN explained the perimeter is secured with an approximate 10 foot wire fencing topped with three strands of barbed wire, water and cliffs with steep jagged rocks.*

*VIRGIN advised the perimeter security fence contains signs stating no trespassing or authorized personnel only.*

"*11. VIRGIN said the official way to enter the NSW Detachment is to either have a pass code assigned or push the call button located at the front gate, at which time an NSW Detachment member will hear the ring at one of the various locations within the Headquarters Building and grant the guest access. VIRGIN added this would absolutely include the after hours duty watch stander. VIRGIN added with that being said, if the visitor buzzer never sounds, that means the individual illegally gained access to the base.* "[104]

---

[101]NAVY 4870.
[102]NAVY 4772.
[103]NAVY 4777.
[104]NAVY 4778.

(Forensic Psychiatric Evaluation:   Personal and Confidential)

6/22/2020:      Interview of Stephen Lenhert (Civilian): "*3. LENHERT described UDELL as very squared away and one of the best Special Boat Detachment guys that has ever been assigned to NSW Detachment Kodiak, since 1999 when LENHERT was assigned to the Detachment. LENHERT added UDELL is motivated, has good initiative and always willing to help other members when needed.* **LENHERT further added over the year of knowing UDELL, he is always calm, cool and collected and has never observed him get hot headed or angry.** *LENHERT also has never heard of UDELL getting into trouble.*"[105]

6/23/2020:      Interview of Carolyn Merrigan: (Jayson's aunt):

"*2. MERRIGAN described V/VINBERG as a good kid. MERRIGAN added over the past four or five days V/VINBERG had been helping his Aunt Sandy VINBERG, CIV paint her houses wooden deck. MERRIGAN said throughout the day of the incident, V/VINBERG was at Sandy VINBERG's residence painting and appeared to be in good spirits, wherein he even spoke telephonically to his family, whom were currently in Utah.* **MERRIGAN added she was also present at Sandy VINBERG's[106] residence on the <u>day of the incident</u> with V/VINBERG.** *MERRIGAN added V/VINBERG was laughing and joking around throughout the day and everything appeared fine. MERRIGAN further added V/VINBERG is a Jack of All Trades. MERRIGAN further added V/VINBERG ate Salmon, rice, barbeque ribs and corn during the day. MERRIGAN only recalled V/VINBERG drinking water and not consuming any alcoholic beverages.*"

"**3. MERRIGAN related on 13Jun20, V/VINBERG finished for the day and around 1930, 13Jun20, MERRIGAN drove V/VINBERG back to Donna VINBERG's, CIV, (907) 512-6330, V/VINBERG's mother, residence,** *which is where V/VINBERG was currently living. MERRIGAN did not know what V/VINBERG's plans were for the rest of the evening.*"

"*4. MERRIGAN believed V/VINBERG returned to Kodiak, Alaska in January or February of 2020 wherein she would see him once in a while. MERRIGAN was aware V/VINBERG did have a job at one point in time at the fuel docks and for an unknown reason quit.* **MERRIGAN recalled V/VINBERG making a comment about missing his family and wanted to bring them to Kodiak for a visit.** *MERRIGAN was not aware of any issues V/VINBERG's family might be experiencing. MERRIGAN also did not have any knowledge of who V/VINBERG's friends were, as he never brought any around the house.*"

---

[105]NAVY 4780.
[106]Jayson's aunt.

"*5. MERRIGAN does not recall ever hearing V/VINBERG make any comments about suicide or wanting to physically hurt another person.*"

"*6. MERRIGAN advised V/VINBERG had intentions of returning to Sandy VINBERG's residence at 0900, 14Jun20 wherein he would continue working on painting the porch.*"

"*7. MERRIGAN related Donna VINBERG informed her V/VINBERG left her residence about 2100, 13Jun20,[107] and must have walked or got a ride from someone. MERRIGAN added Donna VINBERG really did not say much about the argument / disagreement between V/VINBERG and Donna VINBERG prior to his leaving the residence. MERRIGAN added this incident was a total shock to the family.*"[108]

6/23/2020:     Interview of Danny Wayne Fox, USN: (Special Operations Master Chief Petty Officer): "*SOCM FOX related he had known SB1 UDELL since his (UDELL) arrival at the detachment in August of 2019. SOCM FOX characterized SB1 UDELL as a quiet and reserved individual but commented he had no delay in engaging with his duties following his arrival. According to SOCM FOX, SB1 UDELL was a highly motivated and reiterated SB1 UDELL hit the ground running organizing his duties at the detachment. SOCM FOX stated SB1 UDELL'S duties included managing the boat barn in facilitating the Preventative Maintenance System (PMS) of the detachment's boats and Jet skis to keep them operational. According to SOCM FOX, SB1 UDELL is a huge asset to the detachment as he additionally monitors the weather to ensure safe transit with the aforementioned vessels and performs associated duties as a mechanic. SOCM FOX reported SB1 UDELL is qualified in mountaineering, currently working on his master training specialist credential teaching multiple classes at the detachment and is a climbing safety officer. SOCM FOX advised SB1 UDELL is not a USN, Sea, Air and Land (SEAL) but does go out into the field with other operators and opined he is no different than other SEAL instructors other than he also drives the boats. SOCM FOX stated he has never had any disciplinary issues or concerns concerning SB1 UDELL.*"[109]

6/23/2020:     Interview of John Glover (Civilian assigned to NSW): ███████████ ████████████████████████████████████ *GLOVER added*

---

[107]Approximately one hour before the incident.
[108]NAVY 4789-4790. Ms. Merrigan stated she did not know whether or not there was any disagreement or argument (USAO 6737).
[109]NAVY 4792-4793.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential) **Page 44 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 44 of 82

[redacted] *Prior to 2001 the NSW Detachment only had a vehicle swing gate secured by a pad lock."*

6/24/2020: Interview of Sandra Vinberg (Jayson's aunt):

*"3. S.VINBERG confirmed V/VINBERG was at her residence on the day of the incident where he was assisting in staining the porch. S.VINBERG said V/VINBERG had also assisted her in completing a few other tasks around her house during the previous week leading up to the incident. S.VINBERG added V/VINBERG ate dinner with S.VINBERG and another Aunt Carolyn MERRIGAN, CIV.* ***S.VINBERG reported around 1930 or 2000, 13Jun20, MERRIGAN provided V/VINBERG a ride back to his mother's (Donna VINBERG (D.VINBERG)) house, which is where he was staying.*** *S.VINBERG further reported V/VINBERG was planning on returning the following day to continue working on staining the porch."*

*"4. S.VINBERG added V/VINBERG was a good and very likeable person, who was hardworking, honest and a spitting image of his grandfather. S.VINBERG further added V/VINBERG always asked if he could help and always did good work. S.VINBERG related she never observed V/VINBERG being aggressive and she was missing V/VINBERG terribly.* ***S.VINBERG said on the day of the incident, V/VINBERG had a great demeanor.*** *S.VINBERG recalled V/VINBERG consuming one beer on the day of the incident, while working at her house.* ***S.VINBERG did not have any knowledge of V/VINBERG having issues with drugs.*** *S.VINBERG did recall MERRIGAN, V/VINBERG and her going to the marijuana shop so S.VINBERG could pick up some bath salts, which she uses while taking a bath."*

***"7. <u>S.VINBERG recalled being over at V/VINBERG's mother's house on the day after the incident and D.VINBERG saying 'Why, why, he just snapped. If you are going to act that way get out of here.'</u>"***

***"8. S.VINBERG advised she never heard V/VINBERG make a comment about hurting himself or any other person."***

*"9. S.VINBERG recalled while V/VINBERG was at her house on the day of the event, he used Face Time to speak with his wife and kids. S.VINBERG added both MERRIGAN and she were also able to speak with V/VINBERG's family."*[110]

*"10. S.VINBERG related V/VINBERG never worked on the NSW Detachment or for the Navy. S.VINBERG added MERRIGAN and she were trying to figure out why this happened, as V/VINBERG was a loving father with a positive attitude. V/VINBERG appeared to enjoy assisting MERRIGAN and S.VINBERG."*

*"11. After the interview had concluded and the audio recording was stopped, **S.VINBERG made a comment that something happened between D.VINBERG and V/VINBERG. S.VINBERG added there was a rift in the family over the past year, wherein S.VINBERG has a mental list of all the time D.VINBERG had stabbed her in the heart, by making certain comments.** S.VINBERG added the comments were regarding S.VINBERG's husband wanting a divorce and S.VINBERG messing around with crew members on a boat. S.VINBERG does not know why D.VINBERG made the comments, but they broke S.VINBERG's heart. S.VINBERG added D.VINBERG has had lots of surgeries on her neck, shoulder and knees,-however, does not know exactly what medication she had been prescribed. S.VINBERG added D.VINBERG had her ups and downs and even loses it with her doctors."*[111]

6/24/2020:     Interview of Abner Nelson (Friend of Jayson's for over fifteen years since high school):

*"2. NELSON advised V/VINBERG returned to Kodiak in February or March 2020. NELSON further advised V/VINBERG was struggling with his own things and wanted to step out on his own and show that he could take care of himself, as V/VINBERG's wife was the bread winner of their household. NELSON said V/VINBERG and he were somewhat close friends and the VINBERG's and NELSON'S families are friends."*

*"5. NELSON advised over the previous month prior to the incident he did not hear from V/VINBERG. NELSON recalled about two or three weeks prior to the incident he bumped into V/VINBERG at the Safeway and said hello; however, NELSON did not observe anything out of the ordinary."*

---

[110]NAVY 4797-4799.
[111]NAVY 4797-4799.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential) **Page 46 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 46 of 82

"8. NELSON did not know of any problems V/VINBERG might have had with
Law Enforcement in the past. NELSON related he never heard V/VINBERG
**make any comments about hurting himself or any other person. NELSON
further related he had never observed V/VINBERG being aggressive.**"[112]

7/3/2020:     Interview of Michael Nielsen (Becky Vinberg's step-father):

"2. NIELSEN explained he was B.VINBERG's step-father who resided with her
at 1064 Woodmoor Drive, Bountiful, UT, and spoke with BUPD officers
conducting a welfare check. NIELSEN explained he did not anticipate
B.VINBERG would contact RA to be interviewed, but explained he wanted to
convey to 'the guard' that **'if he's feeling guilty, tell him that Jayson was a train
wreck and this was bound to happen.'**[113]

3. NIELSEN explained V/VINBERG met his wife, B.VINBERG, circa 2008 in
Alaska. V/VINBERG was a parolee at that time for a burglary conviction
(NFI). V/VINBERG began a sexual relationship with his parole officer,
B.VINBERG. NIELSEN recalled B.VINBERG was not charged criminally for
the sexual relationship with V/VINBERG; however, NIELSEN explained
B.VINBERG lost her job and she and V/VINBERG subsequently relocated
together to Utah.

