# In The Matter Of:

*Estate of Jayson Vinberg, et al. vs.*
*United States of America*

---

*Deposition of MARK ZELIG, Ph.D., ABPP*
*April 23, 2025*

---

*Northern Lights Realtime & Reporting, Inc.*
*545 East 12th Avenue*
*Anchorage, Alaska 99501*



Exhibit E
Page 1 of 23

1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ALASKA

3

In the Matter of the Estate     )
4  of Jayson Vinberg, through      )
its Personal Representative,    )
5  Becky Vinberg,                  )
                                   )
6        Plaintiff,                )      Case No. 3:22-cv-0135-SLG
                                   )
7  vs.                             )
                                   )
8  UNITED STATES OF AMERICA,       )
                                   )
9        Defendant.                )
   _____)

10

11  _____

12              DEPOSITION OF MARK ZELIG, PhD, ABPP
   _____

13

14

15

16                     April 23, 2025
                      From 9:30 A.M.
17

18
                        Taken at:
19            OFFICE OF THE U.S. ATTORNEY
           222 West 7th Avenue, #9, Room 253
20              Anchorage, Alaska 99513

21

22

23

24

25

1   Q.  Let me back up.  Let's mark as Exhibit B your document review

2   from April 17th.

3   (Defendant's Exhibit B was marked for identification.)

4           MS. SCHEPERLE:  And then I'm going to mark as Exhibit C

5   your rebuttal report so we can just look at all of those together.

6   (Defendant's Exhibit C was marked for identification.)

7           THE COURT REPORTER:  So, there's Exhibits B and C.

8   Q.  (BY MS. SCHEPERLE)  Okay.  So, I'm trying to figure out what

9   you did to prepare for this deposition and, like, your timeline

10  and when you reviewed different things.

11      So, maybe it would be easier to go to your rebuttal and you

12  tell me what you reviewed at the time you wrote your rebuttal.

13  And then we'll turn to the other things.

14  A.  Okay.

15  Q.  It'll be more linear that way.

16  A.  Sure.

17  Q.  Okay.

18  A.  So, I did review Dr. Ornish's report --

19  Q.  Okay.

20  A.  -- early after being retained.

21  Q.  Got it.

22  A.  Okay.

23  Q.  And you can -- I have a copy of your rebuttal here if that

24  would be helpful to refresh what you might have looked at.

25  A.  Well...

**Exhibit E**
Case 3:22-cv-00135-SLG   Document 154-6   Filed 08/25/25   Page 3 of 23
**Page 3 of 23**

1  Q.  It's Exhibit C, for the record.

2  A.  You know, I'm trying to remember -- and maybe Plaintiffs'

3  counsel can help me.

4          THE WITNESS:  I believe I -- didn't I send you a

5  memorandum telling you what I had reviewed?

6          I mean, I --

7          MR. HITCHCOCK-LOPEZ:  I don't know if I -- I don't

8  really want to be testifying here.

9          But it's --

10  A.  Oh.  You know what's easier?  If we just look at the timeline.

11  Q.  (BY MS. SCHEPERLE)  Okay.

12  A.  It has those things that I reviewed.

13  Q.  So, for the record, you're going to the timeline that's at the

14  end of Exhibit A [sic].  It's Bated Plaintiff 10891.

15  A.  Well, I'm looking at Exhibit C right now.

16  Q.  Oh, excuse me.  Exhibit C.  Thank you.

17  A.  Okay.  So -- so, the timeline has the ordinance -- the or --

18  okay.  Has the Ornish report cited.

19      And what it does not have -- it doesn't have some of the

20  citations that are in the initial rebuttal report.

21  Q.  Okay.  So, let's walk through this.  So, you have on your

22  timeline the Ornish report.  On page 5 of 6 of that timeline, you

23  have South Porch Video.

24  A.  Yes.

25  Q.  So you reviewed that?

1  A.   Correct.

2  Q.   In the body of your report -- I'm looking at -- let me see

3  here -- page 4 of 7.   It's Plaintiff 10887 -- you reference

4  reviewing Becky Vinberg's deposition.   And you cite pages 95 to

5  102.

6  A.   Yeah.   I reviewed parts of it.

7  Q.   Okay.   What other parts of her deposition did you review as of

8  the time of writing your rebuttal?

