# Mark Zelig, Ph.D., ABPP, LLC

Board Certified by the American Board of Professional Psychology in
Forensic Psychology, Police & Public Safety Psychology, and Clinical Psychology
Alta Psychological Services, Inc.
Licensed in Alaska, Colorado, Hawaii, Nevada, Utah & Wyoming

6925 Union Park Center, Suite 550
Cottonwood Heights, Utah 84047-6527
801-273-3365

Facsimile (toll free) 866-907-2822
email: forensicalaska@gmail.com
website: www.markzelig.com

4325 Laurel St, Suite 297
Anchorage, Alaska 99508-5365
907-561-4141

Confidential
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH

**Document Review**

22 April 2025

Note: This report contains confidential information regarding the defendant, plaintiff, and members of their families. I strongly recommend that this report be sealed by the Court, and only distributed to those who must review its contents.

This document is a summary of the documents and interviews referenced below. As such, none of these entries necessarily reflect any professional conclusion or opinion regarding the validity or relevance of the facts which are of interest to the parties.

These notes were generated as I encountered various documents. Anything which appeared to have possible relevance was noted. Some of these notations may ultimately lack relevancy. The reader may also observe conflicts of fact, time, or perception between different reference sources.

On occasion, I have referred to a document as "unremarkable," which either means the information contained therein is redundant or not of apparent relevance to this forensic evaluation.

I have also added commentary when appropriate, which is either bracketed, bolded, or contained in some of the footnotes. To avoid confusion, I have converted all time references to the 24-hour clock (e.g., 11:00 pm = 2300). To make this easier to read, I have italicized direct quotes and set off longer quotations as block quotes.

I have expanded medical abbreviations within quoted passages to improve readability. The names of brand-named drugs are capitalized; generic drugs are not. The definitions of various psychiatric terms, conditions, and medications are provided in the Glossary, which is contained within the *Time Line, Character List, and Glossary*.

Since there are several people with the same last name referenced below, I referred to them by their first names, hoping to ease the burden on the reader. No informality is intended.



**Exhibit G** VB005519
**Page 1 of 44**

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 2 of 43

**Table of Contents**

Kodiak Area Native Association Health Services (KANA), added 22 April 2025 . . . . . . 4
   3 March 2020, Initial Consultation, Adam Colton, DO . . . . . . . . . . . . . . . . 4
   8 April 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        8 April 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   13 April 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   20 April 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   22 May 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   Death Certificate, 23 June 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

NCIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   Social Media Check on Bradley Udell, 14 June 2020 . . . . . . . . . . . . . . . . 5
   Social Media Check on Mr. Vinberg, 14 June 2020 . . . . . . . . . . . . . . . . . 5
   Report of Investigation, 15 June 2020 . . . . . . . . . . . . . . . . . . . . . . . 5
   Interview with SBC Daniel Bronner, USN, 19 June 2020 . . . . . . . . . . . . . . 6
   Interview with SO1 Jeffrey Welch, USN, 19 June 2020 . . . . . . . . . . . . . . . 6
   Interview with IT1 Avery Storm, USN, 19 June 2020 . . . . . . . . . . . . . . . . 6
   Interview with HM2 Joseph Birkmeyer, USN, 19 June 2020 . . . . . . . . . . . . 7
   Interview with SO1 Luke Brown, USN, 19 June 2020 . . . . . . . . . . . . . . . . 7
   Interview with SO1 Jonathan Cox, USN, 19 June 2020 . . . . . . . . . . . . . . . 7
   Interview with Jared Holforty, Civilian, 20 June 2020 . . . . . . . . . . . . . . . 7
   Report of Investigative Action, 24 June 2020 . . . . . . . . . . . . . . . . . . . . 7
   Interview with SOC Troy Button, USN, 24 June 2020 . . . . . . . . . . . . . . . . 7
   Interview with SO1 Zachary Castonguay, USN, 24 June 2020 . . . . . . . . . . . 8
   Report of Investigation Action, 29 June 2020 . . . . . . . . . . . . . . . . . . . . 8
   Report of Investigative Action, 1 July 2020 . . . . . . . . . . . . . . . . . . . . . 8
   Executive Summary 13 July 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   Investigative Action, Record Book Review for PO1 Udell, 20 July 2020 . . . . . . 8
   Investigative Action, Identification of State Troopers and Kodiak Investigators, 30
       July 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   Investigative Action, 30 July 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   Schematic Diagrams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   Investigative Action, failed attempts to interview Donna Vinberg, 30 July 2020
   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   Investigative Action, neighborhood canvas, 30 July 2020 . . . . . . . . . . . . . 9
   Report of Investigative Action, Attempts to interview Becky Vinberg, 2 August 2020
   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ornish, Steven, MD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   Psychiatric Evaluation, 19 December 2024 . . . . . . . . . . . . . . . . . . . . . 10
      Synopsis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        Commentary, added 21 April 2025 . . . . . . . . . . . . . . . . . . . . . 10
   Security of Naval Special Warfare Cold Weather Detachment . . . . . . . 10
   Records Reviewed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Exhibit G**

**Page 2 of 44**

VB005520

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 3 of 43

Footnote added 21 April 2025 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Review of Autopsy Report . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Interview with Bradley Udell . . . . . . . . . . . . . . . . . . . . . . . . 13
Interview with Anthony Furio, father of decedent, 20 June 2020 . . . . . . 14
Interview with Richard Borton, 21 June 2020 . . . . . . . . . . . . . . . . . . 14
Interview with of LS2 Gerald Schlintz, USN . . . . . . . . . . . . . . . . . . . . . 14
Interview with CWO Stacy Virgin, USN . . . . . . . . . . . . . . . . . . . . . . 14
Interview with Stephen Lenhert (Civilian), 22 June 2020 . . . . . . . . . . . 14
Interview with Caroline Merrigan (Jayson's Aunt), 23 June 2020 . . . . . . 14
Interview with Danny Wayne Fox, USN . . . . . . . . . . . . . . . . . . . . . . 15
Interview with John Glover (Civilian) . . . . . . . . . . . . . . . . . . . . . . . . 15
Interview of Sandra Vinberg (Jayson's Aunt) . . . . . . . . . . . . . . . . . . . 15
Interview with Abner Nelson (Friend of Jayson's), 24 June 2020 . . . . . . 15
Interview of Michael Nielsen (Becky's Stepfather), 3 July 2020 . . . . . . . 16
Letter from Frank V. Russo, Criminal Chief, US Department of Justice to
Special Agent Eric MacLennan, US Naval Investigative Services and
Investigator Christopher Long, Alaska State Troopers, Investigation
Conclusions, US Department of Justice . . . . . . . . . . . . . . . . . . . 16
Diagnoses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Commentary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Suicide by Cop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Deposition of Bradley Udell, 29 February 2024 . . . . . . . . . . . . . . . . . . . 19
Examination by Mr. Traini . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Further Examination by Ms. Gardner . . . . . . . . . . . . . . . . . . . . . . . . . 26

Providence Kodiak Island Medical Center, added 22 April 2025 . . . . . . . . . . . . . . 26
9 April 2020, Stephen Burnside, MD . . . . . . . . . . . . . . . . . . . . . . . . . 26

Rustemeyer, Hope added 22 April 2025 . . . . . . . . . . . . . . . . . . . . . . . . . 27
Behavioral Health Assessment, 16 March 2020 . . . . . . . . . . . . . . . . 27
6 April 2020, Hope Rustemeyer . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
8 April 2020, Hope Rustemeyer . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
13 April 2020, Hope Rustemeyer . . . . . . . . . . . . . . . . . . . . . . . . . . 30
20 April 2020, Hope Rustemeyer . . . . . . . . . . . . . . . . . . . . . . . . . . 30
22 April 2020, James Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
27 April 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
11 May 2020, Hope Rustemeyer . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Sled Dogs added 22 April 2025 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Vinberg, Becky . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Deposition 21 November 2024, Salt Lake City . . . . . . . . . . . . . . . . . . . . 32
Examination by Ms. Scheperle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Social History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Exhibit G**
**Page 3 of 44**
VB005521

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 4 of 43

    Ms. Vinberg moves to Alaska and meets Jayson . . . . . . . . . . . . . . . . . 33
    Ms. Vinberg's Experience with Firearms . . . . . . . . . . . . . . . . . . . . . . . 33
    Sources Of Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Ms. Vinberg's knowledge about Jayson before they got married . . . . . . 33
    Work experience after moving back to Alaska in 2020 . . . . . . . . . . . . 35
  Ms. Vinberg's familiarity with the Detachment . . . . . . . . . . . . . . . . . . . . . . 38
    Becky Vinberg's criticism of Bradley Udell . . . . . . . . . . . . . . . . . . . . . 41
  Examination By Mr. Hitchcock-Lopez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Unified Police Department, Salt Lake County, Utah, added 22 April 2025 . . . . . . . . 41
  Shoplifting Arrest, 6 May 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*new*

### Kodiak Area Native Association Health Services (KANA), added 22 April 2025

<u>3 March 2020, Initial Consultation, Adam Colton, DO</u>. Dr. Colton learns that Jayson has moved back to Kodiak for the first time since high school and is presently staying with his mother. Jayson inquired about resources at KANA in regard to job training *"and helping him get back on his feet now that he is back in town. Takes no medications."* This clinician notes:

> longstanding issues with polysubstance abuse inclusive of cocaine and methamphetamine. Had issues with this living in Utah and went [on] a bender over the last week on his way back to Kodiak. Stopped in Anchorage for one week and has been 'partying quite a bit' inclusive of regular use of meth (inclusive of IV use) and cocaine. Has history of heroin long time ago however did not like it. Occasional alcohol user. He states an interest in speaking with BHS regarding addiction resources. He denied any depression or suicidal ideation.

The physical examination is unremarkable.

Diagnoses include polysubstance abuse and intravenous drug user (NAVY-PLTF 86-87).

[BHS likely refers to Behavioral Health Services].

<u>8 April 2020</u>. Jayson reports that he has been experiencing three months of auditory hallucinations that began before he initiated the frequent use of drugs.

> These voices are familiar and he recognizes them as the voices of his friends and family that are telling him to do certain things in his life such as go to rehab, get a divorce, etc. There is no threatening nature of these voices and denies any suicidal or homicidal ideations. Understands these voices are not real and wants to get them to go away. He has been binging on meth for the past month. He stopped last Saturday. He believes that he is having mild withdrawal symptoms along with irritability. In the past week he has been awake most of the time and would like some assistance with his sleep. He was reportedly seen by Hope at Caroline Street

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 5 of 43

but did not receive any treatment for mental health in the past. He denied any family history of schizophrenia. He is not interested in seeing a psychiatrist. He is prescribed Trazodone. He is also given a prescription for olanzapine (an antipsychotic). Today's diagnoses include auditory hallucinations, insomnia, and methamphetamine abuse. He declined the referral to psychiatry (NAVY-PLTF 79-80).

8 April 2020. Continues to use meth continually. He saw Hope at Caroline Street recently. He is denying any history of schizophrenia in his family (NAVY-PLTF 83).

13 April 2020. Jayson reported that he was seen at the Providence ED four days prior after his auditory hallucinations got worse. He had not picked up the Zyprexa prescription. When at Providence he was having suicidal ideation. He denies making that report today. He reports that he hasn't used meth for a week and wants to repeat lab testing because he was sharing needles about a week ago. He is denying homicidal or suicidal ideation (NAVY-PLTF 81).

20 April 2020. Daily meth use continues with no plans on stopping. He stopped the olanzapine because it made him feel sluggish and loopy. Requests trazodone noting that it has helped him in the past (NAVY-PLTF 79).

22 May 2020. Jayson appears for a refill of trazodone. He stopped using olanzapine last month. He continues to hear voices but they don't bother him so he prefers not to be on medication for it. He plans to follow up with Hope on Caroline Street. He's not sure he wants to stay in Kodiak, indicating he *"needs to figure some things out"* (NAVY-PLTF 77-78).

Death Certificate, 23 June 2020. Dr. Rolf is the medical examiner. Decedent's race is described as Alaska Native (NAVY-PLTF 75).