4. NIELSEN recalled V/VINBERG would 'leave Becky and the kids for a month
every year, go to a crack house, and sleep with as many women as he could
and then come back when he ran out of money.' NIELSEN opined
V/VINBERG abused 'crack' and alcohol (NFI). NIELSEN explained
V/VINBERG's behavior caused him to 'ban' V/VINBERG from his residence,
located at 1064 Woodmoor Dr., Bountiful, UT approximately one (1) year
ago. NIELSEN stated B.VINBERG and her boys (ages 11 and 5) moved in
with NIELSEN due to B.VINBERG's fear of V/VINBERG. NIELSEN
explained V/VINBERG had sketchy friends (NFI) **and may be prone to violence.
NIELSEN relayed a story wherein B.VINBERG's 11 year old son bragged about
V/VINBERG 'beating someone up badly (NFI).'**

5. NIELSEN explained V/VINBERG previously worked in a 'tire shop' and may
have most recently been employed by the US Coast Guard in Kodiak, AK
before quitting a short time later (NFI). NIELSEN expressed he was skeptical
about V/VINBERG's Coast Guard employment.

---

[112]NAVY 4786-4787.
[113]NAVY 4662.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential)   **Page 47 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 47 of 82

6. *NIELSEN opined V/VINBERG did not hold any anti government sentiment and explained V/VINBERG and B.VINBERG had an American flag in their living room. NIELSEN did not suspect V/VINBERG of membership in any extremist group.[114]*

7. *NIELSEN opined B.VINBERG would be upset with him for contacting NCTS as she instructed him to not call back, but he agreed to conduct additional telephonic interviews as necessary. NIELSEN opined B.VINBERG was 'in denial' as she expressed concern V/VINBERG was 'shot in the back'. NIELSEN opined B.VINBERG was conditioned to not participate with law enforcement by V/VINBERG."*

3/5/2021:   Letter from Frank V. Russo, Criminal chief, US Department of Justice, to Special Agent Eric MacLennan, US Naval Investigative Services and Investigator Christopher Long, Alaska State Troopers, Investigation Conclusions, US Department of Justice:

*"**Summary of Incident**": "On Saturday evening, June 13, 2020, the NSM[115] was assigned to be the Duty Watch Stander at the Detachment, which is generally surrounded by a 10 foot fence line topped with barbed wire, marked in places with 'no trespassing' and 'authorized personnel only'. The Watch Stander was not a law enforcement officer and was not in uniform at the time. Access to the Detachment is controlled by a gate and an intercom that connects to various locations within the headquarters building at the Detachment. At the time and date of the incident, the NSM was alone at the Detachment, and no one had attempted to contact him to gain access to the Detachment. At approximately 9:20 pm, surveillance video captured Mr. Vinberg within the fenced area of the Detachment. There is no indication of how he gained access to the Detachment.[116] Vinberg then approached the Detachment building and began banging on the second deck staircase door. The NSM asked who Vinberg was and how he got onto the Detachment. According to the NSM, Vinberg stated that he snuck on to the Detachment. The NSM told Vinberg to leave and that he was not authorized to be there. Vinberg approached the main entrance on the first floor, banged on the exterior door, and displayed knives that he brandished toward the door. The NSM could see the knives through the glass window (the knives were also captured on the surveillance video) and texted command personnel about Vinberg's unauthorized presence and the fact that he was displaying knives. Another Navy service member indicated he was on the way.*

---

[114]NAVY 4662-4663.
[115]Navy Service Member.

Exhibit B
(Forensic Psychiatric Evaluation:   Personal and Confidential)   Page 48 of 82
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 48 of 82

At approximately 9:54 pm, Vinberg walked toward the main gate, and the NSM came outside of the building to observe and watch for the arrival of the other Navy service member. At approximately 9:55 pm, Vinberg reversed course and approached the NSM, who instructed Vinberg to stop, both verbally and by motioning with his hand. **Vinberg ignored the NSM's instruction and continued to advance, stating 'Or what?', at which point the NSM raised his personally owned handgun. Vinberg got within ten feet of the NSM and had his hands near his pockets (where the NSM believed one of the knives was located). The NSM then fired multiple rounds at Vinberg.** Within minutes, the other Navy service member arrived and called 911 while the NSM performed CPR, which was then taken over by a different service member that arrived. First responders arrived several minutes after that, and Mr. Vinberg was subsequently pronounced deceased at 10:35pm. Four kitchen-type knives were recovered from the scene.

*Analysis:* Under federal law in the Ninth Circuit, use of force is justified when a person reasonably believes that it is necessary for the defense of oneself or another against the immediate use of unlawful force. However, a person must use no more force than appears reasonably necessary under the circumstances. Force likely to cause death is justified in self-defense only if a person reasonably believes that such force is necessary to prevent death or great bodily harm. Significantly, the government bears the burden of proving beyond a reasonable doubt that the defendant did not act in reasonable self-defense. See Ninth Circuit Pattern Criminal Jury Instruction, §6.8.

Given the facts set forth above, the government cannot not carry its burden to prove that the NSM did not act in reasonable self defense when he shot Vinberg. There are several inescapable facts that prevent the government from overcoming the NSM's claim of self-defense. At the outset, it should be noted that Vinberg was indisputably trespassing on the grounds of the Detachment. Despite conducting numerous interviews, NCIS's investigation cannot explain Vinberg's presence or reason for being at the Detachment, nor did anyone there appear to know him. The toxicology report on Vinberg does, however, indicate that he was impaired at the time of the incident, which may provide insight into his presence and actions.

Next, the NSM was isolated at the Detachment, which bears on whether the NSM's self-defense was reasonable. While one could argue that he could have remained inside the locked building, the NSM's explanation for going outside to watch Vinberg (to ensure the safety of the other arriving service member) is not unreasonable. Furthermore, there is no duty to retreat understate or federal law when confronted with deadly force.

*It further cannot be disputed that Vinberg was armed with knives, which he was inexplicably brandishing in a threatening manner at the door and window of the Detachment. The knives were observed by the NSM, who relayed their presence to other Navy service members prior to the shooting.*

**Finally, Vinberg's behavior in approaching the NSM despite the NSM's explicit verbal and non-verbal directives to stop strongly supports a claim of self-defense. The video surveillance footage shows that Vinberg approached within ten feet of the NSM, who had his firearm drawn and was directing Vinberg to stop, to which Vinberg allegedly responded, 'Or what?'. Vinberg's did not have his hands up, but they were near his pockets, where he had a knife.**

**The NSM's statements and behavior during and after the shooting are consistent with a reasonable fear of harm, which the government would not be able to disprove beyond a reasonable doubt, as is required under the law.**

*For these reasons, the United States Attorney's Office for the District of Alaska declines to prosecute the NSM who shot and killed Mr. Vinberg in Alaska federal court.*"[117]

{Remainder of page deliberately left blank}

---

[117]NAVY 4572-4575.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 50 of 82**
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 50 of 82

## DIAGNOSIS

1. Methamphetamine use disorder, severe (intravenous and smoking preferred routes of administration) dating back to approximately age seventeen[118] -- active since moving back to Kodiak, Alaska in February 2020, and noted in his mental health records by Addiction Counselor Hope Rustemeyer on 5/11/2022 to have last used on or about 5/7/2022. No further contact with his addiction counselor after 5/11/2022.[119]

2. History of intravenous cocaine disorder and crack cocaine disorder (smoking preferred route for crack cocaine) dating back to approximately age seventeen (unclear when last used), with intravenous cocaine abuse during binges.[120]

3. Alcohol use disorder dating back to age 12 -- active at time of his death.[121]

4. Cannabis use disorder -- active at time of his death.[122]

5. Alcohol intoxication at the time of his death (BAL 0.11).[123]

6. Cannabis intoxication at the time of his death.[124]

7. Methamphetamine-induced psychotic disorder (predominantly auditory hallucinations) and depressive disorder -- active at the time of his death.[125]

8. Methamphetamine and alcohol-induced anxiety and depression.[126]

9. Possible methamphetamine withdrawal (mild) around the time of his death.[127]

---

[118]NAVY-PLTF 96, 126.
[119]NAVY-PLTF 104.
[120]NAVY-PLTF 96.
[121]NAVY-PLTF 96.
[122]NAVY-PLTF 104.
[123]NAVY 2139.
[124]NAVY 2139-2140. Jayson's pericardial blood Δ-9 THC, the active ingredient of marijuana was 23 ng/ml. Usual peak levels in serum for 1.75% or 3.55%. THC marijuana cigarettes is 50 - 270 ng/mL at 6 to 9 minutes after beginning smoking, decreasing to less than 5 ng/mL by 2 hrs. Since THC concentrations in blood are usually about one-half of serum/plasma concentrations, Jayson's serum/plasma concentration would have been approximately 46 ng/ml at the time of his death -- evidence of cannabis intoxication at the time of his death.
[125]NAVY-PLTF 83-84. PLTF 7792.
[126]NAVY-PLTF 126.
[127]NAVY-PLTF 83.

10. History of suicidal ideation on 4/9/2020 when presented to the Providence Kodiak Island Medical Center ER.[128] Jayson was noted to have suicidal ideation when using methamphetamine or drinking, and to have last used methamphetamine four or five days earlier.[129]

11. Attention deficit hyperactivity disorder (ADHD).[130]

12. Antisocial personality traits.

13. Suicide by cop.

## OPINION

In order to best understand the issues at hand, an overview of the relevant psychosocial and polysubstance history is provided below. At the time of his death, Jayson was a 30-year-old, separated, male with a long history of intermittent alcohol abuse and cannabis abuse dating back to age twelve, methamphetamine abuse dating back to age seventeen, and with subsequent crack cocaine abuse, and intravenous crystal methamphetamine and cocaine abuse characterized by binges throughout his adult life. Writes Addiction Counselor, Hope Rustemeyer, on 3/16/2020:

> *"Client reports mother having drug and alcohol addiction problems throughout his life."*[131]

> *"Drug and Alcohol History and Current Status: Client reports first trying alcohol, cigarettes, and marijuana when he was 12 years old. He drank did all three when he could steal it from his mother, marijuana was favored over alcohol. After being in McLaughlin and a group home in Anchorage he got out at 17 he started drinking alcohol and moved onto smoking crack cocaine and methamphetamines. Client said smoking meth was his immediate preferred high. Client reports every 6 months to a year he would leave his family and binge for up to a week smoking meth, he reports smoking at first and then injecting a gram and a half of meth daily when he binged. The longest binge lasted four to six months about a [sic] 4 years ago, he started using needles to inject meth and cocaine on this binge. He also racked up $50,000 in debt and had to file bankruptcy during that binge. This pattern continued until a year ago when he went to outpatient in Salt Lake City. He was clean for about three months and then started using drugs again. Client last used meth on his way to Kodiak from*

---

[128]NAVY-PLTF 107-139.
[129]NAVY-PLTF 126.
[130]Deposition of Esther Furio, page 18.
[131]NAVY-PLTF page 93.