9  A.   That -- it's limited to that.

10  Q.   Okay.   So, those -- that section, you also have some reference

11  to Alaska State Trooper reports.   And the Bates that I got there

12  were from 1806 through 1889.

13     Are those -- is that -- is that what you reviewed as far as

14  state trooper reports?

15  A.   At that time, yes.

16  Q.   Okay.   And then finally, it's -- this is on page 5 of 7 -- you

17  reference pictures at Bates 1933 to 2261.

18     Had you looked at those pictures at the time you wrote your

19  rebuttal?

20  A.   Oh, yes.   I did.

21  Q.   Any other materials that you reviewed at the time of writing

22  your rebuttal?

23  A.   The only other materials would be -- on page 7 would be

24  journal articles.

25  Q.   Okay.   Got it.   But no other factual materials?

1    A.   (The witness reads the document.)   I may have seen

2    something -- I may have looked in -- on the Internet for newspaper

3    articles, but I'm not sure.

4    Q.   You mean related to the incident?

5    A.   Yes.

6    Q.   Have you -- you don't -- excuse me -- you don't cite it

7    anywhere, so I'm assuming you did not review Mr. Udell's prior

8    statements or deposition; is that right?

9    A.   I did not review his deposition.

10    Q.   What about his statements to the Navy in the course of their

11    investigation?

12    A.   I cannot remember.

13    Q.   Okay.   If you had -- is it your practice to note the factual

14    material that you review?

15    A.   Yes.

16    Q.   So, is it a fair assumption you had not reviewed it if it's

17    not noted?

18    A.   That -- that is more than likely the case.   Because...

19    Q.   Okay.   And had you reviewed, like, any medical records or text

20    messages, anything like that, as of February 7th, 2025?

21    A.   I believe that I heard about the text messages from

22    Plaintiffs' counsel.   But I cannot recall reviewing them at that

23    point.

24      And I had a very -- very tight timeframe here from when I was

25    retained to the time that I had to get this in.

1  Q.  Okay.

2  A.  So, I made it very clear that my ability to review all of the

3  material I wanted to was limited.  And it certainly was.

4  Q.  Okay.

5          MS. SCHEPERLE:  I'm going to mark this as Exhibit D.

6  (Defendant's Exhibit D was marked for identification.)

7          THE COURT REPORTER:  There's Exhibit D.

8  Q.  (BY MS. SCHEPERLE)  This exhibit is what I believe are your

9  notes from review of this case; is that right?

10 A.  These are notes that I made after each conversation I had with

11 Mr. Hitchcock-Lopez.

12 Q.  Okay.  So, when you -- if you go to -- I see that you have,

13 like, a timestamp and a date at the top.

14     Is that fair to say that's when you created these?

15 A.  I always put the date on them.

16 Q.  Okay.  And that's the date that the conversation happened?

17 A.  The date and time.  Yeah.

18 Q.  Okay.  If we go to the one dated 1 April 2025 -- it's the

19 second-to-last page.

20     So, you have here, three lines down, "I indicated that I was

21 uncertain how much to bill for preparation due to the fact I had

22 not completely read all the relevant materials before I wrote my

23 report."

24 A.  Yes.

25 Q.  So, at -- so, this was on April 1st.  And so had you, by

```
 1        Do you ask for things that might be missing from what you have
 2   that are referenced?
 3   A.  Well, I -- I often -- I typically -- and it was in this
 4   case -- is I make it real clear to the retaining attorney that, "I
 5   want you to send the most damning evidence to me that you can."
 6   Q.  Uh-huh.
 7   A.  Because I tell them that is so much better than being made
 8   aware of evidence on cross-examination in trial.
 9   Q.  Okay.
10   A.  You know?
11   Q.  So, you're asking -- you ask the attorney to send you the
12   things that are most damaging to their case?
13   A.  Yeah.
14   Q.  Okay.  And did that happen here?
15   A.  As far as I know.
16   Q.  Okay.  And then, typically, are you conducting, like, a
17   comprehensive review of the file before issuing an opinion?
18   A.  I typically do a comprehensive review of the file.  If I had
19   more time, I would have reviewed more material.
20   Q.  Okay.  So, here, the reason you didn't follow that process was
21   a time crunch?
22   A.  It was a -- yes.  It was a -- a major time crunch.
23   Q.  And we talked about it earlier.  I think that you said your
24   depositions are the main thing that you would want to look at next
25   that you hadn't had an opportunity to complete looking at.
```

1  looked at the complete file, looked at the summaries and thought

2  about whether or not you needed to listen to an important

3  interview?  Things like that?