**NCIS**

Social Media Check on Bradley Udell, 14 June 2020. Investigator Landrum was unable to find a Facebook or other social media account related to Bradley Udell (Navy 4908).

Social Media Check on Mr. Vinberg, 14 June 2020. Investigator Landrum found a Facebook account for Jayson Vinberg, with the most recent activity on March 2017. His profile was listed as private. This investigator found a recent Facebook Event page (Celebration of Life), which was also listed as private (Navy 4909).

Report of Investigation, 15 June 2020. This is repetitive except for the comments that the "*Kodiak Chief of Coast Guard Police confirmed that due to concerns of bears on Kodiak military facilities, it is normal to carry a personal firearm and is allowed on base.*"

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 6 of 43

This author indicates that NCIC checks were conducted on Vinberg and Udell with the following:

- *"SB1 Udell maintains a top secret security clearance and had no other pertinent records."*

- Regarding Vinberg, he *"was arrested multiple times in California and Utah. Vinberg was convicted for one felony charge: battery against a police officer, as well as arrested for several theft related misdemeanors (receipt stolen property, shoplifting, etc). During an arrest in 2017 Vinberg admitted to using methamphetamines. Open source social media checks did not find any information on Vinberg of a concerning or political nature"* (Navy 4918).

Interview with SBC Daniel Bronner, USN, 19 June 2020. [1] SBC Bronner was interviewed by Special Agent (SA) Lindsay Wilson. Bronner reported that at approximately 2215-2220 on 13 June 2020, he received messages from Brad Udell reporting an individual who had knives. Bronner's first impression was that this involved a neighbor who has dogs that get into the base on a regular basis. Bronner responded to the Detachment and upon arrival was told by SOC Button to provide aid to the victim. Bronner performed CPR for about 1 minute before SOC Button had him call Stacey Virgin. Bronner also opened the gate for the Kodiak Police Department and the Alaska State Troopers when they arrived.

Bronner stated that those who served on the base were given permission to carry personal firearms for *"personal defense/in case of bears."* Bronner sometimes carried his personal Glock 19 (Navy 4874).

Interview with SO1 Jeffrey Welch, USN, 19 June 2020. SO1 Welch responded to the Detachment after seeing messages indicating that there was someone there with knives. Upon arrival, he saw Bradley Udell performing chest compressions. Welch also provided chest compressions, but then had Udell resume compressions because he was looking for a needle concerned that Vinberg may have a pneumothorax. Welch described Udell as being *"a hard worker, super reliable and the first to help out"* (Navy 4879).

Welch indicated that carrying a firearm was neither encouraged or discouraged.

Interview with IT1 Avery Storm, USN, 19 June 2020. IT1 Storm was interviewed by SA Lindsay Wilson. He was camping with various service members and he was included on the Sled Dogs group chat. IT1 Storm also described Udell as a hard worker who is extremely reliable. In response to Udell's first transmissions on the Sled Dogs group chat, the initial messages were in a *"lighter tone"*, which changed once Udell transmitted *"no seriously he has knives"* (Navy 4885).

---

[1]All of Mr. Udell's coworkers who were part of the Sled Dogs gave NCIS permission to do a forensic search on their phones.

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 7 of 43

Interview with HM2 Joseph Birkmeyer, USN, 19 June 2020. HM2 Birkmeyer wrote that the chat comment *'did you pop him'* was sent in jest and advised his use of the word *'pop'* was meant as in to hit. HM2 Birkmeyer stated they often joke in the text thread about "*scrapping/dusting up.*" HM2 Birkmeyer described SB1 Udell as a *'big, corn fed brawler.'*

Birkmeyer did not respond to the incident. ████████████████████████
████████████████████ HM2 Birkmeyer does not own a pistol, so he doesn't carry a personal firearm while on duty. He stated that the duty pistol is a 9mm pistol, which is typically on the Watchstander's person (Navy 4889).

Interview with SO1 Luke Brown, USN, 19 June 2020. SO1 Brown was camping with SO1 Jonathan Cox and IT1 Avery Storm, along with their families. At about 2200, Udell posted a message on Sled Dogs stating that someone was on the compound. Like others, he assumed that it was connected to the neighbor who has the dogs that get onto the Detachment. SO1 Brown believed that everyone at the command is allowed to carry firearms and *"he believed the Watchstander had to be armed."* He believes that the command duty firearm is a Glock 17 or 19 and that since the incident *"the duty weapon was passed from belt to belt when taking over duty."*

Brown was asked what he meant when he posted *"bury him."* He was referencing a person named Dane, a prior coworker who has since left, but was included in the chat string. *"SO1 Brown stated that the group often jokes around on the group thread and indicated his message was sent in jest."* Brown said that he had consumed a lot of alcohol by the time the first text message was sent (Navy 4894).

Interview with SO1 Jonathan Cox, USN, 19 June 2020. SO1 Cox was interviewed by NCIS and indicated that he was with the group camping. They were 40 miles from the Detachment and all had been drinking. One of the members had their phone and was reading out the messages. ████████████████████████████████████
████████████████████████████ He also stated that command had been working on a formal policy regarding firearms (Navy 4900-4901).

Interview with Jared Holforty, Civilian, 20 June 2020. Mr. Holforty is a civilian deputy officer in charge of the Detachment and worked at the Detachment prior to retiring from active duty. He responded to the Detachment when he saw emergency equipment entering the facility. *"Holforty described V/Vinberg as looking like a 'Antifa dude' wearing camouflage pants, a black jacket, with a goatee and wearing a hat on backwards."* Holforty indicated that it was possible for people to sneak on the base during low tide (Navy 4905).

Report of Investigative Action, 24 June 2020. Repetitive (Navy 4916).

Interview with SOC Troy Button, USN, 24 June 2020. Troy Button was jointly interviewed by an NCIS agent and an agent from the Alaska Bureau of Investigation. SOC Button also received text messages and while he was en route to the base, he asked SB1

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 8 of 43

Udell to open the gate to expedite his arrival, but Udell responded back that he could not. Button was in a truck accompanied by a couple civilian friends. *"SOC Button stated their policy is 'escalation to force' in regard to threats, and stated they used verbal and visible warnings"* (Navy 4864).

Interview with SO1 Zachary Castonguay, USN, 24 June 2020. This man also received the text messages. At first, *"SO1 Castonguay stated he assumed the messages were in regards to something silly, but upon receiving text messages that mentioned knives, he realized the situation was serious."* SO1 Castonguay responded from his residence and it took him about a half-hour to arrive. SO1 Castonguay stated it is well known in the command that everyone carried personal firearms, although he didn't know the particular type of firearm carried by Udell. Castonguay also described Udell as a hard working employee who is quiet and serious, but likes to laugh. Castonguay has never seen Udell get upset. Castonguay further stated that *"people come to the Detachment to either conduct business or pick a fight saying Navy Seals have a persona and sometimes tough guys want to challenge them"*. SO1 Castonguay relayed that there have previously also been drunk individuals at the front gate.

When asked about policy in regard to threats, SO1 Castonguay stated the policy is 'escalation of force' and intruders are asked to leave" (Navy 4869-4870).

Report of Investigation Action, 29 June 2020. No additional information (Navy 4914).

Report of Investigative Action, 1 July 2020. The author (I cannot discern their name) summarized various sources of information uncovered in the investigation and concluded that Mr. Vinberg was shot and killed when he attempted to enter a building despite the efforts of Mr. Udell to calm him down (Navy 4911).

Executive Summary 13 July 2020. It is unclear who the author of this summary is. I learn that Troy Button was the first person to respond to the base given the group text messages. The author opined *"no criminal statutes apply at this time."* This is a joint investigation with NCIS and the Alaska Bureau of Investigation (Navy 4856).

Button told NCIS that when he arrived, he observed Udell holding a firearm and the victim lying on his side. As he approached, he observed several knives. Udell stated that he shot him. Button directed Udell to start CPR while he called 911. He estimated that it took AST about 10 minutes to arrive.

There is commentary about the interview with Daniel Bronner, who arrived shortly thereafter and provided aid. He recalls Udell appearing to be in shock and stating *"the guy didn't leave me with any choice"* (Navy 4857).

Investigative Action, Record Book Review for PO1 Udell, 20 July 2020. Mr. Udell's record is unremarkable. The only disciplinary information pertains to running a stop sign

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 9 of 43

in August 2010. He rated as a sharp shooter with the 9mm pistol. He has received 7 performance evaluations, all of which were favorable (Navy 4848-4849).

Investigative Action, Identification of State Troopers and Kodiak Investigators, 30 July 2020. Special Agent Carlin reports the involvement of investigators of outside agencies. I have placed their names it the Character List (Navy 4831).

Investigative Action, 30 July 2020. SA Daniel Carlin interacted with IT1 Avery Storm who provided assistance in reviewing and duplicating the NSW Detachment surveillance videos. Agent Carlin reviewed part of the videos and noted that some of the film bounced around and others parts were in need of forensic enhancement because the lighting was not adequate. Despite the issue with the lighting, SA Carlin observed a clip in which Vinberg appeared to be holding knives in his hands.

SA Carlin determined that 16 out of the 18 security cameras were operable. One of the inoperable cameras is located at the main gate. The surveillance time stamps are 16 minutes behind the actual time.

SA Carlin goes on to provide a chronology about what he observed at various times. I'm assuming that when he quotes times, he is correcting for the 16-minute discrepancy. I will not summarize all of these clips except for those which appear to be most important for this evaluation. I posted other critical times in the Time Line (Navy 4835).

The NCIS Special Agent asked Storm to whom he showed the surveillance video. He stated that he showed it to several command-level individuals that include Officer in Charge CW03 Stacey Virgin; Senior Enlisted Advisor Master Chief Danny Fox; and Udell. Storm also stated that when he was showing the video in their video room to Virgin, Fox and then Udell entered. [**Udell saw the video. It was shown to him by Storm; it is not clear on what day he saw the video from the NCIS report.**]

Schematic Diagrams. These are diagrams of both levels of this building. They are referred to as Exhibit 34 (Navy 4839-4844).

Investigative Action, failed attempts to interview Donna Vinberg, 30 July 2020. SA Carlin indicated that between 21 June 2020 and 8 July 2020, multiple attempts were made to set an interview time with Donna Vinberg. At various times, she expressed that she didn't need to talk to NCIS, but she has a lot of questions for which she hopes she can get some answers (Navy 4845).

Investigative Action, neighborhood canvas, 30 July 2020. Contact with various neighbors on Spruce Cape Road and Sut Larsen Way did not yield any witnesses who saw Vinberg on the date of the incident (Navy 4847).

Report of Investigative Action, Attempts to interview Becky Vinberg, 2 August 2020. SA Tyler Winstead reported unsuccessful attempts to contact Becky Vinberg between 1

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 10 of 43

July 2020 and 3 July 2020.  Her stepfather, Michael Nielsen, spoke with the special agent and stated that Becky Vinberg would not voluntarily contact NCIS (Navy 4850).

**Ornish, Steven, MD**

Psychiatric Evaluation, 19 December 2024.

Synopsis.  Dr. Ornish characterizes Jayson as being a 30-year-old, separated male with a substance abuse history that goes back to his adolescence.  He did serious drugs such as crack cocaine and methamphetamine (p. 1).  During a time that Jayson was 15 -- 17 years of age he was reportedly incarcerated at the McLaughlin Youth Center in Anchorage.  While incarcerated, he met Becky, his future spouse, who was 11 years older than he and was also his parole officer (pp. 1-2).

Dr. Ornish writes that when the relationship between Becky and Jayson was discovered, Becky lost her job and they both relocated in Utah, Becky's home state. They married on 17 May 2008.

Becky testified that she was physically abusive toward Jayson earlier in their marriage.  Dr. Ornish footnotes this statement referencing a Navy documents Bates number.  The nature of the document is not described.

Between 2008-2020 Jayson lived in Utah.  He had two children with Becky and his polysubstance abuse addiction continued causing disruptions in their life. They separated on several occasions.