**Exhibit B**
(Forensic Psychiatric Evaluation:  Personal and Confidential)  **Page 52 of 82**
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 52 of 82

> *Salt Lake, he had a four day layover in Anchorage and binged on meth and cocaine, has been clean since March 1st, 2020."*[132]

> *"He reports he was using meth straight out of McLaughlin, leaving for week long benders."*[133]

At age fourteen or fifteen, Jayson was prescribed Concerta (time-released Ritalin) by Dr. Jensen in Kodiak, but did not like the way it made him feel.[134] By age seventeen, he was smoking crack cocaine. He subsequently began injecting methamphetamine intravenously and cocaine during his intermittent binges.[135]

**Jayson has considerable antisocial personality traits, as indicated by: 1) repeated performing acts that are grounds for arrest; 2) use of aliases (pled guilty to being in the possession of another person's driver's license; 3) impulsivity; 4) irritability and aggressiveness, as indicated by repeated physical fights or assaults (assaulted two police officers; and 5) repeated failure to sustain consistent work behavior or honor financial obligations. Evidence for this is woven into the narrative below.**

From approximately age fifteen to seventeen, Jayson was incarcerated at the McLaughlin Youth Center for a burglary conviction. Jayson was noted to be in juvenile detention through much of high school,[136] and at some point he was expelled from school and sent back to McLaughlin Youth Center where he *"timed out."*[137] Crimes included breaking into Cost Savers and stealing alcohol and cigarettes, as well as a minor in possession.[138] It was while incarcerated at the McLaughlin Youth Center that Jayson met his wife, Becky Vinberg, who testified that she was working there mostly full time filling in for shifts (as a correctional officer),[139] as well as working as a substitute teacher for the Anchorage School District.[140] At that time, she testified that she had been hired by the Utah Department of Corrections in Adult Probation and Parole.[141]

According to the 7/3/2020 interview of Michael Nielsen, Becky Vinberg's step-father, in or about 2008, while on parole in Alaska for a burglary conviction, at age seventeen Jayson began a sexual relationship with his parole officer, Becky, who was twenty-eight year old --

---

[132]NAVY-PLTF 96.
[133]NAVY-PLTF 94.
[134]NAVY-PLTF 96.
[135]NAVY-PLTF 96.
[136]NAVY-PLTF 94.
[137]NAVY-PLTF 94.
[138]NAVY-PLTF 94.
[139]NAVY-PLTF 94.
[140]Page 21.
[141]Page 6.

eleven years his senior.[142]  Becky testified that their "*romantic relationship*" began during the summer of 2007 while Jayson was out on parole,[143] although Jayson told KANA addiction counselor, Hope Rustemeyer, that his "*emotional relationship*" with a female correctional officer began while he was still incarcerated at the McLaughlin detention center, and that their romantic relationship began after he was released to transitional housing, so it is unclear if Becky was ever Jayson's parole officer.[144]

Jayson was transferred from the McLaughlin Youth Center to the AK Baptist Family Center, where he lived for approximately one year.  Jayson was noted by Hope Rustemeyer to be a poor historian for his timeline, but after he was expelled from high school was sent back to McLaughlin, were he "*timed out,*" and was released to transitional housing (the AK Baptist Family Center?), while still monitored by the Department of Juvenile Justice.[145]

When their relationship was discovered, Becky lost her job, and she and Jayson relocated together to Utah.[146]  Sometime in the summer/fall 2007, Jayson and Becky moved in together, and on 5/17/2008 they were married.[147]  She testified that she learned she was pregnant with their first son the Sunday before the wedding.[148]

Becky was physically abusive early in their marriage.[149]  Becky testified that between 2007 and 2014, there was domestic violence in their relationship, with periods whereby she would punch or hit him, while he would just sit there, a couple of times per month.[150]  She also testified that Jayson used cocaine and ecstasy when they first started dating during the summer 2007.  Jayson also described Becky as physically abusive.[151]

At age seventeen, Jayson was released to transitional housing, while still under the auspices of the Department of Juvenile Justice.[152]  He reported he was abusing methamphetamine straight out of McLaughlin, leaving for week-long benders.[153]  Also at age seventeen, he started drinking alcohol, and began abusing methamphetamine and crack cocaine, with

---

[142]NAVY 4662, NAVY-PLTF 94.
[143]Pages 69-70.
[144]NAVY-PLTF 94.
[145]NAVY-PLTF 94.
[146]NAVY 4663.
[147]Becky Vinberg transcript, pages 68-74.
[148]Page 74.
[149]NAVY-PLTF 96.
[150]Page 140.
[151]NAVY-PLTF 94.
[152]NAVY-PLTF 94.
[153]NAVY-PLTF 94.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential)  **Page 54 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 54 of 82

smoking methamphetamine being his preferred high.[154] He was noted in the ER to have struggled with addiction and methamphetamine use since age eighteen.[155]

Jayson continued to abuse cocaine and methamphetamine. While living in Salt Lake City, every six months to one year he would go on benders, as well as being a philander.[156]

At approximately age twenty-six, every four to six months Jayson would leave his home, and go on a bender lasting approximately one week, whereby he would abuse cocaine, as well as intravenous and inhaled methamphetamine, and live in a trap house. He racked up $50,000 in debt, and filed for bankruptcy.[157] His longest binge occurred when he was approximately twenty-six years old, and lasted four to six months, at which time he was abusing intravenous methamphetamine and cocaine.[158] During his binges, he would inject 1.5 grams of methamphetamine daily. Smoking methamphetamine was noted to be his preferred immediate high.[159]

On 7/18/2017, two days shy of his 28th birthday, in a plea bargain in the 3rd District Court, Salt Lake County, State of Utah, Jayson pled guilty to Obtain/assist: Obtaining An Identifying Document of Another - Class A Misdemeanor.[160] He was in possession of another person's driver's license. The charge of theft by receiving stolen property was dropped. He was sentenced to 365 days, with a 31 day credit for time served.[161] He was placed on probation with various conditions, including to abstain from all drugs and alcohol.[162]

Becky testified that in February 2017, they separated because Jayson had relapsed, was abusing drugs, and for six months was living on the streets.[163] She further testified that in April 2018, they separated because of Jayson's struggles with drug addiction.[164] Becky and their children moved in with her mother in Utah, while Jayson lived with various coworkers and friends in Syracuse, Utah and subsequently moved South Ogden, Utah where he lived with some roommates in Utah.[165]

---

[154]NAVY-PLTF 96.
[155]NAVY-PLTF 126.
[156]NAVY-PLTF 94.
[157]NAVY-PLTF 94-96.
[158]NAVY-PLTF 96.
[159]NAVY-PLTF 96.
[160]UTCOURTS 8964.
[161]UTCOURTS 8978.
[162]UTCOURTS 8967-8968.
[163]Page 77.
[164]Page 77.
[165]Pages 59-60.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 55 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 55 of 82

On 5/7/2018, at age twenty-eight, approximately two years before the day in question, Jayson was arrested for shoplifting, after attempting to steal a box of syringes from a pharmacy. He was noted to have slurred speech, unsteady gait, and difficulty staying awake.[166] The cause of these symptoms is unclear, but this is consistent with either alcohol abuse and/or opioid abuse. **The fact that he attempted steal a box of syringes is evidence of ongoing intravenous drug abuse.**

In 2019, Jayson moved out of his house in Utah and into the East End Family Treatment Center in Salt Lake City for three months of outpatient residential drug treatment, during which time he was purportedly clean.[167]

In February 2020, Jayson got more distance from Becky and moved back to Kodiak to live with his mother just before the pandemic.[168] While in route to Kodiak, he had a week long layover in Anchorage, and went on another methamphetamine binge.[169] At the time of his death was living with his mother, Donna Vinberg.[170]

On 6/8/2020, five days before Jayson's death, Becky, who was living in Bountiful, Utah with her step-father, Michael Nielsen, signed divorce papers that she had petitioned. On 6/10/2020, three days before Jayson's death, filed the petition for divorce.[171]

Additional relevant timeline following Jayson's move back to Kodiak in February 2020, for the approximately eight weeks leading up to the day in question, is as follows:

4/8/2020:      Adam Colton, DO: Outpatient Clinic Note: "*30 y/o male with polysubstance abuse presenting for complaints of 3 months of auditory hallucinations that he believes have been there since before he started using drugs frequently. Was previously living in Utah at a time of when they [sic] symptoms started and has been consistently using illicit drugs since moving back to Alaska over a month ago. These voices are familiar and recognizes them as the voices of his friends and family that are telling him to do certain things in his life such as 'go to rehab', 'get a divorce' etc. There is no threatening nature of these voices and denies any suicidal or homicidal ideations. Understand these voices are not real and wants to get them to go away.*

*Has been binging on methamphetamine since moving back to Kodiak 1 month ago and just got off a week of being awake most of the time and last*

---

[166]UPD 8941-8942.
[167]NAVY-PLTF 94.
[168]NAVY 4703, 4757.
[169]NAVY-PLTF 94.
[170]NAVY 4703. Also see deposition of Becky Vinberg, page 59.
[171]NAVY 4663; NAVY-PLTF 23; DCU 5793.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 56 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 56 of 82

*methamphetamine use was on Saturday. Feeling quite irritable with mild withdrawal symptoms still and is hoping to get something that may help with sleep. Doesn't feel voices have gotten any worse with methamphetamine usage.*"[172]

4/9/2020:     Rebecca Echols, RN: Providence Kodiak Island Medical Center Emergency Department: Triage Note: *"Patient states having thoughts of harming himself for about 'few months'. Denies thoughts of harming others. States having past inpatient stay 'years ago'. States not having a plan, 'but if I have to have one I guess it would be a needle.' States has not had any ETOH in a 'few days'.*"[173]