4  A.  I'm not going to say the complete file.  Because some of the

5  files -- I mean, just look what's on your desk there.

6    I mean, some of these files are so huge that I have to make

7  some decisions about what is -- what are the most important

8  documents.

9  Q.  Okay.

10  A.  And some of those, I may listen to the actual interview; I may

11  not.  I -- I really have to prioritize.

12  Q.  Okay.  But I'm trying to understand, before you offer an

13  opinion in court, like, what else you would typically do that you

14  have not yet done in this case.

15    So, as I understand it, that would be, in this case, looking

16  at the depositions, looking at the interviews and making decisions

17  about whether or not to listen to it or read a transcript.

18    And then I would assume there's, like, perhaps other factual

19  information.  Like, other parts of the investigative file you

20  haven't had a chance to look at yet.

21    Is that fair?

22  A.  Yes.  Well, it's generally fair.  What I would do if I knew

23  this was going to trial is I would make every effort possible to

24  read the depositions.  Or read any original transcripts.

25    I can almost guarantee if this goes to trial, I'm not going to

1  continuing education.

2  Q.  Okay.  So, I noticed on here that you are a member of the

3  American Psychological Association, right?

4  A.  I am.

5  Q.  And you're -- I think you had in here that you're going to be

6  contributing to the upcoming APA handbook on forensic psychology?

7  A.  That is correct.

8  Q.  Okay.  So, you've received other honors from them over time,

9  it looks like, too?

10  A.  Yes.

11  Q.  Okay.  So, you are familiar with the guidelines -- the

12  specialty guidelines for forensic psychology?

13  A.  I am.

14  Q.  And are they simply best practices for forensic psychologists?

15  A.  That's hard for me to say right now because they're under

16  revision.  They're very general recommendations.

17     And -- but there are times in which a responsible forensic

18  psychologist will deviate from those.  But when they deviate, they

19  usually can tell you why they're -- are doing so.

20  Q.  Okay.  And that's part of the preamble to the guidelines,

21  right?

22  A.  Well, guidelines in the American Psychological Association --

23  none of them are mandatory.

24  Q.  Right.

25  A.  The ethics code is the mandatory part.

1  Q.  Okay.  All right.  And these guidelines are meant to apply to

2  several things, including providing testimony in judicial

3  proceedings?

4  A.  They cover all sorts of things.  Even teaching --

5  Q.  Okay.

6  A.  -- at a college.  They address some of that.

7  Q.  Okay.  And the APA guidelines have in the -- Section 9 has

8  several principles.  And one of them is, you know, seeking

9  information to test different hypotheses, right?

10  A.  Yeah.  Are you talking about the ethical principles or the

11  forensic psychology guidelines.

12  Q.  The forensic psychology guidelines?

13  A.  Okay.  They -- they certainly recommend that when you do a

14  forensic investigation, to the extent possible, you consider

15  various sources of information.

16  Q.  They also recommend that you have sufficient information or

17  data to form an adequate foundation?

18  A.  Well, an adequate opinion, yeah.

19  Q.  Okay.

20  A.  I believe.

21  Q.  And they recommend that forensic practitioners seek to make

22  reasonable efforts to obtain information or data and document

23  their efforts to do so?

24  A.  Yes.

25  Q.  Okay.  So, in this case, as we've gone over, before issuing

1  your rebuttal, you had not had an opportunity to look at all of

2  the material?

3  A.  Yes.

4  Q.  Okay.  But you would agree it's best practice to have done so

5  before issuing an opinion, right?

6  A.  This is where you have to use your head a little bit.  Because

7  I had a limited amount of time.  And I -- what I did do is try to

8  focus on what was most relevant at the time.

9      And Dr. Ornish did quite a review -- lengthy review of

10  documents.  I believe his report's 92 pages or something like

11  that.

12      So -- yeah.  I think for the time I had, that this was

13  reasonable.  And I think it also -- I made it pretty clear that my

14  opinion's subject to change.

15  Q.  Okay.  And I understand that answer.  But I was asking more

16  generally.

17      Is it best practice, in forensic psychology, to review all

18  available information?

19  A.  Well, yeah.  If you -- you know, that's more of an

20  aspirational -- it's more of an aspirational guideline than it is,

21  like, a -- like, a piece of -- whether your behavior's ethical or

22  not.