Jayson's used illicit drugs including methamphetamine on a daily basis.  This author writes that *"Jayson's psychiatric state deteriorated and he developed psychotic symptoms primarily characterized by auditory hallucinations of voices due to his active methamphetamine addiction (intravenous and smoking), alcohol abuse, and cannabis abuse"* (p. 3).

**On 10 June 2020 three days before Jayson's death, Becky filed the petition for divorce (p. 3).**

Commentary, added 21 April 2025. I found no evidence of deterioration after moving to Kodiak.  He was having auditory hallucinations prior to his arrival, and there was no apparent change in his drug-taking behavior. Moreover, he appeared future-oriented, "hoping to have a fresh start and have his family visit this summer" (Rustemeyer Intake Evaluation, 16 March 2020).

Security of Naval Special Warfare Cold Weather Detachment. Dr. Ornish describes his understanding of the security that protects the Naval Special Warfare Cold Weather Detachment, which is referred to as a base in various discovery documents but is technically a detachment that is used for training Navy Seals.  The base is surrounded by

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 11 of 43

a 10-foot chain link fence topped with three strands of barbed wire ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**On the night of his death his mother, Donna, and he got into an argument** *"and he loaded his pockets up with beer and took off out the door, so I don't know where he went"* **(quoting Donna, p. 4).** He dressed himself for the outdoors. **Dr. Ornish writes that Jayson was first visualized on security camera at about 2120 after he had entered the base.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮

*"Jayson was wearing camouflage pants, dark jacket, and black gloves and armed with four kitchen knives."* Bradley Udell, who is described as a Special Warfare Boat Operator, First Class was the officer of the day and armed with his personal Walther PPK .380 handgun – the Base's firearm's policy reportedly allows personnel on base to carry their own personal weapon (p. 5).

Dr. Ornish apparently viewed the surveillance video indicated that Jayson appeared to have difficulty *"walking in a straight line, and meandered side to side"* (Quoting a Navy document with a Bates number of 4521). [ **I didn't see that!**]

Jayson walked up two flights of stairs and was yelling something unintelligible through the door and pounding on it.

> *"Mr. Udell opened the door, and asked who he was and how he got on the compound, to which Jayson replied, 'I snuck on.' He never buzzed the front gate to gain access. Mr. Udell told him he was not authorized to be on the installation and directed him to go down through the front door. Mr. Udell texted his fellow Navy personnel in their chat group that 'some random dude just got caught on the compound,' and they replied that backup was on their way. At some point the second floor work phone rang, and Mr. Udell spoke to SOC Troy Button and informed him of the intruder, who told him that he was on the way"* (p. 5).

Mr. Udell walked downstairs and observed Jayson remove two knives and then he banged aggressively and tapped the double pane reinforced window with the knives yelling *"Come on! . . . and trying to goad Mr. Udell to exit the building."* He put them back in his front pockets and then pulled them out again and continued to yell "*Come on*" to Mr. Udell (pp. 5-6).

Jayson left the main entry and walked to the road that leads to the main gate. Mr. Udell exited the main building to maintain visual contact with Jayson. Mr. Udell believes that Jayson must have heard the interior door close *"for Jayson turned around and began walking towards [Mr. Udell] with what appeared to be a knife in his right hand although later*

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 12 of 43

*it was determined that all three knives were in Jayson's pockets at the time he was shot and killed."*

> *"Mr. Udell verbally directed Jayson to leave, but he did not comply; rather, he continued to walk towards Mr. Udell undeterred. Mr. Udell held out his outstretched left hand in the universal stopping sign, and with his handgun in a low ready position again commanded Jayson to stop at least two or three times, including commanding 'stop coming towards me,' and 'don't come any closer!' But Jayson continued to advance, repeatedly responding 'or what?' Mr. Udell observed Jayson reach for his right front jacket pocket, where he knew Jayson had a knife, remove his hand from his pocket and continue to advance towards him. When Jayson was approximately six feet away, Mr. Udell fired all seven rounds of his handgun into Jayson, killing him. Mr. Udell removed two black-handled knives from Jayson's pockets, 911 was called, and CPR was preformed. A third knife was removed by Trooper Tilley. Various law enforcement databases/agencies revealed that Jayson had a history of disorderly conduct, resisting arrest, failure to identify himself with assaultive behavior towards law enforcement and other responders during prior contacts with law enforcement. Those incidents appeared to have originated outside the State of Alaska"* (p. 6).

A review of his record indicates multiple arrests in California and Utah, including a felony charge for battery against a police officer (p. 6).

Dr. Ornish writes that Jayson's post mortem BAC was .111 with toxicology positive for cannabinoids (with Delta 9 THC level 23ng/ml) *"consistent with cannabis intoxication at the time of his death"* (p. 7).

Records Reviewed. On p. 7 Dr. Ornish provides the table that lists the Bates numbers, source, and description of the item. There are 9916 pages of discovery that has Bates numbers, plus additional materials (p. 19). As I glance through these documents it is apparent these include various interviews with Navy personnel as well as family members.

Footnote added 21 April 2025. I am also curious that Bates 4060-4062 is entitled as a Walther PPK-S recall (p. 13).[2]

---

[2] The issue was found that some Walther PPK and PPK/S semiautomatic handguns will fire a chambered round without the trigger being pulled. Smith & Wesson engineers found that after chambering a round and disengaging the safety, there is a possibility that lowering the hammer will fire the chambered round without pulling the trigger. The Walther PPK and PPK/S pistols affected were made by Smith & Wesson from March 21, 2002 to February 3, 2009 with the following serial numbers: 0010BAB – 9999BAB 0000BAC – 9999BAC 0000BAD – 9999BAD 0000BAE – 9999BAE 0000BAF – 9999BAF 0000BAH – 9999BAH 0000BAJ – 9999BAJ 0000BAK – 9999BAK 0000BAL – 5313BAL 0000BAM – 1320BAM 0000LTD – 0499LTD 0001PPK – 1500PPK 0026REP – 0219REP 0001WLE – 0459WLE If you own a Walther PPK or PPK/S made during this time period and it has one of the serial numbers listed above, Smith & Wesson asks that you STOP USING YOUR PISTOL and return it to Smith & Wesson for a free

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 13 of 43

I note that depositions were obtained from the following people:

- Bradley Udell
- Becky Vinberg
- Anthony Furio
- Esther Furio
- Troy Button
- Stacy Virgin (p. 20).

On page 20 of this report Dr. Ornish lists excerpts from the documents that he had referenced above.

At this point I am going to enter remarkable excerpts in the Time Line.

Dr. Ornish examined investigative reports. The investigators were not able to schedule an interview with the decedent's mother, Donna Vinberg (p. 36). *"The investigation revealed that D. Vinberg might have been the last person to see [the decedent] alive"* (p. 36).

Review of Autopsy Report. This report reportedly states that there were multiple indeterminate range wounds (p. 36).

Interview with Bradley Udell. Mr. Udell reported that after closing the upstairs door he texted a message to a group of Navy personnel. One of these persons is SOC Troy Button who reportedly told Udell he was in route to base (pp. 37-38). Udell reported that before making contact with Vinberg outside of the building, that he had chambered a round, adding that he does not normally carry his weapon with a round therein (p. 39). After Udell saw Vinberg fall to the ground near the flag pole he set:

his pistol down on the grass near the vestibule and approaches Vinberg whom he believed was positioned face down or on his side and placed Vinberg's hands behind his back and removed two knives from Vinberg's jacket pockets and tossed them towards them near the HQ building. Udell later recovered and holstered his pistol (p. 39).

Button arrived about the same time the incident was occurring and Udell reported that Vinberg approached him with a knife. Udell returned to the HQ building prior to Button instructing him to start CPR. Udell felt a weak pulse. Bronner arrived and took over CPR from Udell. Udell went back to headquarters and then returned and took over administering CPR to Vinberg (p. 39).

---

replacement of the hammer block. Accessed 21 April 2025 from https://vpc.org/wp-content/uploads/2020/07/Walther-PK-380-news-story.pdf

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 14 of 43

Udell indicated that during the incident he was wearing blue jeans and a blue sweatshirt. *"Udell identified there are no specific rules for engagement outside of the right to self-defend as a normal Navy watchstander."* Udell assured others that he had not let Vinberg on base. Udell also stated that he

> knew the first round that he fired hit as Vinberg's body jolted, but did not look like it affected him, at which point in time Udell fired the rest of his rounds, which caused Vinberg to stumble backwards. Udell related that he did not retreat back into the building as he was worried about fellow NSW members arriving and did not want them to be ambushed by Vinberg. Additionally, Udell advised retreating back into the building is not part of a watchstander orders to protect US Government property (p. 40).

Interview with Anthony Furio, father of decedent, 20 June 2020. Mr. Furio last saw his son at the end of May – about 7 - 10 days prior to the incident. Mr. Furio believed that his son was trying to find a job and means to relocate his family to Kodiak. He understood that Vinberg spoke with his wife two to three times a day. Furio was aware that his son had a drug and alcohol problem. The only issues that he was aware of that his son had with law enforcement was an occasion in Tahoe, CA [sic] after his son became intoxicated and passed out prior to being awoken by a law enforcement officer (p. 41).

Interview with Richard Borton, 21 June 2020. Borton was Vinberg's employer at Petro Star North Pacific Fuel. Vinberg always appeared early for work but near the end of his employment he was becoming reserved, not as talkative, and five days before he resigned told Borton that he needed to figure life out. Borton believed that Vinberg was hanging with the wrong crowd. Borton believed that Vinberg was into drugs because he had acknowledged that he would not pass a drug screen, however he did not appear to be under the influence during that time so Borton didn't remove him from work (p. 41).

Interview with of LS2 Gerald Schlintz, USN. This is one of Udell's coworkers who stated that Udell was dependable and he never observed him become angry or aggressive (p. 42).

Interview with CWO Stacy Virgin, USN. █████████████████████████
███████████████████████████████████

Interview with Stephen Lenhert (Civilian), 22 June 2020. Lenhert has apparently known Udell since 1999 [sic] and described him as motivated with good initiative. He described Udell as being calm, cool, and collected *"and has never observed him get hot headed or angry"* (p. 43).

Interview with Caroline Merrigan (Jayson's Aunt), 23 June 2020. Caroline stated that she was present at the residence of Sandy Vinberg on the day of the incident. She described Mr. Vinberg as *"laughing and joking around throughout the day and everything*

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 15 of 43

*appeared fine. . . . Merrigan only recalled Vinberg drinking water and not consuming any
alcoholic beverages"* (p. 43). Merrigan further related that after Vinberg had finished the
days' work that she drove him back to the residence of his mother (Donna) at about 1930.
Merrigan denied hearing Vinberg make any comments about suicide or wanting to hurt
another person. He apparently voiced the intention of returning to Sandra Vinberg's
residence the following day at 0900 to continue his work on painting the porch. **[ future
oriented ]**

Merrigan reportedly spoke to Donna Vinberg and learned that Mr. Vinberg had left her
residence at 2100 on 13 June 2020. Donna did not mention anything about them having
an argument or disagreement (p. 44).

Interview with Danny Wayne Fox, USN. SOCM Fox has known Udell since his
arrival at the detachment of August 2019. SOCM Fox highly values Udell's contribution to
their team (p. 44).

Interview with John Glover (Civilian).

Interview of Sandra Vinberg (Jayson's Aunt). Sandra confirmed that Mr. Vinberg
had been working on various projects around her residence and that he was planning to
return the following day to stain the porch. Mr. Vinberg was there until Aunt Caroline
Merrigan gave him a ride to his mother's house at about 1930 or 2000. [ future oriented ]

S. Vinberg said on the day of the incident, Vinberg had a great demeanor. S.
Vinberg recalled Vinberg consuming one beer on the day of the incident, while he
was working at her house." She was unaware of any issues that Jayson had with
drugs. S. Vinberg recalled being over at Vinberg's mother's house on the day after
the incident and D. Vinberg staying 'why, why, he just snapped. If you're going to
act that way get out of here' [I don't understand the context of that comment] (p. 45).