4/9/2020:     Stephen Burnside, M.D.: *"Jayson J. Vinberg is a 30 y.o. male who presents for suicidal ideation. His initial complaint was either obtaining a COVID-19 test or 'suicidal tendencies.' He states he is hearing voices. He states he has been hearing voices 'all the time', which he finds very bothersome. He has history of the same, years ago. He is not on any medications. He was unsure of diagnosis. Voices were telling him to come and get tested for COVID, get a divorce and seek treatment. He has thoughts of hurting himself. If he would do it he would do it with a 'needle', implying an overdose of methamphetamines. Does not have narcotics. Denies any recent attempts or overdose. States he does not currently want to die.*

*He admits to using amphetamines for a weeks time and then would stop. Last used Saturday, 4 to 5 days ago. He has also been drinking he describes as moderately, was his last but 3-5 beers 2-3 times a week; last used 3 to 4 days ago.*

*Urine toxicology positive for ethanol and cannabinoids.*[174]"

Assessment:
1. **Auditory hallucinations.**
2. **Methamphetamine use.**

"*Plan: Patient was evaluated by myself and mental health. Neither of us feel he is imminent risk for self-harm. His auditory hallucinations/psychosis likely secondary to recent methamphetamine use. He contracts for safety. He has follow-up for mental health evaluation and treatment scheduled to KANA. He is provided prescription for Risperdal to help suppress hopefully his auditory hallucinations.*"[175]

---

[172]NAVY-PLTF 83.
[173]NAVY-PLTF 107, 112.
[174]NAVY-PLTF 107-108.
[175]NAVY-PLTF 110.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential) **Page 57 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 57 of 82

4/20/2020:     Adam Colton, DO: *"<u>Continued to use meth daily and has no plans on stopping.</u> Has been following up with Carolyn Street [clinic] but does not see much of the point of this anymore as he does not plan on quitting - feels he is wasting everyone's time."*[176]

4/20/2020:     Hope Rustemeyer: KANA: (Addiction Counselor): *"Client requested to cut all contact at this time, he had left the Salvation Army and <u>was actively using meth again</u>. He stated at this point the voices were no [sic] bothering him. I asked if I could keep calling for a bit to check in on him, client agreed to it."*[177]

5/11/2020:     Hope Rustemeyer: KANA: (Addiction Counselor): *"He reported he is still hearing voices but it had been about 4 days since his last use, besides marijuana. Client stated he is no longer interested in detox or residential. I will try to keep contact by checking in weekly but client is unsure if he would like to remain in KANA services."*[178]

6/8/2020:      Petition for divorce signed by Becky Vinberg.[179]

6/10/2020:     Petition for divorce filed by Becky Vinberg.[180]

→6/13/2020:    **Fatal shooting.** Events on this day in question:

Per Jayson's father, Anthony Furio, Jayson spoke to his wife on the day of the incident, and would speak to his wife two to three times a day.[181] According to Anthony, Jayson went to his Aunt's house, Sandra Vinberg, to stain her deck, and had dinner with Sandra and another aunt named Carolyn Merrigan on the day in question.

**According to Sandra, while Jayson was at Sandra's house, he FaceTimed with his wife and kids.** Sandra and Carolyn also spoke to Jayson's family via FaceTime. She reported that he had one beer while at her house and had a great demeanor. Sandra described the FaceTime call that Jayson had with Becky and their two sons on the day in question:

Sandra:        *"I remember that last day he worked I think around lunch time. I don't know if he called Becky or Becky called him, but they did that FaceTime --"*

Investigator:  *"FaceTime video?"*

---

[176]NAVY-PLTF 79.
[177]NAVY-PLTF 105.
[178]NAVY-PLTF 104.
[179]DCU 5813.
[180]NAVY-PLTF 23.
[181]NAVY 4757, statement to Special Agent Carlin, Anthony Furio, the father of Jayson.

**Exhibit B**

Ms. Marie Scheperle
December 19, 2024
Re: *Estate of Jason Vinberg v. United States of America*
Page 59 of 82

| | |
|---|---|
| Sandra: | *"And Carolyn and both talked to Becky, and each of the boys and showed them the dog, and --"* |
| Investigator: | *"Oh man."* |
| Sandra: | *"I mean it was a fun call. Everyone was happy happy [sic]. Kids were growing up, and all that. Becky looked good. It was just a fun call."*[182] |

Sandra denied Jayson expressed any suicidal or homicidal ideation. Around 7:30 or 8:00 PM, Carolyn gave Jayson a ride back to his mother's, Donna Vinberg's, house.[183]

The day after the incident, Sandra was at Donna's house, and Donna stated that Jayson had *"just snapped."* Although the investigation report quotes Donna as having stated, **"Why, why, he just snapped. If you are going to act that way get out of here."**[184] Below is an exact transcription by the undersigned of the recording whereby Donna states that Jayson had *"just snapped"* just before he left Donna's house on the day in question:

| | |
|---|---|
| Investigator: | *"Do you remember Donna making any comments regarding a possible -- maybe not, maybe an argument or a disagreement or anything like that between her and Jayson on Saturday night?"* |
| Sandra: | *"All I know is what she said when we all showed up. Soon as we got the call, everyone --"* |
| Investigator: | *"Went to her house."* |
| Sandra: | *"Yeah. And she was a crying mess."* |
| Investigator: | *"Okay. Did she say anything about --"* |
| Sandra: | **"Just, I saw her, DJ was holding her [Donna] and -- she said 'DJ, why, why?' What did she say? <u>'He just snapped.'</u> Something about him snapping, and -- she said, 'If you're gonna be like that,' something like that, 'If you're gonna be that way, get out of here,' something like that. Only because she was crying to DJ."**[185] |

---

[182]Bates 1712, Time index 36:35.
[183]NAVY 4797-4798.
[184]NAVY 4798.
[185]Bates 1712, Time index 32:45.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 59 of 82**

Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 59 of 82

According to Carolyn Merrigan, Jayson was laughing and joking around throughout the day, and everything appeared fine. **Carolyn recalls Jayson making a comment about missing his family and wanting to bring them to Kodiak for a visit.** Carolyn never heard Jayson express any suicidal or homicidal ideation that day:

> *"You know he was so, in really good spirits, that's why this just doesn't make any sense to me. I dropped him off at home about 7:30 that night and left there at about 8:00. And what happened after that I don't know."*[186]

Around 7:30 PM, Carolyn drove Jayson back to Donna's house. According to Carolyn, Jayson intended to return the next morning to Sandra's house to continue painting the porch.[187]

**The investigation report makes reference to Donna informing her the day after Jayson's death that Donna and Jayson having gotten into an argument on the day in question just before Jayson left Donna's residence that night on the day in question.[188] However, a careful listening of the recorded interview between the investigator and Carolyn reveals that Carolyn alluded to a possible disagreement between Jayson and Donna, but then later during the same interview denied any knowledge that Donna had told her that she and Jayson had argued:**

Investigator:   *"Was there a possibly an argument that occurred in the house that night in the house before he left?"*

Carolyn:   *"I don't know."*

Investigator:   *"Okay."*

Carolyn:   *"I really don't know. "*

Investigator:   *"Alright. So his mom never said anything while you were talking about this?"*

Carolyn:   *"No, not really, I mean they, yes back and forth, mother and son, you know, that kind of stuff. And he was, you know -- not a big blowup that I know of."*

Investigator:   *"Okay."*[189]

---

[186]Bates 1709, Time index 10:51.
[187]NAVY 4790.
[188]Bates 4790.
[189]Bates 4790, Time index 29:50.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential)   **Page 60 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 60 of 82

However, later during the interview Carolyn stated that she did not know whether or not there had been an argument between Donna and Jayson.[190] According to Carolyn, Donna told her (the day after the incident?) that Donna and Jayson had gotten into an argument and that Jayson left Donna's residence around 9:00 PM, and either walked or got a ride from Donna's house.[191] From the investigation report by Pierre Pages:

> *"I was able to gather that sometime during early evening hours on 06/13/2020 there had been a sort of disagreement between Jayson and his Mother over an unknown topic. During the disagreement Jayson became upset, dressed himself for the outdoors, loaded his cargo pants pockets with beers from the refrigerator and left the apartment on foot and did not speak anything about where he was going. Jayson was unable to be reached by cell phone according to family and he never returned home that evening. During this visit with Donna she became upset with AST and told us to leave the residence, we obliged her demands. It should be noted that some family members were engaging in consuming alcoholic beverages while we were present, therefore the climate was not conducive to fact gathering."*[192]

When Donna was asked by Trooper Beaver if she knew why Jayson was on the Navy Base, Donna replied:

> *"Him and I got into an argument last night and he loaded his pockets up with beer and took off out the door, so I don't know where he went."*[193]

Approximately twenty minutes after leaving his mother's house, at 9:20 PM, security video captured Jayson along the exterior gate of the NSW.[194] Approximately thirty-five minutes later, at 9:55 PM, Jayson was shot and killed.

{Remainder of this page intentionally left blank}

---

[190]Time index 36:40.
[191]NAVY 4790.
[192]NAVY 4519.
[193]Transcript of Trooper Audio Excerpts, USAO 7837. Also Navy 7795 audio recording.
[194]NAVY 4804.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 61 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 61 of 82

## SUICIDE BY COP

Jayson's mother, Donna Vinberg, who appears to have been the last person to see Jayson alive prior to his incursion onto the Navy Base, refused to cooperate with the investigators.[195] Multiple requests were also made by investigators to interview Becky, but she also refused to cooperate.[196] Becky was subsequently deposed. Despite his mother's and wife's respective lack of cooperation, there is sufficient evidence upon which to base an opinion in this "psychological autopsy" -- defined as a thorough retrospective investigation of the intentions of the decedent.[197]

*"Suicide by cop"* (SbC) refers to behaviors by an individual intended to provoke a law enforcement officer to use lethal force that results in the person's death.[198] Although Mr. Udell was the Navy Officer of the Day/Duty Watchstander, he is neither a "*cop*," nor a law enforcement officer. Nevertheless, I am using the term "*cop*" more generically, since the psychological dynamics of "*suicide by cop*" are on point in the instant matter:

> "*Perpetrators of SbC are often young adult white males [mean age 31-35 years] who are single, divorced or widowed and who have significant mental health and criminal backgrounds. Many SbC incidents are short in duration and occur at a residential location, with the perpetrator frequently intoxicated. Precipitating events are often romantic conflict, **with many incidents indicative of recent or <u>impending relationship termination</u>**. SbC perpetrators demonstrate suicidal intent through a unique combination of verbal, behavioral, and planned indicators, with some perpetrators committing 'outrageous acts' designed to elicit police response and others showing little, if any, suicidal ideation prior to the SbC incident.[199] Deadly force is used in the majority of SbC incidents and many SbC subjects are killed by police after threatening to harm police or others. **In many legal interventions where the subject is an attempted or completed SbC, less-lethal force options (e.g., verbal negotiation strategies, physical restraints or incapacitating devices like TASERs or batons) generally do not appear effective.*"[200]

---

[195]NAVY 4845, 4519.