23      And that's exactly why I asked Plaintiffs' counsel if they

24  could get an extension.  But I was told that the Government's

25  being very hard lined on this, and that would not be likely.

1    So, I understand where both of you are coming from there, but

2  I certainly did try to get more time.

3  Q.  Okay.  And all of the information, with the exception of a

4  couple of the family -- recent depositions, was available prior to

5  February 7th, correct?

6  A.  I -- I have a feeling I could have got whatever I requested.

7  Q.  Okay.  What efforts did you make to request additional

8  information before drafting your rebuttal?

9  A.  Well, I was -- I was told that they have a large collection of

10  discovery.  I started looking at the Bates numbers here.  That I

11  think go into five digits.

12    So, I knew that what I needed to do in the short run was to

13  try to identify what was most important.

14    And in -- when I'm being asked to do a rebuttal -- give a

15  rebuttal opinion, that tells me that my main job is to rebut the

16  other experts.

17  Q.  Okay.

18  A.  So, that's why I focused on reading his report.

19  Q.  Okay.  But you didn't read the only other living person's

20  account of what happened; Mr. Udell's interview with the Navy or

21  his deposition, correct?

22  A.  There's a lot of things that I didn't read or that I haven't.

23  Q.  Right.  But you would agree he was the only person still

24  living who witnessed what happened?

25  A.  Yes.  I would agree with that.

1  Q.  Okay.  And you didn't make efforts to review that before your

2  rebuttal?

3  A.  No, I did not.

4  Q.  Okay.  And you would agree that the guidelines recommend that

5  practitioners ordinarily avoid relying on only one source of data,

6  right?

7  A.  Yes.

8  Q.  Okay.  And at the time you wrote your rebuttal, your sources

9  of data were Dr. Ornish's report, the south porch video, some of

10 the trooper reports, some pictures, and about five pages of

11 Becky's deposition; is that right?

12 A.  Five pages of what?

13 Q.  Becky Vinberg's deposition.

14 A.  Probably less than that.

15 Q.  Okay.  And have you ever watched the videotape of Mr. Udell

16 being interviewed?

17     Or I'm sorry -- yeah.  The interview with Mr. Udell.

18 A.  No.

19 Q.  And I think you touched on this earlier.  You'd have to agree

20 that his body language, demeanor, inflections might give you

21 important information?

22 A.  Yes.

23 Q.  Okay.  Okay.  And that not only goes to maybe how things

24 affected him but also his credibility in his account, right?

25 A.  Well, it's more information.  So, it could go toward

1  increasing or decreasing his credibility.

2  Q.  Right.  I don't mean one way or the other.  I just mean it

3  could impact his -- his credibility?

4  A.  Sure.

5  Q.  Okay.  You wrote on your timeline back -- Exhibit G.  Let's go

6  to this part -- that Mr. -- I'm trying to -- I had it on

7  Exhibit B -- or Exhibit F, I mean.  Give me a second.

8      Okay.  So, if we're on page 13 of your most recent timeline --

9  that's Exhibit G -- you have at 2151 on June 13th, 2020 --

10 A.  We're on page 13, right?

11 Q.  Yes, sir.

12 A.  Okay.

13 Q.  It says "Vinberg appears to be holding two objects that were

14 possibly knives in each hand."

15 A.  That's from the NCI -- NCIS report.

16 Q.  Okay.  Is there doubt in your mind about whether or not he was

17 holding knives?

18 A.  There isn't much doubt.  Except for the fact that -- as I

19 recall that part of the report, even the NCI -- gosh.  Tongue

20 twister.  Even the Navy investigator felt that was important to

21 get some enhancement --

22 Q.  Okay.

23 A.  -- of that to better discern what was in his hands or not in

24 his hands.

25 Q.  Okay.  And did you look at those enhanced photos?

1   A.  No, I did not.

2   Q.  Are you aware that they show Mr. Vinberg holding knives?

3   A.  I would assume that they do.  But I haven't seen that.

4   Q.  So, you're not doubting that piece of evidence.  You were

5   just, you know, phrasing this in line with the report?

6   A.  Yeah.  I --

7   Q.  Okay.

8   A.  -- I don't have any reason to doubt that they -- that they

9   weren't knives.

10       I'm just making very -- I'm making it very clear what my

11  source of information was.