According to the person who reported this interview, after the audio recording ceased

*"S. Vinberg made a comment that something happened between D. Vinberg and
Vinberg. S. Vinberg added there was a rift in the family over the past year where
S. Vinberg has made a mental list of all the time D. Vinberg has stabbed her in the
heart by making certain comments."*

There is additional transcript about this rift between Sandy and Donna. Sandy goes on to
discuss that Donna has her ups and downs and loses it with her doctors (p. 46).

Interview with Abner Nelson (Friend of Jayson's), 24 June 2020. Abner indicated
that Jayson was hoping to return to Kodiak and demonstrate that he could take care of

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 16 of 43

himself because Jayson's wife was the breadwinner in the household. He denied ever hearing Jayson state that he wanted to hurt himself or someone else (pp. 46-47).

Interview of Michael Nielsen (Becky's Stepfather), 3 July 2020. It is unclear if Mr. Nielsen was speaking with the investigating agent or a Bountiful police officer when he reportedly stated that he *"wanted to convey to the guard that if he's feeling guilty, tell him that Jayson was a train wreck and this was bound to happen"* (p. 47). Nielsen reported that Jayson *"would leave Becky and the kids for a month every year, go to a crack house, and sleep with as many women as he could and then come back when he ran out of money . . . . Nielsen explained that Vinberg's behavior caused him to ban Vinberg from his residence"* (located in Bountiful) approximately one year prior. Mr. Nielsen believed that Jayson had sketchy friends (p. 47). Nielsen did not believe that Vinberg held any anti-government feelings and did not suspect that he would be a member of an extremist group. Nielsen opined that Becky was in denial, expressing concern because Jayson was shot in the back. Nielsen further opined that Becky *"was conditioned to not participate with law enforcement by Vinberg"* (p. 48).

Letter from Frank V. Russo, Criminal Chief, US Department of Justice to Special Agent Eric MacLennan, US Naval Investigative Services and Investigator Christopher Long, Alaska State Troopers, Investigation Conclusions, US Department of Justice. For the most part this letter contains the history that has been previously described. One of the most important paragraphs, which has not been previously articulated is that

> "[T]he NSM was isolated at the detachment, which bears on whether the NSM's self-defense was reasonable. While one could argue that he could have remained inside the locked building, the NSM's explanation for going outside to watch Vinberg (to ensure safety of the other arriving service member) is not unreasonable. Furthermore, there is no duty to retreat under State or Federal law when confronted with deadly force (p. 49).

The letter concludes that for the above reasons the United States Attorney's Office for the District of Alaska will not prosecute the NSM who shot and killed Mr. Vinberg (p. 50).

Diagnoses. Dr. Ornish lists a number of diagnoses as follows:

1. Methamphetamine use disorder, severe, dating back to age 17 and active since moving back to Kodiak in February 2020.

2. History of intravenous cocaine disorder and crack cocaine disorder, dating back to age 17 with intravenous cocaine use during binges.

3. Alcohol use disorder dating to age 12, active at the time of death.

4. Cannabis use disorder, active at the time of death.

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 17 of 43

5.    Alcohol intoxication at the time of death (BAL .11).

6.    Cannabis intoxication at time of death.

7.    Methamphetamine induced psychotic disorder (predominantly auditory hallucination) and depressive disorder – active at the time of death.

8.    Methamphetamine and alcohol induced anxiety and depression.

9.    Possible methamphetamine withdrawal, mild, around the time of death.

In footnote 124 Dr. Ornish writes that

> Jayson's pericardial blood Delta 9 THC, the active ingredient in marijuana was 23 ng/ml. Usual peak levels in serum for 1.75% or 3.55%. THC marijuana cigarette is 50-270 ng/ml at 6 to 9 minutes after beginning smoking, decreasing to less than 5 ng/ml by two hours. Since THC concentrations in blood are usually about 1/2 of serum/plasma concentrations, Jayson's serum/plasma concentration would have been approximately 46 ng/ml at the time of his death – evidence of cannabis intoxication at the time of his death (pp. 51-52).

10.    History of suicidal ideation on 4/9/2020 when presented to Providence Kodiak Island Medical Center ER. Jayson was noted to have suicidal ideation when using methamphetamine or drinking, and to have last used methamphetamine 4 to 5 days earlier.

11.    Attention Deficit Hyperactivity Disorder.

12.    Antisocial personality traits.

13.    Suicide by cop (p. 52).

    Commentary added 22 April 2025. I agree with most of Dr. Ornish's diagnostic hypotheses. The extend of suicidal ideation reported on 9 April 2020 is questionable, given the circumstances of the admission and the limited assessment. Suicide by cop is not a diagnosis.

    Opinion. In addition to summarizing Jayson's substance use history the author writes

> Jayson has considerable antisocial personality traits, as indicated by 1) repeated performing acts that are grounds for arrest; 2) use of aliases (pled guilty of being in possession of another person's drivers license); 3) impulsivity; 4) irritability and aggressiveness, as indicated by repeated physical fights or assaults (assaulted two

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 18 of 43

police officer); and 5) repeated failure to sustain consistent work behavior or honor financial obligations. Evidence for this is woven into the narrative below (p. 53).

During much of this section Dr. Ornish repeats the history that has been previously described especially as it pertains after he arrived in Kodiak. Dr. Ornish iterates Donna's report that during the evening before the shooting that Jayson *"snapped"* (p. 60). Dr. Ornish closely scrutinizes the recorded discussion that the investigator had with Caroline (p. 60).

Dr. Ornish also makes reference to a conversation that Donna had with Trooper Beaver when she was asked if she knew why Jayson was on the Navy Base. Donna reportedly replied *"him and I got into an argument last night and he loaded his pockets with beer and took off out the door, so I don't know where he went"* (p. 61). Dr. Ornish states that approximately 20 minutes after leaving his mother's house he appeared on the security video of the gate of NSW (p. 61).

Suicide by Cop. Dr. Ornish begins this section by noting that both Donna and Becky were not cooperative with investigators. Despite this lack of cooperation *"there is sufficient evidence upon which to base an opinion in this 'psychological autopsy' – defined as a thorough retrospective investigation of the intentions of the decedent"* (citing CL Scott The Psychological Autopsy 2006). This author then goes on to review the literature of suicide by cop which includes two citations (p. 62).

The author returns to the fact that Becky had signed divorce papers and filed them 3 days before the incident. (p. 73). This author writes that

> Jayson learning that his wife had filed for divorce, and his fight with his mother Donna, who told him to 'get out of here,' were the final straws for his emotional crisis culminating by suicide by cop – all in the context of his untreated and active methamphetamine, alcohol and cannabis abuse, and a drug-induced psychotic disorder . . . . Jayson's acute alcohol and cannabis intoxication further impaired his judgement and attenuated his impulse control and were also significant factors (p. 74).

Dr. Ornish writes that a additional evidence comes from the expression of suicidal ideation, in Kodiak as early as 9 April 2020 (p. 75). In this paragraph Dr. Ornish reminds the reader that he endorsed four of the six items on the Columbia Suicide Severity Rating Scale (p. 75).

Dr. Ornish also believes despite the lack of clinical documentation that Jayson continued with methamphetamine after 7 May 2020 – the date that he was last known to use it and the date of his death (p. 76).

However, Dr. Ornish does acknowledge that Jayson's urine and pericardial blood toxicology was negative for methamphetamine which Dr. Ornish acknowledges that the

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 19 of 43

detection window is 1 to 5 days and accordingly, Jayson may have been undergoing methamphetamine withdrawal which may cause *"intense dysphoria with cravings; depression; anxiety; irritability; agitation; insomnia; and suicidal ideation; withdrawal symptoms colloquially known as a crash although he did not appear to be crashing earlier in the day in question when painting Sarah Vinberg's deck"* (p. 76).

The author cites a checklist published by Lindsay and Lister (2008) that is a checklist for criteria by suicide by cops. As published in Psychological Reports 2008 (p. 78). The author further references criteria written by Mohandie and Meloy (2000) and Favril on risk factors for suicide in adults (p. 80).

**Udell, Bradley**

    Deposition of Bradley Udell, 29 February 2024. This is a video recorded conference in which Mr. Udell's deposition is taken. Appearing for the Plaintiff are Eva Gardner and Dylan Hitchcock-Lopez -- Marie Scheperle and Joshua Traini are present for the Defendant. Also present are Anthony Furio, Esther Furio, and Becky Vinberg. Esther and Tony Furio are Jayson's stepmother and father and along with Becky they are co-personal representatives of his estate. Michael Reiner is also present, who is a expert witness for the Plaintiff.

Mr. Udell began his military career in February 2013 (p. 12). Mr. Udell had two deployments before coming to Alaska. He stated that he was unable to discuss the location or dates of his deployment (p. 14). Mr. Udell arrived at the Detachment in April 2019 and left in July 2022 (p. 15). Mr. Udell described the Detachment as "a cold-weather maritime training facility" (p. 16).

Exhibit 1 is an aerial view of the Detachment (it is difficult for me to follow the ensuing discussion because I have not been given a copy of this exhibit).

The red roof building is the main office, which is the building that Mr. Udell was in on the day of the incident (p. 27). The witness's attention is drawn to a hiking symbol that says Spruce Cape Trail, which abuts with the road through the Detachment (p. 28).

There is an inquiry regarding Mr. Udell's training and duties at the Detachment. In his response he avoided specific information, indicating that the answer is either classified or he was not sure if it was classified or not (p. 39). He also taught classes and stood watch (p. 40).

When asked to explain the duties of a watchstander, he stated the duties vary considerably depending on what type of premise you're watchstanding (p. 40). Mr. Udell, when asked if a watchstander is armed, states that it depends to which watch he has been assigned (p. 41). The witness states that as it pertains to the Detachment, he was armed with his personal firearm (p. 43). When asked why he carried the firearm he replied, *"the only reason I carry it is for any wildlife encounters because sometimes bears would get on the*

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 20 of 43

*DET"* (referring to the Detachment) (p. 43). When bears came onto the property they would just leave them alone and they would eventually leave (p. 44). The witness acknowledges that in the past, State Wildlife would be called with animal problems with eagle migration (p. 45).

Mr. Udell is asked about any authority he has been granted when things went amiss within the Detachment while he was watchstanding. He replied that he is *"a steward of the facilities. As far as any legal authorities to do anything, I had none"* (sic, p. 46). In terms of training he received to be a watchstander, he reported that a senior service member gave him a tour of the facility and advised him of what to look for and what to check (pp. 46-47).

Mr. Udell denied that he received a recommendation to carry a weapon or that a service weapon was available at the facility (p. 47). He was not instructed on what to do if he found a trespasser on the Detachment (p. 47). He denied receiving any additional training (p. 48).

When asked to describe his typical day, he stated that the shift change was at 0900. He would arrive 15 minutes early to review any pass-down information from the log book. It was a 24-hr shift (p. 50). If you were watchstanding during the weekend, other personnel would only be in the building on rare occasions (p. 51). **[I am mindful that 13 June 2020, the date of the incident, was a Saturday.]** When asked to describe his chain-of-command, he stated that it depended on what the problem was. If it was facility-related, you would communicate with the facilities manager. If not, you would turn to your training chief (p. 52).

The witness was not able to recall if on 13 June 2020 – a Saturday – there were any class sessions being held (p. 52).

When asked if there is ever any communication between the Detachment and local law enforcement the witness replied, *"not that I am aware of"* (p. 53). Similarly, he was not aware of any 911 calls that were made from the Detachment (p. 53).

Regarding any unique features of watchstanding for this location, the witness stated that every day watch is slightly different, but *"I've never been . . . tasked with so much, like maintaining a facilities before"* (p. 54).

When asked how he would dress, he replied that if a class was in he would wear his BDUs and an instructor's shirt. If a class wasn't in town, he would be in civilian clothing (p. 54). When Mr. Udell wasn't teaching a class he would make sure that all the maritime craft he was in charge of would make sure of their upkeep and that they were running (pp. 55-56).

When asked if all watchstanders carried weapons, Mr. Udell stated that he knew that some of them did, but he did not know if all or if the majority of them did (p. 58).

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 21 of 43

Mr. Udell denied having any training on how to deal with a trespasser or unauthorized person entering the Detachment (p. 60).