[196]NAVY 4504.

[197]Scott CL et al, The Psychological Autopsy: Solving the Mysteries of Death, Psychiatric Clinics of North America 29 (2006) 805-22. The term was coined by E.S Schneidman, confounder of the LA Suicide Prevention Center in 1981.

[198]Ibid, Scott.

[199]Although Mr. Udell was not a policeman per say, his role was one of "policing" and keeping secure the Navy base.

[200]Patton CL, Fremouw WJ, Examining "suicide by cop": A critical review of the literature, Aggression and Violent Behavior, 27 (2016) 107-120. (quote from page 118).

*"SbC research focusing on intervention efficacy has revealed interesting yet worrisome results. SbC incidents are often concluded by the subject's death, and when less-lethal use of force options are used, they are rarely effective. Even verbal negotiation strategies, which have been effective at resolving hostage/barricade incidents without SbC subject intent, fall short of resolving SbC incidents. Purposefully drawing out incident duration, which has long been thought to lead to positive outcomes in hostage/barricade situations (Mohandie & Meloy, 2010), did not lead to significant differences in subject fatality between SbC incidents lasting 1 h or more than 1 h. These results could suggest that SbC subjects are not diverted from their goals by police officers or special response teams because they may view police officers as a means to an end, or a tool used to achieve their goal to die by suicide-thus limiting the impact negotiators have on their survival."*[201]

*"Stressors common for SbC subjects in the 24 h prior to the SbC attempt are interpersonal problems, loss/bereavement, physical health concerns, and legal issues."*[202]

*"**Eighty (43.2%) were using alcohol at the time of the incident and 57 (30.8%) were using all other drugs**....Rates of intoxication during the commission of SbC from other studies range from 36% to 75.5% (Dewey et ah, 2013; Lord, 2000; Mohandie & Meloy, 2010; Wilson et al., 1998). Although Mohandie et al. (2009) found a much lower rate of intoxication during the event (36% of all SbCs), SbC subjects were more likely than non-SbC subjects to be under the influence of alcohol during the event, F = 9.9923, p < .005. When a SbC subject is intoxicated during the act, it is most often due to alcohol alone or alcohol combined with other drugs, with 'hard drugs' (cocaine or methamphetamines) following second (Lord, 2000; Mohandie & Meloy, 2010). Substance abuse is also common for SbC subjects, with estimates of 53.8% (Lord, 2000) to 65.2% (Hutson et al., 1998), though data on long-term use is often limited by the incident-focused nature of many SbC samples....The study of the role of intoxicating substances' in the commission of SbC presents important implications, as the intoxicated subject has been found to be more impulsive and more lethal in these types of events (Beck, Weissman, & Kovacs, 1976)."*[203]

*"**Knives were used in 24 (20% of cases) [of suicide by cop].**"*[204]

---

[201]*Ibid,* page 118.
[202]*Ibid,* Patton.
[203]*Ibid,* page 112.
[204]*Ibid,* page 115.

Exhibit B
(Forensic Psychiatric Evaluation: Personal and Confidential) Page 63 of 82
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 63 of 82

> *"Clear evidence of intent (i.e., verbal expression of wish to die by SbC) is lacking for many subjects involved in SbC incidents. When evidence of SbC intent is presented, it is more often in the form of disturbed behavior or aggressive gestures, including intoxication, mental health concerns, behavior influenced by domestic disputes, or <u>provoking police to shoot either by refusing to follow instructions or by advancing toward police with a deadly weapon</u>. Researchers have yet to agree on a standard way to conceptualize SbC intent but approaches focusing explicitly on behavioral indicators, rather than on verbal expression of intent, appear to have the greatest utility."[205]*

> *"Like suicide-only subjects, they present with a host of psychological problems, including drug addiction and/or an inability to process an interpersonal crisis, but SbC subjects are more likely to refuse to surrender, more likely to be aggressive to others, and more likely to die during the event-suggesting that though they have actionable targets for mental health intervention, <u>they are likely to be so resolute in their pursuit of suicide that they will not avoid hurting others to get it</u>."[206]*

The motive for Jayson's behavior on the day in question is best explained by his suicidal goal to provoke Bradley Udell, the Officer of the Day/Duty Watchstander, into shooting and killing him in self-defense, since he wished to take his own life but was unable to do so. Jayson snuck on the Navy Seal training base, where it was foreseeable that he would encounter an armed serviceman. After having snuck on the base, Jayson walked to the back door vestibule, up two flights of stairs, and was at the metal second floor egress door yelling something unintelligible through the door while pounding on it. Mr. Udell could not hear what Jayson was yelling.[207] Mr. Udell opened the door, and asked who he was and how he got on the compound, to which Jayson replied, "*I snuck on.*" Mr. Udell walked downstairs toward the main entrance of the headquarters building, where he observed Jayson through the glass window pacing and yelling, "*Come on!*" He observed Jayson place his hands in his jacket pockets and remove two knives, who began banging aggressively and tapping the double pane reinforced window with knives yelling, "*Come on!*" and trying to goad Mr. Udell to exit the building.

Jayson brandished the knives, replaced them in his front jacket pocket, but pulled the knives back out on at least three occasions. He continued to pace, attempting to entice Mr. Udell to come outside.[208] When Mr. Udell remained inside the building, Jayson began walking away towards the road that led to the main gate. Mr. Udell exited the building, and propped

---

[205]*Ibid,* page 115.
[206]Ibid, page 118
[207]NAVY 4517.
[208]NAVY 4724.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 64 of 82**
Case 3:22-cv-00135-SLG   Document 154-3   Filed 08/25/25   Page 64 of 82

the outside door with his foot to maintain visual contact with Jayson, in order to ensure the safety of the arriving personnel, as well as the protection of government property.[209]

Mr. Udell verbally directed Jayson to leave, but he did not comply; rather, he continued to walk towards Mr. Udell undeterred.[210] Mr. Udell held out his outstretched left hand in the universal sign to stop, and with his handgun in a low ready position again commanded Jayson to stop at least two or three times, including commanding, "*Stop coming towards me!*" and "*Don't come any closer!*" but Jayson continued to advance in a highly menacing and threatening fashion, repeatedly responding, "*Or what?*" Mr. Udell observed Jayson reach for his right front jacket pocket, where he knew Jayson had a knife, remove his hand from his pocket and continue to advance towards him. When Jayson was "*a little bit farther than six feet away,*" Mr. Udell fired all seven rounds of his handgun into Jayson, killing him.[211]

Statements by Mr. Udell to the investigators on the day of question transcribed by the undersigned showing Jayson's threatening behavior caused him to fear for his life and act in self-defense are as follows:

> "*He was coming down the road so I, at which point I had my gun, and I said, and I said, 'Don't come any closer, don't come any closer,' and he said, 'What are you going to do? What are you going to do?' He starts approaching underneath to the the foyer awning here and then I stopped him from attack [sic] me.*"[212]

Mr. Udell:      "*He had left. I had come out of this door. And I was, had I was like in between the door. I was still trying to get on, on the phone with my supervisor. At which point he came back, started first {word unintelligible} walking to about right here, that's when I told him like 'Hey', I had it like low ready, I told him, 'Hey you need to stop, you need to leave here immediately,' and he's like, 'Or what, or what, or what?' And he got to about --*"

Investigator:   "*I'm sorry, he said, 'Or what, or what?'*"

Mr. Udell:      "*Yeah, 'Or what or what?' And he, and he got to about right here.*"

Investigator:   "*Okay, alright. And that's when you engaged him?*"

---

[209]Deposition of Bradley Udell, page 193.
[210]Deposition of Bradley Udell, pages 117-118.
[211]NAVY 4724. Deposition of Bradley Udell, page 118.
[212]Bates 1717, Time index 0:00 to 0:20.

**Exhibit B**
**(Forensic Psychiatric Evaluation: Personal and Confidential) Page 65 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 65 of 82

Mr. Udell:    *"Yes sir."*[213]

.

.

.

*"He ends up leaving the front, the front area of the compound, walking towards the main road that exits the facility, so I then leave the two double doors to insure that he is actually leaving. He turns around, he and approaches me, ignores my commands that he needs to leave, and then as he keeps approaching tell him to stop, 'Don't come any closer, don't come any closer!' and then at that point I was in fear for my life and felt like I had to defend myself."*[214]

When asked by the investigator what he thought Jayson's intent was, Mr. Udell replied:

*"He 100% absolutely wanted to cause serious bodily injury or death to myself."*[215]

*"His aggressive nature and wielding weapons in both hands caused me to be fearful for my life."*[216]

*"As he got closer and I physically put my hand out, I said 'Stop, stop,' he eventually started saying, 'Or what? Or what?' [as he continued to approach]."*[217]

With his weapon drawn, Mr. Udell continue to command, *"'Stop!' 'Stop!' 'Stop coming towards me' -- a combination of those things, and he still advances while saying 'Or what?'"*[218]

As Jayson continues to approach Mr. Udell, *"His hands go back inside of his pockets where I had previously seen him draw and put back in knives in each [front jacket] pocket....He continues to move forward and he's pulling a knife out of his pocket, I feared for my life and did what I needed to do to save it."*[219]

---

[213]Bates 1717, Time index 2:40.
[214]Bates 3758, time index 11:00. Also page 16 of the official transcript of the Bradley Udell interview.
[215]Bates 3758, Time index 42:10.
[216]Bates 2758, Time index 42:50.
[217]Bates 3758, Time index 52:58.
[218]Bates 3758, Time index 1:04:50
[219]Bates 3758, Time index 1:06:00.