12  Q.  I understand.  And do you have any doubt that Mr. -- of

13  Mr. Udell's account that Mr. Vinberg was holding knives, tapping

14  on the glass, and saying, "Come on"?

15  A.  I only can go on what Mr. Udell reports.  Because there is no

16  audio.

17       But I don't have any reason to believe that he was lying.

18  Q.  Okay.

19  A.  I -- I'm -- I'm sure like other witnesses, he could be making

20  mistakes.

21  Q.  Okay.

22  A.  But I don't have anything to suggest that he was willfully

23  misrepresenting his experience.

24  Q.  And do you agree that Mr. Vinberg holding knives -- you know,

25  displaying them by tapping on windows and saying, "Come on," might

1    Q.  Okay.  And he also attached -- if you go back to the first
2    page -- Mr. Udell's deposition.  On January 24th.
3    A.  (The witness reads the document.)  Yes, he did.
4    Q.  Okay.  So, you testified a moment ago that you looked at some
5    of the links that Mr. Hitchcock-Lopez had identified but not all
6    of them.
7        And my understanding is that you didn't do any research beyond
8    what he sent you either; is that -- is that right?
9        I mean, you did -- let me -- excuse me.  You did some
10   literary -- literature research, but you didn't do any factual
11   research beyond what he had sent you?
12   A.  I had -- I had not -- everything I relied upon is cited in
13   this preliminary report.
14   Q.  Right.
15   A.  So, that means there were a lot of things that I didn't look
16   at.
17   Q.  Right.  I'm just trying to make sure I understand that you
18   didn't look beyond the -- the factual predicate that
19   Mr. Hitchcock-Lopez sent you.
20   A.  No.  I -- I'm not even sure I quite understand the question.
21   Q.  Well --
22   A.  I can --
23   Q.  I'm sorry.
24   A.  Go --
25   Q.  Sometimes when I work with experts, they will do independent

1    research.  Or, you know, if I send them the whole file, there

2    might be some things I expect that they've looked at, but then

3    they have actually picked up on something I completely -- I didn't

4    identify.  They've looked at something -- another aspect of the

5    file.

6        So, what I'm trying to understand is whether -- as I think

7    this is true from your testimony, it seems that you reviewed the

8    things identified in your timeline at the time of writing the

9    rebuttal, which are also all things that are referred to by

10   Mr. Hitchcock-Lopez in his email.

11       It's not like you went out and found another part of the file

12   that he didn't direct you to.

13   A.  No.  I did not.

14   Q.  Okay.  And I think you would agree that -- as you mentioned in

15   reference to something else -- that attorneys and forensic

16   psychologists might have different opinions about what's

17   important?

18   A.  Oh, certainly.

19   Q.  Okay.  And so you'd agree that Mr. Hitchcock-Lopez's legal

20   perspective might differ from yours on what is probative for

21   forensic psychology?

22   A.  That's right.  I mean, he's an advocate for his client.  I'm

23   an advocate for the data.

24       And sometimes those don't exactly fit with each other.

25   Q.  So, if you relied on Mr. Hitchcock-Lopez filtering what you

1   this literature is to make law enforcement officers and other

2   people entrusted with firearms aware of the -- this -- signs that

3   they may be stepping into one of these situations.

4   Q.  Okay.

5   A.  So, I -- so, that's why I thought it was important to identify

6   that.

7   Q.  Okay.  And to be clear, I think on your CV, I didn't see that

8   you had served in the military, right?

9       You served in the police?

10  A.  No, I did not.

11  Q.  And have you ever been qualified as an expert in military

12  psychology?

13  A.  I'm pausing a second because I have testified at a number of

14  court-martials and asked to give expert opinion there.

15      But when you talk about military psychology or you talk about

16  police psychology, what we think of is we think of specific parts

17  of psychology that just pertain to police departments or military

18  organizations.

19      So, in that regard, even though I've been an expert in

20  military reports, I can't recall a time that I've ever been asked

21  to give an opinion on so-called military psychology.

22  Q.  Okay.  And you're not an expert in antiterrorism; is that

23  right?

24      From a military perspective?

25  A.  No.  But I have done -- oh.  I've done some things that are

1  A.  No.

2  Q.  And you're not sure if you've reviewed the policy for watch

3  standers that outlines their duties?