Mr. Udell denied receiving training from the Coast Guard police, but stated that he was taught de-escalation techniques in basic training and *"at every work up that I've been through"* (p. 63). When asked for examples, he cited unwanted visitors trying to get on board their boats and that de-escalation [would include talking] *"to them, see why they're there, what they're doing, what their motives are and then, you know, obviously we react based off the individual"* (p. 65). He stated that he has had training in shooting individuals that included **"ask, tell, make,"** which he further explained was "ask them to stop, tell them to stop, make them stop" (p. 65).

This witness further qualified that his training is focused on combat during forward deployments. He has had some training that applies to oversea's civilians who might, for example, encounter one of their boats on a civilian pier and they want to walk around the boat. When given the hypothetical of having a boat tied up at a pier at Paris and asked how he would deal with a *"hapless Frenchman who wants to see the boat and doesn't understand that he is being told to stop,"* the witness states that the asking-tell-make framework doesn't apply in all situations, especially in France since they are an ally (p. 67). Continuing with this hypothetical, he was then asked if he is authorized to shoot this Frenchman. Mr. Udell replied, *"absolutely not"* (p. 67). When asked what he would do if the Frenchman had a knife, Mr. Udell responded *"no matter where you're at, everyone has the inherent right to self-defense"* (p. 68).

The witness acknowledges that he has not received any prior training in de-escalating situations involving civilians within the United States (p. 68).

**In the context of this assignment, the witness indicated that he had not had access to a service weapon** (p. 71).

The witness denied that he was able to carry a personal weapon at any of previous watchstanding posts (p. 72).

Nobody in his chain-of-command ordered or gave him permission to carry a personal weapon. There was no explicit command. However, other service members who were on watch did this and this witness states the main reason was because of the bears (pp. 73-74). [**Then why was he carrying a .380?**]

This witness stated that policies regarding carrying firearms are defined by the particular command (p. 74).

████████████████████████████████████

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 22 of 43

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

Encounter With Jayson Vinberg, 13 June 2020. Mr. Udell was asked what he did when he initially encountered Mr. Vinberg. He testified:

> Opened it. Didn't recognize the individual. Said, you know, 'Who are you?'. You can't be here." And he said, "I snuck on." I said, "You don't have authorized access here" or something along those lines. And, you know, he didn't say anything. Said, 'Okay. Could you please go downstairs?' Closed the door behind me. Started contacting, you know, everyone via text message, saying, 'Hey, there's someone on the DET. You know, don't know what he wants' or something along those lines. Again, I don't remember exactly what the text said. Went downstairs. At this point, he had pulled out two of the knives that he was carrying on his person. Was tapping on the glass of the exterior building. The phone rang upstairs -- one of the desk phones. I grabbed it. It was a -- a supervisor. Asked me what was going on. Told him what I knew at the time, that there's an intruder, armed intruder. And he said that he was on his way, at which point I went back downstairs. You know, the individual -- the armed intruder was banging on the door, yelling, 'Come on,' some other, like, inaudible -- I couldn't hear exactly between two doors -- brandishing the knives. And then, you know, at some part during that, you know, through the glass windows, I was signaling to him and, you know, yelling through -- 'You need to leave,' you know, verbally saying that and then also signaling with my hands, a leaving gesture. At some point, he started to walk away. And then, you know, I exited the doors to ensure that he was leaving. And then also, as I was just previously informed, my immediate supervisor and presumably, you know, someone else with him were driving to the DET. So I wanted to make sure that if those two paths crossed, that, you know, no incident broke out or -- that, you know, they were safe as well. And then he turned around.· He came toward me, disregarding my verbal and physical commands to stop moving -- multiple physical commands, multiple verbal commands, and then he kept approaching me. And, again, at this point, I knew he had knives on him. Didn't know if he had a firearm on him. And, you know, through tapping on the glass with the knives, he was already a -- threatening manner. And then I was scared for my life as he kept approaching me, and I had to defend myself.

Q. Okay. What were you wearing that day?

A. Civilian clothes (pp. 77- 80).

Mr. Udell testified that he did not have his gun when he made the initial contact upstairs. He was storing it in his desk, but would take it with him when he did *"rounds"* (p. 81).

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 23 of 43

When asked about internet access in the building, the witness referred to a government land internet and added that the cell service is poor (p. 86).

Ms. Gardner represents that this event, which happened a week before solstice, did not have sunset until 2312 (p. 87).

In regard to their first contact, Mr. Udell stated that Jayson wasn't knocking on the door, he was more like "violent banging, I would say, it was very loud" (p. 87).

The witness indicated that there was no window in the upstairs door and he assumed that the person on the other side would be one of the people who worked at the Detachment. When asked if Jayson spoke with slurred speech or showed other indications of impairment Mr. Udell replied, *"the only . . . words he said were 'I snuck on'"* (p. 92). He stated those words clearly (p. 92). Mr. Udell asked him to go downstairs because he didn't want to have a conversation *"in this door that only opens, you know, advantageous for his direction if he was going to try and do something."* He also repeated that he was not armed at that time (p. 93).

Jayson went down to the front door and in the meantime Mr. Udell engaged in a group chat. Troy Button called on a land line and Mr. Udell went from downstairs to upstairs. Mr. Button is his supervisor (p. 95).

When asked about their conversation, the witness advised him of the situation. He cannot remember if he was asked any other questions, but he indicated that he was on his way to the Detachment (p. 96). The witness returned downstairs and Jayson was tapping two of his knives on the glass on the double doors. After his first interaction with Jayson, Mr. Udell retrieved his gun and put it in "condition 1," which he described as having the safety on with a round in the chamber (p. 97). The witness does not believe that Jayson tried to get in, but he was *"banging on the door very violently shouting 'come on,' and other . . . inaudible yells. Something to entice me to come outside is what I gathered"* (p. 98).

Furthermore, Jayson was periodically brandishing the knives and then putting them back in his pockets and then pulling them out again. The witness believed that Jayson wanted him to come outside to hurt him, specifically that *"he would stab me to death"* (p. 99). Because of his aggressive behavior, Mr. Udell *"immediately assumed that there is a potential he could also have a firearm, considering most people in Alaska . . . carry firearms"* (pp. 99-100).

When he is asked if he has had training to handle this situation, Mr. Udell stated *"it's not a common scenario. Like, you just don't go out and train to that one-off scenario. It's not, you know, how training works"* (p. 102). **[All the better reason to call the police or the State Troopers to handle this]**. Mr. Udell further stated *"I just remember an overwhelming sense of fear that this man that gained unauthorized access was going to hurt me or someone else"* (p. 103).

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 24 of 43

When asked about measures that he took, he *"repeatedly told Jayson that 'you need to leave' and was physically instructing him with his hands with a leaving gesture"* (p. 104). The witness testified that he intended to follow Jayson all the way to the front gate to insure that he left (p. 108).

When Mr. Udell is asked if his intention to maintain visual on him until he left was addressed as part of his watchstander training, Mr. Udell responded *"the watchstanding duties at the [Detachment] didn't incorporate intruders. This isn't something . . . that happens here . . . or happened there"* (p. 111).

Mr. Udell is asked why he decided <u>not</u> to call 911. He answered *"because I was the only person there on the DET. I was also split between communicating with my chain of command. I didn't know how the events were going to play out, and I wanted to keep eyes on him instead of trying to get a signal to my cell phone right there . . . at the doors. . . . I would have to press my phone against the glass or go completely outside – outside of the vestibule to get service"* (p. 112). This witness denied knowing if Troy Button was carrying a firearm (p. 112).

Once outside, Mr. Udell continued to give verbal instructions to stop moving towards him including don't move any further. He also outstretched his hand providing the universal sign for stop multiple times. After he drew his firearm, he continued to give him these commands. After he drew his firearm, Jayson *"kept saying, 'or what?' after the firearm was drawn. . . .he kept moving towards me."* Jayson kept putting his hands back in his pockets even to point that he got six feet away from him *"and at that point, he was going to pull the knives out and – I believed – and attack me"* (p. 116). He kept saying *"or what?"* (p. 116). The witness stated that when he drew the weapon it was in a *"low ready position"* (p. 117).

Mr. Udell stated he initially fired a shot in the midst of overwhelming fear and he wasn't sure if he hit him or if it had any effect. He assumed he hit him because he jumped (p. 120). When he was asked if his intent was to kill Jayson, Mr. Udell stated *"the intent was for me to stay alive"* (p. 120).

Jayson did not advance after the first shot was fired, but he just stood there and he had knives in his pockets. After Jayson was down, Mr. Udell put his firearm down and then searched Jayson for weapons.

**Mr. Udell stated he had a week of close-quarter combat, which is repeated every two years, in which they are taught to continue shooting until someone is dead if they're aggressing toward the service member.**

When asked if he had any training incapacitating someone but not killing them, he stated **"No. It's against the law of war to shoot and wound"** (p. 125). At this point, Mr. and Ms. Furio accepted counsel's invitation to leave the deposition.

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 25 of 43

When asked if it occurred to him to call 911, he stated that while he was searching and removing the knives, another service member arrived and called 911. Mr. Udell found two knives and threw them towards the Detachment building. When Mr. Button pulled up, he pulled up in a vehicle and ran towards Mr. Udell and asked what happened. Mr. Udell came inside and was instructed to go outside and start CPR (p. 127).

When he was asked if he had specific training to cover a situation like this, he stated that he had not and iterated that no one expected anything like this to ever happen at the Detachment. At this point Exhibit 4 is produced, which is the Watchstander's Guide for this Detachment (p. 131).

Exhibit 6 is the group messaging that took place (p. 139).

The first chat message was "some random dude just got on the campground" (p. 143). This was followed by Mathias writing "did you pop him?" And then Luke said "bury him" (p. 145).

Mr. Udell stated that all these messages were coming in at the same time and he does not recall going through all of them at the time of the event.

A message was then posted "did you pop him?" Followed by another one that said "scrap" followed by a question mark. Mr. Udell denied knowing what scrap meant and when asked what he understood it to mean, he stated he would be speculating if he answered that question (p. 147). **[Whether he would be speculating or not, what is relevant here is what that word meant to him at the time he heard it.]**

When asked how he interpreted the terms *"bury him,"* he replied *"I don't know. Defuse the – the threat. Make it stop. I don't know. Again I can't speak to what other service members' thought processes were behind their correspondence"* (p. 147).

Mr. Udell is asked why he wrote *"he's at the front door LOL."* This was before he had brandished any of the knives (pp. 147-148).

Mr. Udell subsequently texted *"he's holding kitchen knives, should I shoot him? But seriously"* (p. 152). A participant on the chat, Zack, says *"is he saying anything?"* Mr. Udell replied *"no, tapping his knives on the window"* (p. 153). This witness estimated that it takes a couple of minutes driving the speed limit to get from the front gate to the quarter deck. The gate is slow to open.

Going back to the text messages, the witness's attention is drawn to Luke Brown, who said *"call the cops,"* a message that Mr. Udell did not see until after the fact.

Exhibit 8 is then discussed. This is a collection of photographs taken by the State Troopers.

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 26 of 43

It is apparent that Mr. Udell was traumatized by this event and that the distress continued after he was placed in his next assignment. He consulted with chaplains and occasionally the resident psychologist.

The witness is asked when looking back if he wished he would have called 911. Mr. Udell doesn't think he would be able to with the service while trying to keep his eyes on him at the same time. When asked if things would have turned out differently had he called 911 the witness replied *"no, because they wouldn't have been able to get on to the Detachment"* (p. 186).

    <u>Examination by Mr. Traini</u>. Mr. Udell stated that he was not authorized to arrest individuals within the Navy (p. 192). The witness stated that civilian law enforcement was not authorized to enter the Detachment at will. If they wanted admission, they would have to be let in and then escorted (p. 195).

The witness is asked what impact this has had on him. He reported anxiety sharing public spaces, frequent loss of sleep and "overall, I'm generally not as personal as I once was" (p. 199).

    <u>Further Examination by Ms. Gardner</u>. Unremarkable.