> *"Obviously it happened extremely fast, but the whole time I'm saying, 'Stop, don't come any closer, don't come any closer!'* **There wasn't like a, a, like a standoff where we're just sitting there looking at each other.**"

When asked what happened next, Mr. Udell replied, *"Again as he retrieved the knife and continued advancing I felt fearful for my life and defended myself.*"[220]

In his deposition, Mr. Udell also testified that he feared for his life:

> *"I mean, I -- as far as thought process, I just remember an overwhelming sense of fear that this man that gained unauthorized access was going to hurt me or someone else."*[221]

> *"It was very possible he could have had a gun. I didn't know for certain at the time. However, like I've stated, he demonstrated a clear intent that he wanted to cause harm to me....A handgun -- was my biggest concern was if he had -- apart form, you know, him stabbing me to death, which he clearly wanted to do."*[222]

**The fact that Jayson continued to approached Mr. Udell in a goading and threatening fashion, after having previously brandished knives, and after Mr. Udell's gun was in a high ready position, and came within approximately six feet of him before Mr. Udell fired upon him in self-defense, without any attempt by Jayson to engage Mr. Udell in a dialogue, or even in a standoff, is behavior consistent with Jayson's goal to provoke Mr. Udell into using lethal force as means to commit suicide.**

Since the incident, Mr. Udell has been steadfast in his contention that he acted in self-defense out of fear for his life. In his deposition, regarding the events leading up to the shooting, and his state of mind, Mr. Udell testified to the following:

Mr. Udell:     *"The phone rang upstairs -- one of the desk phones. I grabbed it. It was a -- a supervisor. Asked me what was going on. Told him what I knew at the time, that there's an intruder, armed intruder. And he said he was on his way, at which point I went back downstairs. You know, the individual -- the armed intruder was banging on the door yelling, 'Come on,' some other, like, inaudible -- I couldn't hear exactly between two doors -- brandishing the knives. And then, you know, at some point during that, you know, through the glass windows, I was signaling to him and, you know, yelling through -- 'You need to leave,' you know,*

---

[220]Bates 3758. Time index 1:09:50.
[221]Page 103.
[222]Page 109.

Exhibit B
(Forensic Psychiatric Evaluation:   Personal and Confidential)   Page 67 of 82
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 67 of 82

> verbally saying that and then also signaling with my hands, a leaving gesture. At some point, he started to walk away. And then, you know, I exited the doors to ensure that he was leaving. And then also, as I was just previously informed, my immediate supervisor and presumably, you know, someone else with him were driving to the DET. So I wanted to make sure that if those two paths crossed, that, you know, no incident broke out or --that, you know, they were safe as well. And then he turned around. He came toward me, disregarding my verbal and physical commands to stop moving -- multiple physical commands, multiple verbal commands, and then he kept approaching me. And, again, at this point, I knew he had knives on him. Didn't know if he had a firearm on him. And, you know, through tapping on the glass with the knives, he was already a -- threatening manner. And then I was scared for my life as he kept approaching me, and I had to defend myself."[223]

. 
. 
. 

| | |
|---|---|
| Atty. Gardner: | *"So you went out -- you decided to step outside of the building, and you held the door open with your foot. This is the unlocked front door, correct?"* |
| Mr. Udell: | *"Correct."* |
| Atty. Gardner: | *"What happened then?"* |
| Mr. Udell: | *"He turned around and started moving toward me. I gave many verbal instructions to stop moving towards me. 'Don't move any further.' Multiple versions of that same context. And then also physically with my hand in an outstretched motion, you know, the universal sign for stop, multiple times."* |
| Atty. Gardner: | *"And -- and then what happened?"* |
| Mr. Udell: | *"Continued to progress toward me. And at some point, I drew my firearm and continued to, you know, give the verbal and physical signals to stop. Again, universal sign for stop is what I was demonstrating with my hand.* |
| | *He said or -- kept saying, 'Or what'? after the firearm was drawn. And then, you know, he kept moving towards me. And, again, at this point, I had already identified that he had at least two knives on him and, you know, did not know if he had a firearm or not."* |

---

[223]Pages 78-79.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 68 of 82**
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 68 of 82

Atty. Gardner:      *"And where was he keeping the knives?"*

Mr. Udell:          *"In his jacket pockets."*

Atty. Gardner:      *"Okay. And his jacket, were the pockets --were they, like, patch pockets on the front? Were they kind of side, you know, hand-warmer-type pockets? Where were the pockets? Were they, you know, chest pockets?"*

Mr. Udell:          *"Just, like, standard waist-level jacket pockets."*

Atty. Gardner:      *"Okay. The kind that are -- sorry to get really detailed about this, but were they the kind where you put your hands in kind of close to the seams of the side of your jacket, like, in line with your -- with your arms or the kind where you can, you know, drop stuff in on the front?"*

Mr. Udell:          *"I mean, they were -- I don't know. Do you have, like, examples so we can hone this in together?"*

Atty. Gardner:      *"I guess when you were seeing him put the knives in and out, did it look like he was putting them -- like, dropping them into pockets or kind of pulling them out sideways in and out of the pockets?"*

Mr. Udell:          *"On multiple occasions, while he had, you know, his hands gripped around knives, he was putting the knife that was clenched in his hand in -- his whole hand inside the pockets."*

Atty. Gardner:      *"Okay.  So his arms were kind of going in sideways, not up and down?"*

Mr. Udell:          *"Yeah, I would say sideways."*

Atty. Gardner:      *"So when he is walking toward you, what was in -- was he holding knives at that point in time in his hands?"*

Mr. Udell:          *"The last time I saw him, like I said, he had his hands in -- gripped around the knives and put his hands in. So presumably, he still had the knives in his hand in his pockets."*

Atty. Gardner:      *"So his hands were in his pockets when he turned around and came toward you?"*

Mr. Udell:          *"There were periods of time when he had a hand out of his pocket, maybe. I don't remember exactly."*

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential)  **Page 69 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 69 of 82

Atty. Gardner: *"And I guess I'm trying --"*

Mr. Udell: *"Like, put his hands inside his pockets."*

Atty. Gardner: *"I'm trying to understand at what point --if you saw him with knives in his hands as he walked toward you."*

Mr. Udell: *"He put his hands back in his pockets when he was, like, six feet away from me. And at that point, he was going to pull the knives out and -- I believe -- and attack me."*

Atty. Gardner: *"Okay. So his hands were in his pockets six feet away from you, correct?"*

Mr. Udell: *"Yes."*

Atty. Gardner: *"What happened next?"*

Mr. Udell: *"Just reading the body language and trying to -- trying to stay calm in the situation. But he put his hands in his pockets, and I could see his gesturing, that he was going to pull them out. And, again, he was still saying, 'Or what?' And then as he gestured to, you know, reach for the knives, I had to defend myself, or he probably would have killed me."*

Atty. Gardner: *"And was your firearm in your hand the whole time when you went out the door?"*

Mr. Udell: *"No."*

Atty. Gardner: *"So at what point did it end up in your hand?"*

Mr. Udell: *"I mean, he -- after he started progressing towards me and he kept getting closer and ignoring my direct commands to stop moving towards me, both verbal and physical, I drew my firearm."*

Atty. Gardner: *"And when you say 'drew,' was it in a pocket? Was it in a holster? Where was it?"*

Mr. Udell: *"In a holster, on safe."*

Atty. Gardner: *"Okay. And did you draw it and hold it out toward him immediately, or did you draw it and just keep it by your -- your side initially, if you recall?"*

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 70 of 82**
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 70 of 82

| | |
|---|---|
| Mr. Udell: | *"I drew it and had it kind of in, like, a low ready position."* |
| Atty. Gardner: | *"At some point, did you raise it and point it toward him?"* |
| Mr. Udell: | *"I did after, again, multiple commands of him -- telling him to stop coming towards me, that he needs to leave. And, again, him countering with, 'Or what? Or what?' Yes, I did."* |
| Atty. Gardner: | *"And how close to you was -- was he when --when you raised your firearm and pointed it at him?"* |
| Mr. Udell: | *"I don't remember exactly how many feet it was."* |
| Atty. Gardner: | *"Was it closer than six feet? Farther than six feet?"* |
| Mr. Udell: | *"Probably a little bit farther than six feet."* |
| Atty. Gardner: | *"And at that point, you had a round in the chamber, correct?"* |
| Mr. Udell: | *"Yes, ma'am."* |
| Atty. Gardner: | *"At what point did that round get placed in the chamber?"* |
| Mr. Udell: | *"Upstairs in the office after the initial interaction."* |
| Atty. Gardner: | *"When he knocked on the door?"* |
| Mr. Udell: | *"He banged on the door violently, yes."* |
| Atty. Gardner: | *"Yes. Banged on the door, but before you had gone downstairs?"* |
| Mr. Udell: | *"Yes, ma'am."* |
| Atty. Gardner: | *"All right. So you raise your firearm. He's a little bit more than six feet. He continues progressing, saying, 'Or what? Or what?' while you're asking him to stop. And then what happens?"* |
| Mr. Udell: | *"Well, like I just said, he gestured with his hands in his pockets. And at that point, you know, I knew he had the knives --a knife --at least a knife in each pocket. And I had to defend myself because, again, six feet away, that's more than close enough for him to lunge and stab me to death."* |
| Atty. Gardner: | *"And can you be specific about what you did to defend yourself?"* |

Exhibit B
(Forensic Psychiatric Evaluation: Personal and Confidential) Page 71 of 82
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 71 of 82

Mr. Udell:          *"I discharged my firearm."*

Atty. Gardner:      *"How many times?"*

Mr. Udell:          *"Seven."*

Atty. Gardner:      *"Did you fire seven all -- seven shots all at once, or can you explain what you recall the spacing and the timing of those seven shots?"*

Mr. Udell:          *"I mean, it was a period of, you know, intense fear, like, overwhelming anxiety, all sorts of different emotions. I remember that after the first shot, you know, obviously, I jumped. I was in a closed space. Basically, lost the hearing in my left ear from that. He kind of jumped. And then nothing really happened. He was still standing there. And, again, I was extremely fearful. You know, in -- in that exact moment, I wasn't sure if I hit him or if it had any effect at all. And, again, just overwhelming fear. And then the next six rounds were used."*

Atty. Gardner:      *"So you're saying you could not tell if your first shot had hit him?"*

Mr. Udell:          *"I assumed, because he jumped, and I was six feet away. But it's not like I've been in this situation before -- so I have only shot at paper, which you can clearly see right after you shoot it."*

Atty. Gardner:      *"So this was the first time you'd ever shot a person?"*

Mr. Udell:          *"Yes, ma'am."*

Atty. Gardner:      *"When you shot him, were you trying to kill him?"*

Mr. Udell:          *"I was defending myself from being killed."*

Atty. Gardner:      *"I under -- and I understand your testimony on that. But was your intent in shooting him -- were you trying to kill him? Was the goal to kill him?"*

Mr. Udell:          *"The intent was for me to stay alive. As far as, like, the thought behind doing what you described, that wasn't what was going through my mind. It was: I am protecting my own life, and I need this unauthorized, armed, violent intruder to stop coming towards me after repeated commands to stop."*[224]

---

[224]Pages 113-121.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential) **Page 72 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 72 of 82

**Mr. Udell's fear for his life way well-founded, since Jayson, six years earlier at the age twenty-four, assaulted two police officer while grossly intoxicated with alcohol, one of whom was seriously injured.** On 8/29/2013, while vacationing with Becky in South Lake Tahoe, while on a gurney being wheeled towards an ambulance, Jayson suddenly became extremely agitated and violent with the first responders, and without warning threw a haymaker striking Officer Rider on the left side of his face with his closed right fist, and head-butted Officer Keys in the left shoulder. From the blow, Officer Rider suffered two fractures in his orbit (the bone socket in the skull that surrounds and protects the eye), one zygomatic (cheek) fracture, and a concussion. Moreover, Jayson screamed at the first responders and threatened to kill them and their children, requiring 8-10 firefighters and officers to restrain him, followed by a shot of the antipsychotic, Haldol, in the emergency room. Jayson was charged with: 1) felony battery against police officer; 2) obstructing/resisting an executive officer (misdemeanor); 3) battery against emergency personnel (misdemeanor); and 4) disorderly conduct: alcohol. The disposition of this case is unclear.