4  A.  No.  I have not.

5  Q.  Okay.  And your expertise -- you have a lot of expertise, but

6  your expertise is in the context of law enforcement, right?

7  A.  Yes.

8  Q.  And you'd agree this case doesn't involve law enforcement

9  officers, right?

10  A.  No.  It's my understanding it was not -- that he didn't have

11  arrest powers or --

12  Q.  Okay.

13  A.  -- anything like that.

14  Q.  Do you have any training or expertise on use of force by

15  military personnel?

16  A.  No.

17  Q.  Okay.  And you would agree --

18  A.  Except -- except --

19  Q.  Go ahead.

20  A.  -- as I -- I certainly think that my experience and training

21  would apply to military personnel that are military police

22  officers.

23  Q.  Okay.  But that's not our situation here, right?

24  A.  That's correct.

25  Q.  Okay.  And you're not being offered as a use-of-force expert,

1 right?

2 A.  I -- I'm not sure.  I --

3 Q.  So, when we --

4 A.  I --

5 Q.  Oh, sorry.  Go ahead.

6 A.  I know.  You're looking for the notice.

7 Q.  I am.  It's somewhere over here.  It's Exhibit J.

8     And you were noticed as an -- a clinical, forensic, and police

9 and public safety psychologist.

10 A.  Yeah.  And it doesn't say use of force.  Except a lot of the

11 police -- the board-certified police and public safety

12 psychologists have a lot of training in force.  And even qualified

13 in -- are very accustomed to weapons.  Wear vests when they go to

14 work on certain calls.

15     And they're very -- a lot of us are very familiar with police

16 use of force.

17 Q.  Okay.  And your opinion in your rebuttal is that Mr. Udell may

18 have been able to avert the outcome, had he received additional

19 training that is commonly provided to law enforcement officers in

20 North America?

21 A.  No question.

22 Q.  Okay.  But as we've gone over, Mr. Udell is not a law

23 enforcement officer for the military, correct?

24 A.  Correct.

25 Q.  So, why would those law enforcement standards apply in this

1   A.  I don't know what the -- the standard of care is in -- yeah.

2   Especially on this particular base.

3   Q.  Okay.  And you don't have any special expertise in military

4   policies and protocols?

5   A.  That's correct.

6   Q.  All right.  And your opinion is based on your police

7   experience and your common sense?

8   A.  And research that I've done as a psychologist.

9   Q.  Has any of that research related to the military?

10  A.  Well, it does.  Because -- because reaction time and some of

11  these other findings we have with police would apply to somebody

12  in this situation.

13  Q.  Okay.  I'm not asking whether it has any relevance.  But has

14  any of that research looked at the military in particular?

15  A.  I'd have to check.  It's probably a good thing to look up.

16  Q.  But sitting here today, you haven't done that?

17  A.  No, I haven't.

18  Q.  Okay.  You've many times criticized Mr. Udell's choice of

19  weapon.  And you asserted in your rebuttal that municipal law

20  enforcement officers would not carry such a weapon --

21  A.  There is --

22  Q.  -- correct?

23  A.  -- an exception.  Sometimes we would carry these smaller guns

24  as backup guns underneath our vests in case our service weapon was

25  taken from us or didn't work.

1   A.   Yes.   And -- and different training.

2   Q.   All right.   And you're not an economist?

3   A.   No.

4   Q.   Okay.   And as we've gone over, you're not being offered as an

5   expert in use of force, according to your notice?

6   A.   According to the notice, yeah.   I -- yes.

7   Q.   Okay.

8   A.   As far as I know.

9   Q.   And you're not being offered as an expert in military

10   procedures or policies?

11   A.   That's my understanding.

12   Q.   Okay.   All right.   Thank you for your time.   I'm sure

13   Mr. Hitchcock-Lopez might have some follow-up.

14           MR. HITCHCOCK-LOPEZ:   I don't really think I do have

15   much.   I just wanted to clarify a couple of things for the record

16   but probably mostly for myself because the record's probably

17   clearer than I am.

18           Am I good to get going?

19           THE COURT REPORTER:   Yes, sir.

20           MR. HITCHCOCK-LOPEZ:   Just launch in.

21                           EXAMINATION

22   Q.   (BY MR. HITCHCOCK-LOPEZ)   Way back when we started, I know

23   Ms. Scheperle was asking you a couple questions about the

24   geography.

25       And I may have just gotten confused, but you have some