**Providence Kodiak Island Medical Center, added 22 April 2025**

    <u>9 April 2020, Stephen Burnside, MD</u>. The chief complaint on this encounter is listed as *"suicidal thoughts."* [However, see below}. Auditory hallucinations and methamphetamine use are also noted. Jayson is seen by Stephen Burnside, MD. Jayson is admitted at 1548 and discharged at 1811.

Jayson denied having a plan, but indicated that if he had to guess *"it would be a needle."* The author indicates *"his initial complaint was either obtaining a COVID-19 test or suicidal tenancies . . . . he states he's been hearing voices all the time, which he finds very bothersome . . . . voices were telling him to come to get tested for COVID, get a divorce and seek treatment"* (NAVY-PLTF 107).

Today his systolic pressure is elevated -- so is glucose (NAVY-PLTF 109).

This physician indicates that *"patient was evaluated by myself and mental health. Neither of us feel he is imminent risk for self-harm. His auditory hallucination/psychosis likely secondary to recent methamphetamine use"* (NAVY-PLTF 110).

Behavioral observations made by staff indicated that his mood was depressed, but his thinking and orientation were within normal limits. He was described as being *"non-psychotic"* (NAVY-PLTF 120). In regard to mental status, one of the questions regarded suicidal ideation. The author wrote "No" (p. 21, NAVY-PLTF 127).

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 27 of 43

In the *Presenting Problem* section, the author writes *"patient stated voices told him to come to the ER to get tested for COVID-19 and say to use the term suicidal tendencies to get admitted and tested*."

During the course of this encounter he was administered the Columbia Suicide Risk Scale (NAVY-PLTF 126).

A drug of abuse screen is negative for all substances except cannabinoids. Methamphetamine is not detected (NAVY-PLTF 134).

**Rustemeyer, Hope added 22 April 2025**

Behavioral Health Assessment, 16 March 2020. The presenting problem is listed as *"just to honestly give myself the best start in being home and being consistent with being successful and staying home."*

Family history includes lung cancer on the maternal side. He also reports that his mother has had drug and alcohol addiction problems throughout her life. There is no known history of substance abuse with other relatives (p. 1 of 6, NAVY-PLTF 93).

This clinician collected a social history:

> Client was born in Kodiak, AK and raised by his father until he was in 8th grade. His parents separated when he was very young. His mom had been away from Kodiak until he was 13, when she moved back, he moved in with her. He was not getting along with his father, he reports not liking going to church and his father being strict.
>
> Client reports his mother was better then, she didn't start drinking and using drugs until he was in high school. He is the middle of 1 older brother and 1 younger sister. His father fished when he was younger, then managed the AK Fresh Cannery. He eventually got a job as a janitor on the base and moved up to painter and retired as a painter. Client remembers his mother working as a chef in Adak for a time but not sure what else she did for work. He is aware that she was married twice before she married his father but doesn't know much about that.
>
> Client reports growing up wasn't normal. Client reports no domestic violence in the home but distinctly remembers after his parents separated an incident where his mother beating on the door at his father house and his father grabbing his mother, eventually taking the children in and mother was still beating on the door. He reports his own behavior was more extreme than his should have been, when things went bad he always made it worse. He stated he wasn't sure if it was depression or anger.
>
> He reports remembering growing up in Kodiak being fun, lots of family and friends. Client reports he currently does not follow any religion, he gets angry when talking

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 28 of 43

about church and his father making him go. His spiritual beliefs are "what comes around, goes around".

Client was sentenced to a McLaughlin Youth Center at 15 years old. After McLaughlin he was sent to AK Baptist Family Center for close to a year, he is unsure if he completed or was sent home due to getting in trouble. He was a poor historian for this timeline. He went back to Kodiak and was expelled from high school and sent back to McLaughlin where he "timed out". He was released to transitional housing at 17 but was still in the Department of Juvenile Justice. Client reports at this time starting a relationship with a female correctional officer 11 years his senior, they had started an emotional relationship while he was still in the detention center. They were married when he was 19 years old. He reports at that time they stayed in Anchorage for a year, moved to Kodiak for a month and then to Salt Lake City and have been there since.

He reports he was using meth straight out of McLaughlin, leaving for week long benders. His wife smoked marijuana and drank alcohol but no heavy drugs when they were first together. He reports that his wife was physically abusive as well. In Salt Lake City, client reports that every 6 months to a year he would go on benders and that he is a chronic cheater as well. He reports that his wife is now patient and relaxed with him after being admitted to the ER for being suicidal about five or 6 years ago, after she was placed on meds.

Roughly three to four years ago client reports leaving his home for about four to six months, he starting using [needles] to inject methamphetamines and was doing coke, living in a trap house and racked up about $50,000 in debt. He filed bankruptcy at that time. He moved out of the family home about a year ago, he still talks to his wife daily. He did go to OP treatment at [Eastman] Treatment Center in Salt Lake City for about 3 months in 2019 and was clean during that time.

He moved back to Kodiak, AK February, 2020. He had a week long layover in Anchorage and spent this time on a binge before getting to Kodiak, client reports last use of meth on March 1st, 2020. **His goal is to get his life together, get sober and reunite with his family.**

Family/Peer Client reports that he is closest with his mother right now because he lives with her. He also stated she does not judge him since she has the same issues. He reports getting along with his father more now, that he understands he was trying to do the right thing. He is least connected with his half siblings, they are just not in contact. He has a friend that he made in recovery in [Eastman Recovery] but they haven't been in contact much since he's been using drugs again. He hasn't made any contact with old friends in Kodiak because he states he is trying to make the right decisions. He reports his family here is supportive, they do drink but not as much as his mother.

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 29 of 43

Work/Education {p. 2 of 6}  Client did not graduate high school but did get his GED in McLaughlin at 17 years old.  Client lost an apprenticeship job recently as a heavy equipment operator, he was especially disappointed because it was a union job.  He say it was alcohol that and drugs that cause him to lose the job.  He is currently awaiting a callback for a job here in Kodiak" (NAVY-PLTF 94-95)

Mental Health History and Current Status.  Client reports he saw Dr. Jensen in Kodiak when he was in 7th and 8th grade.  He reports hating it and that he had nothing in common and that he hated it.  He was put on Concerta but it did not help so he stopped taking it.  Client shared that his wife was physically abusive early in the marriage.  He also was in outpatient residential for 3 months in 2019, he spoke of a counselor that he related to but didn't keep in regular contact once he went back to drinking and drugs.  He also attempted to go to KAMP here in Kodiak recently but did not enjoy it due to the religious aspect.  Client was visibly distressed by inability to figure out timeline during assessment.  No reported S/I or H/I.

Drug and Alcohol History and Current Status.  Client reports first trying alcohol, cigarettes, and marijuana when he was 12 years old.  He drank did all three when he could steal it from his mother, marijuana was favored over alcohol.  After being in McLaughlin and a group home in Anchorage he got out at 17 he started drinking alcohol and moved onto smoking crack cocaine and methamphetamines.  Client said smoking meth was his immediate preferred high.  Client reports every 6 months to a year he would leave his family and binge for up to a week smoking meth, he reports smoking at first and then injecting a gram and a half of meth daily when he binged.  The longest binge lasted four to six months about a 4 years ago, he started using needles to inject meth and cocaine on this binge.  He also racked up $50,000 in debt and had to file bankruptcy during that binge.  This pattern continued until a year ago when he went to outpatient in Salt Lake City.  He was clean for about three months and then started using drugs again.  Client last used meth on his way to Kodiak from Salt Lake, he had a four day layover in Anchorage and binged on meth and cocaine, has been clean since March 1st, 2020.

Developmental History (include prenatal care that assesses for FAS/FAE if applicable).  Client reports not knowing if his mother drank alcohol or did drugs while she was pregnant with him.  He believes he hit all developmental milestones at an appropriate age and was in school with kids his age.  He did well in school until 6th grade, after that all bad grades.

He is highly motivated to have a fresh start and have his family visit this summer.

Clinical Impressions: The client currently meets DSM V criteria F15.20, Stimulant Use Disorder, Severe as evidenced by:

1. Substance is often taken in larger amounts and/or over a longer period than the patient intended. 2. Persistent attempts or one or more unsuccessful efforts made

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 30 of 43

to cut down or control substance use. 3. Craving or strong desire or urge to use the substance. 4. Recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home. 5. Continued substance use despite having persistent or recurrent social or interpersonal problem caused or exacerbated by the effects of the substance. 6. Important social, occupational or recreational activities given up or reduced because of substance use. 7. Tolerance, as defined by either of the following: a. Markedly increased amounts of the substance in order to achieve intoxication or desired effect; b. Markedly diminished effect with continued use of the same amount; The client experiences functional impairment in the relational and vocational realms. The client's use of chemicals has caused repeated relationship struggles and an inability to manage employment at times" (NAVY-PLTF 96).

This document includes a treatment plan, which is difficult to understand because there was a glitch in the formatting of the document.

6 April 2020, Hope Rustemeyer. Jayson reported that he used methamphetamine last week, but stopped two days prior. He has not been sleeping and he is concerned that he is close to losing his job. His mother is drinking on a daily basis (NAVY-PLTF 105).

8 April 2020, Hope Rustemeyer. This session follows Jayson's decision to quit his job. He reported hearing voices for three months. This began in Utah. The voices are not threatening but told him to get a psychiatric evaluation and quit his job (NAVY-PLTF 105).

13 April 2020, Hope Rustemeyer. He told Hope that he went to the ER the previous week because the voices were telling him to get checked for COVID-19. *"The ER report states suicidal thoughts but client reported this not being the case, he only wanted to get tested."* (NAVY-PLTF 105).

20 April 2020, Hope Rustemeyer. Jayson requested to cut all contact at this time. He was actively using meth again. The voices were no longer bothering him (NAVY-PLTF 105).

22 April 2020, James Price. *"The client was asked how ready he was to make a change regarding his drug use and he stated that he goes in and out of using and that he is not very motivated to receive any help at this time."* It sounds as if Jayson was wanting a treatment option off the island. He denied any suicidal or homicidal ideation.

27 April 2020. This note is confusing. I am not sure I understand the nature of the conversation or what Jayson wanted from his therapist (NAVY-PLTF 104).

11 May 2020, Hope Rustemeyer. This is a telephonic contact *"client stated he is no longer interested in detox or residential"* (NAVY-PLTF 104).

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 31 of 43

**Sled Dogs added 22 April 2025**

Brad U.  Some random dude just got on the compound

Mathias Birkmeyer.  Did you pop him?  Scrap?

Luke Brown.  Bury him

Brad U.  He's at the front door lol

Avery Storm.  Old guy that lost his dogs? Or a commie

Dane Olson.  Old guy that needs his ass kicked

Luke Brown.  Is it Dane? (2 hearts)

Zack Castonguay.  If we don't hear from yo uin 20 mikes we're sending in QRF.

Dane Olson.  You turned off my code (sad face, crying face emoji) (NAVY 001686).

T-roy Button.  Inbound

Brad U.  He's holding kitchen knives Should I shoot him?  But seriously

Dan Bronner.  On the way.

Zack Castonguay, Sat, 22:14.  Is he saying anything?

Brad U.  Nope.  Tapping his knives on the window

T-roy Button.  Open the gate

Brad U.  Hit the button (NAVY 001687).

Luke Brown.  Call the cops

Jeff Welch.  Heading over

Zack Castonguay.  Moving, keep eyes on

Avery Storm, Sat, 23:17.  SITREP? (1 heart)

Dane Olson.  Seriously, you can't just stop texting updates!

T-roy Button, Sun, 00:40.  Later fellas not the time stop asking (NAVY 001688).

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 32 of 43

**Vinberg, Becky**

Deposition 21 November 2024, Salt Lake City. Appearing for the Plaintiff is Dylan Hitchcock-Lopez of Ashburn & Mason, Anchorage. Appearing for the Defendants are Marie C. Scheperle, along with Joshua A. Traini (via Webex,) both who are AUSAs in Anchorage. This deposition was video recorded.

Examination by Ms. Scheperle. Ms. Vinberg indicates that she was deposed as part of Jayson's bankruptcy case and she has testified in Utah when she was connected to the Utah Department of Corrections in 2004 (p. 6). In preparation, this witness indicated she spoke with Mr. Hitchcock-Lopez and with "Tony and Esther" who are co-personal representatives for the estate.