Moreover, Michael Nielsen, Becky Vinberg's step-father, told Special Agent Justin Lupien, the following:

> "*NIELSEN explained V/VINBERG had sketchy friends (NFI) **and may be prone to violence**. NIELSEN relayed a story wherein B.VINBERG's 11 year old son bragged about V/VINBERG 'beating someone up badly (NFI).'*"[225]

In February 2020, Jayson separated from his wife of seventeen years and their two sons, ages 9 and 11 years-old, and moved to Kodiak, Alaska where he was living with his mother at the time of his death. He continued to talk to his wife daily, and he told his addiction counselor, Hope Rustemeyer, that his goal is to get his life together, get sober and reunite with his family.[226] Jayson's biological father, Anthony Furio, advised that Jayson was in the process of trying to find a job, wanted to move his family to Kodiak, and would speak with his wife two or three times a day.[227]

Five days before the day in question, on 6/8/2020, Becky signed divorce papers, and three days before the incident, on 6/10/2020, she filed the papers.[228] Since neither Becky, nor his mother Donna, would cooperate with the investigation, it is unclear exactly when Jayson learned that his wife was divorcing him, but Jayson's aunt, Sandra Vinberg, told the investigator that she recalled being over at Donna's house the day after incident and Donna stated that Jayson had "*just snapped*" just before he left Donna's house on the night in question:

---

[225]"NFI" = "No further information." NAVY 4664.
[226]NAVY-PLTF 94.
[227]NAVY 4757.
[228]NAVY-PLTF 23.

*"Just, I saw her, DJ was holding her [Donna] and -- she said 'DJ, why, why?'*
*What did she say? 'He just snapped.' Something about him snapping, and -- she*
*said, 'If you're gonna be like that,' something like that, 'If you're gonna be that*
*way, get out of here,' something like that. Only because she was crying to*
*DJ."*[229]

When Donna was asked by Trooper Beaver if she knew why Jayson was on the Navy Base,
Donna replied:

*"Him and I got into an argument last night and he loaded his pockets up with*
*beer and took off out the door, so I don't know where he went."*[230]

**Jayson's emotional crisis and suicidal behavior, culminating in suicide by cop, was**
**precipitated by a "perfect storm" of risk factors for suicide on the day in question.**
Although Becky testified that their desire for divorce was mutual,[231] divorce is the second
most stressful life event (death of one's spouse is number one).[232] Moreover, the reality
that Becky had filed divorce papers would have shattered his hopes of reunification with his
family. On 3/16/2020, writes Hope Rustemeyer: KANA: (Addiction Counselor):

*"His goal is to get his life together, get sober and reunite with his family."*[233]

*"Client moved out of his home about a year ago but speaks to his wife daily in*
*hopes of reunification of the family."*[234]

**Jayson learning that his wife had filed for divorce, and his fight with his mother Donna,**
**who told him to "*get out of here,*" were the final straws for his emotional crisis culminating**
**in suicide by cop -- all in the context of his untreated and active methamphetamine, alcohol,**
**and cannabis abuse, and a drug-induced psychotic disorder. Although Carolyn stated that**
**Jayson was in good spirits on the day in question, and that nothing seemed amiss, as**
**mentioned Jayson's aunt Sandra Vinberg told the investigator that the day after the incident**
**Donna had told her, "*He just snapped.*"[235] Jayson's acute alcohol and cannabis intoxication**
**further impaired his judgment and attenuated his impulse control and were also significant**
**factors.**

---

[229] Bates 1712, Time index 32:45.
[230] Transcript of Trooper Audio Excerpts, USAO 7837. Also Navy 7795 audio recording.
[231] Page 87.
[232] Holmes & Rahle Stress Scale.
[233] NAVY-PLTF 94.
[234] NAVY-PLTF 96.
[235] Bates 1712, Time index 32:45. "DJ" is John Donald Vinberg, Jason's uncle.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 74 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 74 of 82

Since neither his wife nor his mother were cooperative with the investigators, it is unclear if Jayson made any explicit threat of suicide before leaving his mother's house on the night in question, or the nature of the argument that led to his having *"snapped"* just prior to leaving the house with beer, becoming intoxicated, sneaking on the Navy base, and provoking Mr. Udell into killing him. That said, in her deposition, Becky denied any awareness that Jayson was having suicidal thoughts around the time of his death.[236]

**Additional evidence for suicide by cop are the medical and mental heath records that indicate Jayson has a history of suicidal ideation.** Five to six years before the incident, Jayson was evaluated in the emergency room for suicidality.[237] Moreover, on 4/9/2020, Jayson presented to the Providence Kodiak Island Medical Center Emergency Department with a *"few months"* of suicidal ideation,[238] although later while in the emergency room claimed he alleged suicidal tendencies as a manipulation to get the hospital to test him for Covid-19, since he was hearing voices telling him to get tested for Covid-19.[239] Notwithstanding this, he endorsed four out of six items on the Columbia Suicide Severity Rating Scale.[240] Writes the triage nurse, Rebecca Echols, RN:

> *"Patient states having thoughts of harming himself for about 'few months'. Denies thoughts of harming others. States having past inpatient stay 'years ago'. States not having a plan, 'but if I have to have one I guess it would be a needle.' States has not had any ETOH in a 'few days'."*[241]

Writes the ER physician, Stephen Burnside, M.D.:

> *"Jayson J. Vinberg is a 30 y.o. male who presents for suicidal ideation. His initial complaint was either obtaining a COVID-19 test or 'suicidal tendencies.'"*[242]

**Jayson's psychiatric state was further deteriorated by his active methamphetamine addiction (IV and smoking), alcohol abuse, and cannabis abuse.** He was noted to be consistently using drugs and binging since moving back to Alaska in February 2020,[243] with use of methamphetamine daily,[244] with repeated periods of binging since moving back to Kodiak

---

[236]Page 122.
[237]NAVY-PLTF 94. Details unknown.
[238]NAVY-PLTF 115.
[239]NAVY-PLTF 126.
[240]NAVY-PLTF 118.
[241]NAVY-PLTF 107, 112.
[242]NAVY-PLTF 107.
[243]NAVY-PLTF 83.
[244]NAVY-PLTF 83.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 75 of 82**
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 75 of 82

in February 2020, and with no plans or motivation to stop or to participate in a drug treatment program.[245]

On 4/8/2020, Jayson reported to Dr. Colton methamphetamine withdrawal symptoms, including irritability and insomnia.[246]

On 4/27/2020, Jayson requested of Hope Rustemeyer a desire to be prescribed Vivitrol® for methamphetamine withdrawal, and she explained to him that methamphetamine withdrawal was not an indication for it.[247] **Since his last encounter with his addiction counselor was on 5/11/2020, who noted he last used methamphetamine four days before that, it is unclear when Jayson last used methamphetamine. That said, given the nature and extent of his severe methamphetamine addiction, and his lack of motivation to stop methamphetamine and undergo any substance abuse treatment, it is more likely than not that he continued to abuse methamphetamine sometime between 5/7/2020 (the date he was noted to have last used methamphetamine by Hope Rustemeyer), and the date of his death on 6/13/2020, although her postmortem toxicology was negative for methamphetamine.**

Moreover, in his text message to Becky dated 6/8/2020, Jayson writes:

> *"It's not that I don't have any intensions [sic] of turning it around."*[248]

Becky testified this meant that he had no intention of discontinuing drugs or alcohol.[249] Since methamphetamine has a half-life of approximately 6-17 hours, the urine toxicology detection window for methamphetamine is approximately 1-5 days. **Since Jayson's urine and pericardial blood toxicology were negative for methamphetamine, this is evidence that more likely than not he had not used methamphetamine at least for several days leading up to his death.** That said, common psychiatric manifestations of methamphetamine addiction include mood and anxiety disorders; psychotic symptoms (including auditory hallucinations and paranoia); violent or aggressive behavior; sleep disorders; impaired judgement and impulse control; and agitation and restlessness. Jayson having possibly gone cold turkey off methamphetamine, especially in the absence of any formal detoxification treatment program, would have led to methamphetamine withdrawal symptoms characterized by intense dysphoria with cravings; depression; anxiety; irritability; agitation; insomnia; and suicidal ideation -- withdrawal symptoms colloquially knows as a *"crash,"* although he did not appear to be crashing earlier on the day in question when painting Sandra Vinberg's deck.

---

[245]NAVY-PLTF 79, 104.

[246]NAVY-PLTF 83.

[247]Vivitrol is injectable naltrexone XR -- an opioid antagonist used to treat alcohol dependence and to prevent relapse of opioid dependence.

[248]PLTF 7787.

[249]Page 100.

Jayson's judgement and impulse control were further impaired by his alcohol intoxication (pericardial BAL 0.11) at the time he was killed.[250] **Alcohol intoxication would have diminished his fear of death (i.e., *"courage in a bottle"*) and further contributed to the agitated, confrontational, and aggressive behavior captured on by the vestibule and porch videos whereby he provoked Mr. Udell to shoot him in self-defense.**

Moreover, on 4/8/2020, Jayson reported to Hope Rustemeyer, and later that day to Dr. Colton, three months of hearing friendly voices (auditory hallucinations) of his friends and family telling him to do such things as get a psychiatric evaluation, quit his job, go to rehab, and get a divorce. He had never been prescribed antipsychotic medications prior to this.[251] He was prescribed the antipsychotic, olanzapine (Zyprexa®) by Dr Colton.[252] The next day Jayson was evaluated in the emergency room for suicidal ideation, noted to be having auditory hallucinations *"all the time"* which he found bothersome, and prescribed by Dr. Burnside the antipsychotic risperidal.[253] There is no mention in the emergency room note by Dr. Burnside that Jayson had been prescribed Zyprexa the day before Dr. Colton.