The witness was asked **to list the records she has received but not reviewed** (p. 12). There were a number of items that she did not bring because after conferring with Mr. Hitchcock-Lopez, she was advised that they had already provided everything in their possession. Ms. Scheperle replies *"so you didn't comply with that part on advice of counsel, it sounds like?"* (p. 14).

Social History. Ms. Vinberg grew up in Davis County, Utah and moved to Alaska in 2005. She moved at age 27 in 2006 because she needed a change from Utah and had visited Alaska previously. She had worked for Utah Adult Probation and Parole for almost 5 years when she moved. Prior to moving, she got her undergraduate degree in criminal justice. Ms. Vinberg and Jayson moved back to Utah in September 2008 (pp. 14-16). When they moved to Utah they lived with Ms. Vinberg's father, John Woodhave, and lived there until their youngest son, Duncan was born in 2014 (pp. 17-18).

It appears that Becky and Jayson moved into their own home in 2014 and remained there until 2017 when they sold their house (p. 18). There was a period in 2017 when Jayson moved out of the house and returned a couple of months later. They then moved to an apartment until 2018. Ms. Vinberg stated that Jayson moved out in 2018 and her two children and she moved back with her mother and stepfather (p. 18).

Jayson lived with them in the apartment for about 11 months and then moved to a separate apartment, at which time Ms. Vinberg returned to her mother and stepfather's residence in April 2018. In June 2020 [which is the month that Jayson died], Becky was living with her mother, Jolene Nielsen and her stepfather, Christopher Michael Nielsen, at their residence (p. 17).

Ms. Vinberg presently lives with her two sons, Eaen and Duncan. One of the sons is 10 years old and the other one is 15 years old (pp. 17-18). This witness denied that she has lived with anyone else other than her mother and stepfather since Jayson died (p. 19).

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 33 of 43

Ms. Vinberg moves to Alaska and meets Jayson. Becky indicated that she met Jayson in Anchorage at a time that she had roommates. After Jayson was released, they began a relationship and lived together in Anchorage with roommates, They married in May 2008 and moved to Kodiak in July 2008 and then moved to Utah in September 2008 (pp. 19-20).

After Becky moved to Alaska, she worked for a nonprofit and was also a substitute teacher and got a job at McLaughlin. Becky believes she got her job at McLaughlin within two to three months of moving to Anchorage. Her position was considered temporary and she filled in shifts when they had staff shortages (p. 21).

Ms. Vinberg worked at McLaughlin until 2007 when she was fired for having a relationship with Jayson (p. 22). When asked how McLaughlin found out, the witness was not certain but she was told that Jayson's cousin's girlfriend told them. When she was confronted by the administration, they said they knew that she had a relationship with an ex-resident and for that reason she couldn't continue to work there (p. 23). Following her termination, she continued to work for the Anchorage School District as a substitute teacher (p. 23).

Ms. Vinberg's Experience with Firearms. Ms. Vinberg denied ever applying for a law enforcement position after she was terminated from McLaughlin (p. 25). When she was working at the Utah Department of Corrections, she carried a personally-owned firearm (pp. 25-26). She denied ever carrying a firearm for protection against wildlife when they lived in Kodiak (p. 26). This witness opined that it is appropriate to use force *"when imminent harm is upon you."* She denied ever being in that position. She also denied ever serving in the military.

Sources Of Income. She reported that she is presently a CPA and prepares taxes. She runs her own practice (pp. 27-28). She acknowledged getting $2,500 per month Social Security for her two sons. She also acknowledged that her sons are members of the Koniag Native Corporation and they get small dividends twice a year (p. 28). The witness estimated that the dividends that her sons receive is about $1,500 total per year for each son (p. 29).

Ms. Vinberg's knowledge about Jayson before they got married. Ms. Vinberg testified that she knew little about Jayson's childhood. She was aware that his parents separated when he was young and that his father had custody of him and his sister. The names of his parents are Tony Furio and Donna Vinberg (p. 31).

The witness believes that Jayson grew up in Kodiak, sometimes spending summers with his mother in Phoenix. (The witness clarifies that Donna didn't actually live in Phoenix, but would visit her sister there (p. 33)). He began having trouble as a teenager and was charged with a theft. When he continued to smoke marijuana on probation, he was sent to McLaughlin. She also believes that he received treatment at a place called Alaska Baptist.

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 34 of 43

Jayson was at McLaughlin when Becky arrived (either in Alaska or at McLaughlin – it isn't clear from the context of this deposition) (p. 32).

When asked about her relationship with Donna Vinberg, she stated they would have telephone conversations. They would visit her when they occasionally visited Kodiak (p. 33). She recalls going to Kodiak for Jayson's funeral in 2020.

The witness recalls returning to Kodiak in 2018 to attend a family wedding, during which time they stayed with Tony and Esther for most of their visit. The witness adds that Donna came on one occasion to visit them in Utah after Duncan was born in the Summer of 2015 (p. 34).

This witness is asked about the frequency of contact that she has with Jayson's extended relatives. She describes it as being infrequent and typically done during holidays. When asked about discussions she has had with these relatives regarding this case, she denied knowing their perception of the event, but indicated that their goals *"are to find the truth of what happened"* (p. 38). Becky indicates that information has been withheld from them and discussed having to file a Freedom of Information Act request and receiving non-sensible documents due to heavy redaction. She also stated that they were denied any of the video evidence of the actual shooting.

When Ms. Scheperle then asks if she is seeking the truth of what happened why hasn't she looked at the investigatory records or the pictures or video, Becky replies *"because I have relied upon our attorneys and experts to let me know what's in them. They're very graphic. I can't imagine watching a video of somebody murder my husband (sic). Like I don't know. That's very upsetting. And to see pictures of him after he was shot and killed"* (p. 39). When asked how she is going to learn the truth without looking at the aforementioned evidence Becky replies, *"by relying on our experts and attorneys that we have working with us that I trust"* (sic) (p. 40). Becky mentioned that the protective order is so restrictive that *"she can't tell her children what happened to their father nor share it with Jayson's family, except for Tony and Esther only because they were added as co-personal representatives to the estate"* (p. 40).

The Plaintiff asserts that *"we felt there were inaccuracies in the various reports."* [And we includes] Tony and Esther, Jacob Woodhave (Becky's brother), Robert Eastman (one of Jayson's best friends), LaRita Lektonen-Ward (Jacob's step-sister), Truman Ward (LaRita's husband) and DJ (Donald Jay who is Jayson's uncle) (p. 49). The defense attorney asserts that Becky has not made any requests to their office to add people to the list on the protective order (p. 50).

After taking a break, Ms. Scheperle hands the witness Exhibit B, which is the redacted complaint, and another document, which is not marked as an Exhibit but as being the unredacted complaint. The witness points out paragraph 29 as being the redacted paragraph that she objected to.

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 35 of 43

The witness is then presented with Exhibit C, which is a letter that the family received about a year after Jayson's death. The witness believes this record contains an inconsistency with the aforementioned paragraph 29 (p. 57). Ms. Scheperle points out that this letter is an explanation from the US Attorney's Office in March 2021 regarding why they were not going to prosecute Mr. Udell.

The witness affirms that Jayson moved back to Alaska in February 2020 and concurred that between 2008 and February 2020, Jayson lived in Davis County with the exception of when he lived in South Ogden in 2019, prior to moving back to Alaska (pp. 59-60). The witness understands that when Jayson moved back to Alaska he resided with Donna (pp. 60-61). When asked why he opted to move back to Alaska, the witness stated that he expressed a desire *"to reconnect with his family and try to get his life on track, with the goal of eventually all of us moving up to Alaska to be together"* (p. 61).

    *Work experience after moving back to Alaska in 2020.* Becky believes that Jayson worked on the dock at a fueling station and that he worked for a logging company. However, shortly after returning to Alaska everything shut down because of COVID, making it hard to find a job. She does not know how Donna and he paid for things.

When asked how often they communicated, the witness stated that it varied *"there were some weeks we communicated on a daily or every other week and then there were other times where we went about a week without communicating"* (p. 62).

This witness acknowledges that Jayson and she did not live together as a couple since April 2018. From April 2018 to February 2020, he lived in Syracuse and South Ogden with various roommates (p. 63).

When asked how much financial support he provided, the witness estimated that it was close to a couple hundred dollars each paycheck (p. 64).

The witness affirms that Jayson had a few jobs and he stopped showing up for several of them (pp. 64-65).

The witness is presented with Exhibit D, which is a Notice of Separation from Granite Construction Company. The witness affirms that the reason for separation was that he ceased coming to work. Ms. Scheperle then discusses his departure from Layton Hills Chrysler, which the witness believed he left in order to do heavy equipment operation.

The witness was asked about Jayson's work at Amazon atr which he lasted one day before he voluntarily resigned due to job abandonment. That occurred on 22 November 2019 (p. 67).

When asked about Jayson's departure from Quality Disaster Clean Up, it sounds like he left in 2020. The witness believed he left that company to move to Alaska (p. 67).

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 36 of 43

The witness was asked about Petro Star Kodiak Terminal. She does not know why he left that position.

Discussion returned to the period of time when she met Jayson at McLaughlin. She met Jayson the first day she worked a shift. This witness believes that Jayson left McLaughlin in Spring 2007 and that their romance started in Summer 2007 (p. 69). This witness denied that any romance began during the time he was incarcerated (p. 69).

The witness acknowledges that Jayson was 17 years of age in Summer 2007 and she was 28 years old. This witness isn't sure how they reconnected after he was released, but indicates they may have given each other their phone numbers (p. 71). This witness recalls they began living together with other roommates either in the Summer or Fall of 2007. They became engaged at Christmas 2007 (p. 72).

Becky stated that he treated her well and that he was *"an amazing dad"* (pp. 75-76). After he moved out, he would see her and the children less often. They separated in April 2018 because Jayson relapsed again. They had separated in February 2017, which was his first relapse and marked a period of time in which he lived on the streets (p. 77). Jayson was introduced to meth at work and he was instantly addicted. Prior to this, he had used cocaine and ecstasy back when they began dating in Summer 2007 (p. 78).

The witness admitted that she was also using in the Summer of 2007 and using the same substances as Jayson.

This witness stated in 2009 after their first son was born, they both stopped using substances. He resumed drinking in 2012 or 2013. She does not believe he drank excessively and things were going well until he was offered meth in 2017. (p. 80).

Jayson was homeless for about six months after he relapsed in February 2017. He moved back with Becky after he completed treatment with the Eastman Recovery Foundation. He attended treatment in July 2017. The witness believes that he did well for 11 months then relapsed, which triggered Becky's decision to move in with her mother. This witness believes that after she moved in with her mother, Jayson lived with some friends or coworkers and was trying to remain sober. She does not believe that he ever went back to a formal treatment program.

When asked if he struggled with addiction up until his death, this witness stated that as far as she knew when he returned to Alaska he was sober. She did not believe that he had the money to support drugs. She acknowledges that she was not with him however (pp. 83-84).

Regarding visitation, it was never overnight, but Becky denied ever having any concerns about safety because Jayson would not be around them if he was using (p. 84). The only time that she saw him under the influence following his resumption of drinking in 2012 or 2013 was when he was under the influence of alcohol (p. 85). Becky wasn't too concerned

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 37 of 43

about his drinking until the incident in Lake Tahoe when he drank so much that he passed out on the street. She believes this happened in Summer 2013 (p. 85).

Exhibit F is then introduced, which is the court filing for the divorce that is signed on 8 June 2020 (pp. 86-87). Becky stated that she filed after Jayson repeatedly asked her to do so and believed the filing would be easier in Utah (than Alaska) (p. 87). The witness acknowledges that she also asked for sole legal and physical custody. She further asserted that Jayson was voluntarily unemployed and that he had the capacity to make $20 per hour (pp. 89-90). She asked for $79 per month child support based on the response that she got from a calculator that was on the court's website (p. 90).