On 4/13/2020, Dr. Colton noted that Jayson never picked up his prescription for Zyprexa that he had prescribed on 4/8/2020, and that when Jayson went to pick to the pharmacy to pick up the Risperdal prescription prescribed by Dr. Burnside, it was denied due to having two concurrent antipsychotics prescribed. Dr. Colton noted the plan was for Jayson to start the trial of Zyprexa that night.[254] One week later, on 4/20/2020, Dr. Colton noted that Zyprexa made Jayson feel sluggish and loopy, and that although it decreased the voices, Jayson preferred to discontinue it and, instead requested trazodone for insomnia.[255] One month later, 5/22/2020 (approximately three weeks before the incident), Dr. Colton noted that Jayson had stopped using Zyprexa the preceding month, was continuing to have auditory hallucinations, and raised diagnostic question whether these were the result of ongoing methamphetamine abuse versus underlying *"schizophrenic tendencies."*[256]

**Jayson's auditory hallucinations are best explained by his ongoing methamphetamine abuse, and not by schizophrenia. Notwithstanding his methamphetamine-induced psychotic symptoms, there is no evidence that Jayson's behavior on the day in question was the result of any paranoid or bizarre or non-bizarre delusions (e.g., that the Navy Seal training base was manned by foreign terrorist disguised as American soldiers, from whom he needed to save America).**

---

[250]NAVY-PLTF 57.
[251]NAVY-PLTF 83, 105.
[252]NAVY-PLTF 83.
[253]NAVY-PLTF 107.
[254]NAVY-PLTF 81.
[255]NAVY-PLTF 79.
[256]NAVY-PLTF 77.

**Exhibit B**
(Forensic Psychiatric Evaluation:   Personal and Confidential)   **Page 77 of 82**
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 77 of 82

On 6/8/2020, two days before he was shot and killed, Jayson texted Becky:

> **"I don't wanna live with this noise any more and the only thing I'm willing to do is fight it, I'm angry."[257]**

As mentioned, Jayson had gotten into an argument with his mother, who told him to get out of her house, to which in response he loaded up his pockets with beer, stormed out, and headed for the base on the night in question:

> *"Just, I saw her [Donna], DJ was holding her [Donna] and -- she said 'DJ, why, why?' What did she say? 'He just snapped.' Something about him snapping, and -- she said, 'If you're gonna be like that,' something like that, 'If you're gonna be that way, get out of here,' something like that. Only because she was crying to DJ."[258]*

One basic tenet of psychiatry is that suicide can be a manifestation of "*anger turned inward.*" Jayson also had a great deal of self-loathing. Texts Jayson to Becky on 6/8/2020:

> *"Don't replace me with anyone like me!...please!"[259]*

Additional evidence that this is a case of suicide by cop is as follows. In 2008, two authors published a seventeen-item checklist of behaviors indicative of suicide by cop. Jayson meets the criteria for the items bolded:[260]

History of the Perpetrator:

(1) **Psychiatric or chronic medical illness:** The illness may have been already diagnosed or not be found until the autopsy or psychological autopsy.

(2) **Drug or alcohol abuse:** May be abuse of either legal or illegal substances.

(3) **Low socioeconomic background:** When people commit suicide, they may use the means with which they are most familiar. Exposure to police actions may be common for these individuals.

(4) Prior suicide attempts: The individual may have made prior attempts.

---

[257]PLTF 7792.

[258]Bates 1712, Time index 32:45.

[259]PLTF 7789.

[260]Lindsay M, Lister D, Criteria For Suicide-by-Cop Incidents, Psychological Reports, 2008, 102, 603-605.

**Exhibit B**
(Forensic Psychiatric Evaluation:  Personal and Confidential)  **Page 78 of 82**
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 78 of 82

**(5) Criminal history:** The subject may have a criminal history, most often of an impulsive nature.

Circumstances of the Incident:

**(6) Incident initiated by subject:** The subject approaches the police or creates a situation which will lead others to call the police.

**(7) Event to ensure police response:** The subject will create an incident that is designed to bring the police to him.

**(8) Subject forces confrontation:** Instead of surrendering, the subject will take actions that escalate the incident.

**(9) Initiates aggressive action:** The subject will become aggressive to heighten the officer's fear, thereby initiating an escalation.

**(10) Threatens officer with weapon:** The subject leads the officer to fear for his life.

**(11) Advances toward officers:** The subject will make some attempt to approach or appear to advance toward the officer. This is designed to reinforce the confrontation and the officer's belief that the subject is acting aggressively toward the officer. Again, this action is designed to escalate the situation.

(12) Refuses to drop weapon: The subject will not heed commands from anyone to drop the weapon. To do so would cause an immediate de-escalation of the incident and interrupt the suicide process.

(13) Threatens citizens with harm: The subject will use citizens (hostages) to maintain pressure on the police.

**(14) Presence of deadly weapons:** The subject will retain the weapon so as to ensure that the officer will kill him or her. The subject could also act in a way that causes the police to believe the subject is armed.

**(15) Recent stressor (uncontrolled for):** As with all suicides, there will be a crisis as the catalyst.

(16) Injured officer or citizen: Normally, if there is only one officer, that officer will not be harmed, as the officer is the instrument of death. If there are other citizens or officers present, the subject may attempt to kill one of them to escalate the incident.

Exhibit B
(Forensic Psychiatric Evaluation:   Personal and Confidential)  Page 79 of 82
Case 3:22-cv-00135-SLG     Document 154-3     Filed 08/25/25     Page 79 of 82

(17) Retreat by officer: The officer retreats out of fear for his life, not like a regular police shooting in which an officer retreats for cover and concealment. Officers have stated that they were **in fear for their lives (Officer Udell was in fear for his life).**

For the 39 cases of suicide by cop, the mean score for the 17 items (controlled and uncontrolled) was 12.9. **Jayson scored 12.5 out of 17.**

For the 11 of the 17 checklist items that were <u>controlled</u>, the suicide-by-cop incidents obtained a mean score of 6.9, and the non-suicide-by-cop incidents of 3.8 in the study. **Jayson scored an 7 out of 11.**

Another article published in 2000 listed eighteen "Behaviors clues to suicide by cop risk", with Jayson manifesting seven of the bolded clues:[261]

**1. Demonstrative with weapon.**
**2. Points loaded or unloaded weapon or apparent weapon at police.**
3. Clears a threshold in a barricade situation in order to fire weapon.
4. Shooting at the police.
**5. Reaching for a weapon or apparent weapon with police present.**
6. Attaches weapon to body.
7. Countdown to kill hostage or others with police present.
8. Assaulting or harming hostages or others with police present.
**9. Forces confrontation with police.**
**10. Advances on police when told to stop.**
11. Suspect calls the police him/herself to report crime in progress.
12. Continues hopeless acts of aggression even after incapacitation by gunfire.
13. Self-mutilation with police present.
14. Pointing weapon at self with police present.
15. Refuses to negotiate.
16. No escape demands.
**17. No demands.**
**18. Getting intoxicated with *"chemical courage"*.**

A recent study delineated risk factors for suicide. Jayson had all of the following risk factors:[262]

1. Unemployment.
2. Low socioeconomic status.

---

[261]Mohandie K, Meloy JR, Clinical and Forensic Indicators of "Suicide by Cop", J Forensic Sci 2000;45(2):384-389.
[262]Favril L, et al., Risk factors for suicide in adults: systematic review and meta-analysis of psychological autopsy studies, Evidence Based Mental Health, 22 Nov;25(4):148-155.
**Exhibit B**
**(Forensic Psychiatric Evaluation: Personal and Confidential) Page 80 of 82**

3. Low education.
4. Low income.
5. Depression.
6. Substance abuse disorder.
7. Alcohol use disorder.
8. Drug use disorder.
9. Psychiatric treatment.
10. Relationship conflict.
11. Financial problems.
12. Timing of events within past month.

In summary, based on the evidence, Jayson went to the Naval Special Warfare Cold Weather Detachment to commit suicide by cop by engaging in aggressive and threatening behavior intended to precipitate the use of deadly force by Bradley Udell -- the Officer of the Day/Duty Watchstander. On 4/9/2020, approximately two months before the incident, Jayson presented to the Providence Kodiak Island Medical Center Emergency Department with several months of suicidal ideation. Three days before the incident, Jayson's wife Becky filed for divorce. There had been an argument between Jayson and his mother over an unknown topic, following which his mother told him to get out. Although Jayson was described by his aunt, Sandra Vinberg, as being in good spirits when he FaceTimed with his wife Becky and two kids on the day in question, the day after the incident Sandra was at Donna's house, and, as mentioned, Donna stated to Sandra something to the effect, *"He just snapped,"* and *"If you're gonna be that way, get out of here."*[263] Jayson dressed himself for the outdoors, loaded his cargo pants pockets with beers from the refrigerator and left the apartment on foot, and did not speak anything about where he was going. Jayson was unable to be reached by cell phone according to his family, and he never returned home that evening (since he had been shot and killed).

Jayson's alcohol and cannabis intoxication, in the context of untreated crystal methamphetamine dependence, and his drug-induced psychosis, further impaired his judgment and impulse control. He presented to the Providence Kodiak Island Medical Center Emergency Department on 4/9/2020, approximately two months before the fatal shooting, with several months of suicidal ideation. Interestingly, Mr. Michael Nielsen, the step-father of Becky Vinberg, was not surprised by the incident and told the investigator, *"If he's [Mr. /Udell] feeling guilty, tell him that Jayson was a train wreck and this was bound to happen."*[264] The evidence is highly compelling that Jayson entered the base with a plan to provoke a serviceman into believing that his life was threatened, and to kill him in self-defense, as a means of committing suicide by cop, and from a forensic psychiatric perspective, this is not a close call.

---

[263]Bates 1712, Time index 32:45.
[264]NAVY 4662.

**Exhibit B**
(Forensic Psychiatric Evaluation: Personal and Confidential) **Page 81 of 82**
Case 3:22-cv-00135-SLG    Document 154-3    Filed 08/25/25    Page 81 of 82

If you should have any questions about this forensic psychiatric evaluation, or if I can be of further service to you, or your office, please contact me.

Very truly yours,

Steven A. Ornish, M.D.
Clinical Professor, UCSD Health Sciences
Department of Family Medicine

Past President, San Diego Psychiatric Society

Distinguished Fellow, American Psychiatric Association