At the time of the filing, they agreed to be responsible for each other's credit card debts. She subsequently became aware that he owed the IRS for 2019 taxes, which she estimated is presently $1,500 with penalties and interest (p. 91). Becky believed that Jayson filed for bankruptcy in 2017 or 2018. She also did not file because all of the debts were in his name (p. 92).

Becky acknowledged that she drew up the papers on June 8th and Jayson agreed to those terms in full on June 9th (pp. 93-94). **Jayson also completed the online course that is required when minor children are involved and apparently also did that on 9 June 2020** (p. 95). The only remaining requirement as of June 2020 was to wait 30 days for the court to grant the divorce, which never happened because Jayson passed away three days after (p. 95).

Ms. Scheperle draws Becky's attention to a 9-minute video chat she had with Jayson on 6 June [2020]. This conversation happened at about 10pm. At this point Exhibit H, which are some messages. Becky testifies that they were probably talking about how things went in Alaska. It was not likely that the children were still awake (pp. 96-97). When asked if they had any further discussions, Becky stated that they spoke at about 1520 for about 30 minutes. He was at his Aunt Sally's house staining her deck. She believes they talked for about 30 minutes, indicating they had told the boys about the divorce the day before. He appeared to be in *"good spirits."* They also spoke with his aunts who were there (pp. 97-98).

Becky believes that this video chat occurred on *Facebook Messenger*, which was typical of their video chats. Becky denied that he appeared intoxicated (p. 99).

The witness is asked about a statement on the first page that reads, *"I don't have any intention of turning things around. I'm dead set on figuring this shit out."* Becky was asked what that meant to her. She believed that he didn't have any intention of discontinuing alcohol or drugs (p. 100). He further stated, *"I'm still using and messing around. Maybe we should both take this seriously sometime."* Becky interpreted that as that Jayson *"hadn't stopped using or being with other women"* (p. 101).

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 38 of 43

When the witness is asked about the extent of extramarital affairs, she stated she did not know the extent of such involvement other than when he was using, he indicated that he was having such affairs (p. 101). When asked about him being with other people during the time they were together, Becky stated there was one time *"I suspected . . . something going on with a lady at work"* (p. 101).

The witness is further asked to interpret his statement, *"don't replace me with anyone like me, please"* that appears on p. 3 of the Exhibit. Becky took that to mean that she should not replace him with someone who struggled with addiction (p. 102). The witness was asked if he had ever encouraged her to move on with someone else. She responded affirmatively and stated any time he would bring up the divorce, he told her it wasn't fair for her to keep waiting for him to turn things around and that she should find somebody better. When asked how she responded to that, Becky stated that she told him that she does not plan to replace him and she wasn't going through all of this so she could just go out and find another husband. Becky stated she wasn't getting divorced because she wanted another husband, adding that *"I still haven't even dated since he died"* (pp. 102-103).

When asked about Jayson's statement that is was better for him to keep his distance, the witness affirmed that he was stating that Becky and their sons should maintain their distance while he was using.

The witness was then asked about his statement that he doesn't "**want to live with this noise anymore**." Becky wasn't sure what that meant, indicating that he began saying it before he moved to Kodiak. He told her there was a bunch of noise and she encouraged him to talk to somebody about it. She encouraged him to speak to the Kodiak counselor about it and he would state that he was not crazy. Becky denied that he ever complained of hearing voices -- he just called it noise. She did not know what he meant by that term. They then took a lunch break (p. 104).

Ms. Vinberg's familiarity with the Detachment. Becky stated that during the time she lived in Kodiak for two months she walked around the neighborhood, but never went onto the Detachment and she did not participate with the site visit (pertaining to the instant case, p. 105). This witness recalls seeing a No Trespassing sign on the front gate of the Detachment when they walked around that neighborhood. This witness denied that Jayson had ever talked about the Detachment (p. 108). The witness recalled other people talking about the Detachment, like aunts and uncles, but this was during a time that the area was not fenced and people went down there frequently (p. 108).

There was an occasion in which she believed that he was intoxicated on drugs, but she did not know which ones. Becky called the police because Jayson said that someone was after him (p. 110). [ paranoid ] ?

This witness denied knowing how often he used methamphetamine. Furthermore, she stated that she was not aware that he reported using since age 17, nor that he reported that he used marijuana and alcohol throughout their marriage. She further agreed that he

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 39 of 43

would leave on *"week-long benders"* in the later years of their marriage. When asked how his addictions impacted his personality, Becky stated he was *"really upbeat and happy, regardless of whether he was using or not"* (p. 111). When asked if she had any reason to doubt any of these representations that had just been discussed, Becky doubted that he was using alcohol and marijuana throughout their marriage (p. 112).

The witness's attention is then drawn to Exhibit I and then to a page entitled, *"client history and current status."* This witness denied knowing that Jayson was intoxicated when he trespassed on the Detachment. She then changed her response and stated she was aware that he had drank some beers with his mother before he left the house that night. Ms. Scheperle then makes reference to Exhibit J, which indicated that he had a BAC of .111 (p. 115). This witness did not recall how she learned that he had been drinking with his mother that night (p. 116).

The witness's attention is drawn to Exhibit K, which is a document that pertains to Jayson's employment at Shamrock Plumbing. This document indicates that he worked there from 17 October 2016 until 17 February 2017 and that he quit due to mental health reasons (p. 117). The witness indicates that this is the job that corresponded with when he started using meth and she suspects that his statement about mental health referred to his drug use (p. 118).

This witness denied knowing of any history of mental illness (p. 118).

Exhibit L, a record from Providence Kodiak Island emergency room dated 9 April 2020, is then introduced. The witness is directed to the first page that reportedly states *"patient states having thoughts of harming himself for about a few months. Denies thoughts of harming others. States having past inpatient stay years ago"* (p. 120). The only inpatient treatment she is familiar with is when he went to Alaska Baptist prior to going to McLaughlin (p. 120). This medical record further states that he has been hearing voices that direct him to get tested for COVID, get a divorce, and seek treatment. The witness was not aware of that (p. 121). **The witness denied ever seeing him responding to stimuli that she couldn't see** (p. 121). This record further states that he used the words *'suicidal tendencies'* to get admitted and tested. He acknowledged feeling suicidal "**when using meth or drinking but reported last use of meth Saturday or Sunday without recent thoughts of suicide**" (p. 122). This record indicates that he further reported that the voices were getting worse and that Jayson believes he needs anger management and a psychological evaluation. Furthermore, *"patient states the voices are very annoying and constantly making noise all the time no matter where I live although they don't ever tell him to do bad things"* (p. 123). This document states that he reported struggling with addiction to meth since he was 18 years of age, which he had stopped and started over the years. Becky denied that he ever expressed thoughts of self harm or making any attempts (p. 125).

Ms. Scheperle then takes Becky back to Exhibit I, which apparently lists a visit that he had with the Kodiak Area Native Association (KANA). He had a telephonic visit on 22 May

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 40 of 43

2020. The witness was not aware that he was asking for a refill of trazodone. This record also indicates that he stopped taking Zyprexa. This note also indicates that Jayson was using meth regularly, but not as frequently as before (p. 136). The clinician was unclear whether the voices reflected underlying schizophrenic tendencies or were the result of methamphetamine use.

The witness acknowledges that she was not aware of this and that Jayson did not share his medical history with her (p. 129).

The witness is asked about Jayson's run-in with the law. Becky recalls that in March 2009 they were arguing in their Layton apartment and somebody called the police. When they arrived, Jayson refused to produce his identification and was arrested.

The next event that this witness can recall happened in Clearfield, UT when Jayson and friends were shooting a BB gun in somebody's backyard and were cited for discharging a firearm within city limits.

The witness then recalls the event in Lake Tahoe in 2012 or 2013. Jayson passed out secondary to intoxication. The police were called, the paramedics came, and Jayson was charged with assault for head butting one of the paramedics (p. 133).

In addition, she recalled during his homeless period, which was in 2016 or 2017, he was charged with possession of a stolen vehicle. He went to jail and after he was released he contacted Eastman Recovery Foundation (p. 135).

Exhibit M is then presented, which is evidently a document that indicates that he pled to a misdemeanor arising from a stolen vehicle case in 2017 (p. 137).

This witness also acknowledges that in 2009 when they went to a Jazz game, he had her beer in his hands and he was charged with possession of alcohol by a minor (pp. 137-138).

There is further discussion about a felony arrest on 26 May 2017, which Becky believes is the same as the stolen vehicle case. This witness believes the issue with the stolen vehicle occurred during a brief period when Jayson had moved out (p. 139).

Ms. Scheperle returns to Exhibit I and references information under the *social history section*. Jayson reported that his wife was physically abusive and that when he was arrested in 2009 he was not the aggressor. Becky concurred (pp. 139-140). Becky indicated there were times they would argue and Jayson wouldn't respond and she would *"punch him or hit him and he would just sit there"* (p. 140). This would occur a couple times a month even after their first child. The physical abuse ceased before they had their second child (p. 140). When asked why that stopped, Becky stated that she went to the psychiatric unit at LDS Hospital for a week and started seeing a therapist (p. 141). This witness denied that Jayson ever attacked her (p. 143).

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 41 of 43

Ms. Scheperle then asked about the last time she received any money from Jayson and she believes that would have been in January 2020 before he left for Kodiak.

Becky Vinberg's criticism of Bradley Udell. Becky was present for Mr. Udell's deposition. When she is asked what she believed he did wrong, Becky stated *"I believe that he left a secure building when Jayson was leaving the property"* (p. 147). When asked if he did anything else wrong, the witness replied *"shot and killed Jayson"* (p. 148).

There is now discussion about Becky's response to Interrogatory Number 15, which asked her to describe Jayson's relationship with David E. Downs (p. 149). Becky denied knowing who this person was.

Examination By Mr. Hitchcock-Lopez. The only question asked by Mr. Hitchcock-Lopez was to clarify that Duncan and Eaen's native benefits came straight from Donna (p. 152).

**Unified Police Department, Salt Lake County, Utah, added 22 April 2025**

Shoplifting Arrest, 6 May 2018. This event occurred at a Walgreens. *"Information stated that a male had stolen a box of syringes and ran from the store and then returned 10 minutes later to reclaim the ID he had left on the pharmacy counter. The arresting officer believed that he was under the influence of something as evident by slurred speech, unsteady gait and trouble staying awake"* (p. 6 of 11).

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 42 of 43

## Key Word Index

Alaska Baptist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 39
Amazon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Anchorage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 10, 28, 29, 32, 33
Avery Storm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9, 31
Borton, Richard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Brad U . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
cocaine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10, 16, 29, 36
Dan Bronner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Dane Olson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Eastman Recovery Foundation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 40
ecstasy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
extramarital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
extramarital affairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
fired . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 24, 33
Furio, Anthony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 19
future oriented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Glover, John (civilian) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Granite Construction Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Jeff Welch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Kodiak . . . . . . . . . . . . . . . . . . . . . . . 4-6, 9, 10, 14-18, 26-29, 33, 34, 36, 38, 39, 41
Lake Tahoe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 40
Lenhert, Stephen (civilian) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Luke . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 25, 31
Luke Brown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 25, 31
Mathias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31
Mathias Birkmeyer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
McLaughlin . . . . . . . . . . . . . . . . . . . . . . . . . 10, 28, 29, 33, 34, 36, 39
Merrigan, Caroline (Jason's aunt) . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 14, 15, 18
meth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 28-30, 36, 39, 40
methamphetamine . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 10, 16-19, 26, 27, 30, 38, 40
Nelson, Abner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Nielsen, Michael (Becky's stepfather) . . . . . . . . . . . . . . . . . . . . . . . . 10, 16, 32
noise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39
paranoid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Petro Star Kodiak Terminal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Quality Disaster Clean Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Schlintz, Gerald . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Shamrock Plumbing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Sled Dogs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 31
Tony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 33, 34
T-roy Button . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Udell, Bradley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-9, 11-15, 19-26, 35, 41
Virgin, Stacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Confidential Document Review
Estate of Jayson Vinberg v. United States of America
United States District Court, Alaska District
Case #3:22-cv-00135-HRH
22 April 2025
Page 43 of 43

voices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 10, 26, 27, 30, 38-40
wildlife encounters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Zack Castonguay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Zyprexa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 40