# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

ESTATE OF JAYSON VINBERG,
*through its co-personal representatives* BECKY VINBERG, ANTHONY FURIO*, and* ESTHER FURIO,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

Case No. 3:22-cv-00135-SLG

## ORDER ON THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT[1]

Before the Court at Docket 162 is Defendant United States' Motion for Summary Judgment. Plaintiff Estate of Jayson Vinberg, through personal representatives Becky Vinberg, Anthony Furio, and Esther Furio, responded in opposition at Docket 186. The United States filed a reply at Docket 202. Oral argument was not requested and was not necessary to the Court's determination

## BACKGROUND

This case arose after Jayson Vinberg walked onto the Navy's Special Warfare Cold Weather Detachment (the "Detachment") on Kodiak Island, Alaska

---

[1] This order is the redacted version of the Sealed Order at Docket 204 per the parties' stipulated redactions.

and was shot and killed by U.S. Navy Petty Officer Bradley Udell.[2]  The facts, construed in the light most favorable to Plaintiff for purposes of this motion, are as follows:[3]

On June 13, 2020, U.S. Navy Petty Officer Bradley Udell, a Special Warfare Combatant-Crewman assigned to the Detachment, was on duty as the Detachment's watchstander.[4]  Udell was the only watchstander on duty at that time and was alone on the Detachment.[5]  As a watchstander, Udell was tasked with conducting periodic checks of the Detachment, ensuring gates, doors, and other

---

[2] Docket 100 (Order Re Motion to Dismiss at Docket 61) at 2-3.

[3] As evidence of what occurred on June 13, 2020, between Udell and Vinberg, the United States relies on Udell's February 29, 2024 deposition, which is Exhibit B to the Government's Motion, a transcript of an interview between Udell and investigators that occurred on June 19, 2020, Docket 61-2, and two video recordings from surveillance cameras that the United States conventionally filed at Docket 135.  Docket 162 at 3-6.  The two video recordings that the United States incorporates by reference were filed with its Motion to Dismiss and are titled N-71 South Porch and N-71 Vestibule 2-102.  Docket 61-1 at 1; Docket 135.  The video recordings do not contain audio. Those same video recordings are Plaintiff's Exhibits 21 and 35 filed with Plaintiff's Response in Opposition to the United States' Motion for Summary Judgment. Docket 190-22; Docket 190-36.  The Court refers to the video recordings by their file names as displayed in the bottom left-hand corner of the window when viewing the video recordings in Windows Media Player.

As Plaintiff points out, there are inconsistencies between what Udell told Alaska State Troopers on the night of the incident, what he told investigators several days after the incident, and what he said during his deposition nearly four years later; some of these statements are also inconsistent with the surveillance videos.  *See* Docket 186 at 30 (first quoting Docket 190-43 (Alaska Dep't of Pub. Safety Incident Rep.) at 10 and Docket 190-41 (Law Enforcement Interview Tr.) at 2; then quoting Docket 162, Ex. B (Udell Depo.) at 31; and then citing N-71 South Porch at 09:55:53-09:55:54; and N-71 Vestibule 2-102 at 09:55:53-09:55:54).  For purposes of this motion, the Court "view[s] the facts in the light depicted by the videotape," *Scott v. Harris*, 550 U.S. 372, 381 (2007), and construes any inconsistencies in Udell's various statements in the light most favorable to Plaintiff.

[4] Docket 61-2 (Udell NCIS Interview Tr.) at 30; Docket 149 at ¶¶ 5, 17.

[5] Docket 61-2 at 18, 21.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 2 of 29

access points were locked and secure, and performing walkthroughs of Detachment buildings to check for any issues.[6]  The Detachment is located on property owned by the United States Coast Guard, and the Coast Guard had entered into a Memorandum of Understanding ("MOU") with the Navy, in which the Coast Guard agreed to respond within 15 minutes to "emergency calls for assistance involving threats to physical security of personnel or property" at the Detachment.[7]

On the evening of June 13, 2020, Vinberg entered the Detachment.[8] Surveillance cameras show Vinberg walking north from the main gate, passing the Detachment headquarters building, identified as Building N-71, and then walking out of view of the surveillance cameras toward beaches on the property.[9]  There is a fish cleaning station located in the area where Vinberg was seen walking towards.[10]

About 22 minutes later, Vinberg reenters the view of the surveillance

---

[6] Docket 190-48 at 4-5 (Detachment Duty Officer Watchstanders Guide); *see also* Docket 61-2 at 21-24.

[7] Docket 190-12 at 2 (Memorandum of Agreement Between United States Coast Guard Kodiak, Alaska and Commander, Naval Special Warfare Center); *see also* Docket 162, Ex. A (Ragan Dep.) at 32 (testifying that the Detachment was under Alaska State Trooper jurisdiction and, because the Detachment was on Coast Guard property, Coast Guard officers "could also respond" if law enforcement was needed).

[8] *See, e.g.*, Docket 190-28 (Reiner Suppl. Rep.) at 13.

[9] Docket 190-28 (Reiner Suppl. Rep.) at 13.

[10] Docket 162, Ex. I (Button Depo.) at 46-47; *see also* Docket 190-29 (photograph of fish processing tables).

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 3 of 29

cameras and is seen walking between Building N-71 and a small outbuilding to the east of Building N-71.[11] Vinberg then climbs an outdoor stairwell on the west side of Building N-71.[12] Udell was sitting in an upstairs office in Building N-71 when he heard a knock on the exterior door on that floor that led to an outdoor stairwell.[13] Udell opened the door and asked Vinberg who he was and informed him that he could not be on the Detachment.[14] According to Udall, Vinberg responded that he had snuck on to the Detachment.[15] Udell told investigators several days after the incident, "I didn't really know how to handle the situation after that point."[16] Udell then asked Vinberg "if he would go down the stairs to the front door."[17] "This initial exchange lasted 16 seconds, with Vinberg less than an arm's length from the open door throughout."[18] Vinberg immediately complied with Udell's request, walking directly back to the headquarters building's south porch.[19] After this encounter, Udell loaded a round in the chamber of his personal firearm, put the safety on, and

---

[11] Docket 190-28 (Reiner Suppl. Rep.) at 8, 13.

[12] Docket 190-28 at 8, 13.

[13] Docket 162, Ex. B (Udell Depo.) at 21; Docket 162, Ex. I (Button Depo.) at 46.

[14] Docket 162, Ex. B (Udell Depo.) at 21; *see* Docket 190-28 (Reiner Suppl. Rep.) at 13.

[15] Docket 162, Ex. B (Udell Depo.) at 22.

[16] Docket 61-2 (Udell NCIS Interview Tr.) at 15.

[17] Docket 61-2 (Udell NCIS Interview Tr.) at 15.

[18] Docket 186 at 11 (citing N-71 Vestibule 2-102 at 09:44:06-09:44:23).

[19] Docket 61-2 (Udell NCIS Interview Tr.) at 34; *see* Docket 186 at 12 (first citing N-71 Vestibule 2-102 at 09:44:23-09:44:33; and then citing N-71 South Porch at 09:44:51).

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 4 of 29

Case 3:22-cv-00135-SLG    Document 211    Filed 07/20/26    Page 4 of 29

holstered it on his person.[20]

Udell then texted a group message comprised of fellow Navy servicemembers called "Sled Dogs" that "Some random dude just got on the compound"; the group message included the Detachment Training Chief, Troy Button, one of Udell's superiors.[21] Udell told investigators that he texted the group because he was "[k]ind of looking for advice at that point."[22] Mathias Birkmeyer responded to Udell asking "Did you pop him?" and "Scrap?"[23] Luke Brown told Udell to "Bury him."[24] Watchstanders could communicate with the Officer in Charge through text message, but Udell did not attempt to do so.[25]

Udell told investigators several days after the incident that he then proceeded downstairs "to get eyes on the individual" and was watching Vinberg through a glass window next to the doors of a vestibule; the vestibule was located between the unlocked exterior door to the headquarters building and a locked interior door.[26] "Neither Button nor Udell called Coast Guard Military Police or

---

[20] Docket 162, Ex. B (Udell Depo.) at 26.

[21] Docket 190-21 at 1; Docket 162, Ex. B (Udell Depo.) at 37-40; Docket 61-2 (Udell NCIS Interview Tr.) at 15-16; Docket 162, Ex. I (Button Depo.) at 37; Docket 190-10 (Button NCIS Interview Tr.) at 18; *see also* Docket 61-2 (Udell NCIS Interview Tr.) at 34.

[22] Docket 61-2 (Udell NCIS Interview Tr.) at 16.

[23] Docket 190-21 at 1.

[24] Docket 190-21 at 1.

[25] Docket 162, Ex. I (Button Depo.) at 28-29.

[26] Docket 61-2 (Udell NCIS Interview Tr.) at 36; Docket 162, Ex. B (Udell Depo.) at 26-27. At some point, Udell returned upstairs to answer a phone that was ringing and came back downstairs to the vestibule area. Docket 61-2 (Udell NCIS Interview Tr.) at 41-42; Docket 162,

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 5 of 29
Case 3:22-cv-00135-SLG    Document 211    Filed 07/20/26    Page 5 of 29

911."[27]

As depicted in the two surveillance video recordings, Vinberg is seen pacing in and out of camera view for a couple of minutes; he then knocks twice on the front door, paces some more, then returns, and pounds once on the door with both hands.[28] Vinberg backs away, removes two objects from his jacket pockets (one in each hand), holds them slightly out in front of him, and then places them back into his jacket pockets.[29] Around this time, Udell texted the Sled Dogs group message, asking "Should I shoot him? But seriously."[30]

Vinberg lingers near the door for several more minutes, moving in and out of view of the surveillance cameras.[31] He again removes objects from his jacket pockets, which appear to be knives, and then places the knives and his hands back in his jacket pockets.[32] After lingering near the front door and intermittently looking in the window for a few more minutes, Vinberg again approaches the door,

Ex. B (Udell Depo.) at 26. It is not clear from the video footage when this occurred. Udell told investigators that the phone call was from Button, who asked Udell who Vinberg was and what he wanted, and that Button told Udell that he was on his way to the Detachment. Docket 61-2 (Udell NCIS Interview Tr.) at 42. At his deposition, Button could not recall that phone conversation. Docket 162, Ex. I. (Button Depo.) at 37-38.

[27] Docket 186 at 15.

[28] N-71 South Porch at 09:44:50-09:47:07; N-71 Vestibule 2-102 at 09:43:13-09:47:07.

[29] N-71 South Porch at 09:47:07-09:47:17; N-71 Vestibule 2-102 at 09:47:07-09:47:17.

[30] Docket 190-21 at 3.

[31] N-71 South Porch at 09:47:17-09:48:55; N-71 Vestibule 2-102 at 09:47:17-09:48:52.

[32] N-71 South Porch at 09:48:55-09:49:02; N-71 Vestibule 2-102 at 09:48:52-09:49:01.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 6 of 29

removes the knives from his jacket pockets, and holds them near the window.[33]

Vinberg then places the knives and his hands back in his jacket pockets and continues to stand or pace near the door and look through the window for another few minutes.[34] ██████████████████████████████████████████████ ██████████████████████

Udell testified that he saw Vinberg holding the knives and tapping on the window next to the door with the knives.[36]  And according to Udell, while pacing outside the door, Vinberg yelled "come on."[37]  Udell also testified that throughout the encounter he signaled through the glass and told Vinberg that he "needed to leave" the Detachment.[38]

Vinberg then starts walking away from the door and moves out of view of the surveillance cameras, heading toward the front gate of the Detachment.[39] During this time, the vestibule remains dark and Udell is not visible in either

---

[33] N-71 South Porch at 09:49:02-09:51:37; N-71 Vestibule 2-102 at 09:49:01-09:51:38.

[34] N-71 South Porch at 09:51:37-9:54:37; N-71 Vestibule 2-102 at 09:51:36-09:54:37.

[35] Docket 186 at 16; *see also* Docket 162, Ex. B (Udell Depo.) at 27.

[36] Docket 162, Ex. B (Udell Depo.) at 22, 26-27.

[37] Docket 61-2 (Udell NCIS Interview Tr.) at 39; Docket 162, Ex. B (Udell Depo.) at 29.  *But see* Docket 190-33 (Cox NCIS Interview Tr.) at 10 (recounting that Udell told him he "couldn't really understand what [Vinberg] was saying to him through the windows as he was kind of directing him to leave").

[38] Docket 162, Ex. B (Udell Depo.) at 28-29; Docket 61-2 (Udell NCIS Interview Tr.) at 42-43.

[39] N-71 South Porch at 09:54:38; N-71 Vestibule 2-102 at 09:54:37-09:54:39; Docket 61-2 (Udell NCIS Interview Tr.) at 56.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 7 of 29
Case 3:22-cv-00135-SLG    Document 211    Filed 07/20/26    Page 7 of 29

surveillance video.[40]

Just after Vinberg starts to walk away, the light comes on in the vestibule and Udell enters the vestibule between the unlocked exterior door and the locked interior door of the building.[41] Udell watches through the glass as Vinberg continues to walk away.[42] About 40 seconds after Vinberg starts to walk away, Udell opens the exterior door, propping it open with his right foot while holding his phone in his left hand.[43] Vinberg is approximately 150 feet from the front door of the building[44] when he stops, turns, and begins walking back towards Udell.[45]

Udell told investigators that he did not say anything to Vinberg to make Vinberg turn around and he speculated that maybe Vinberg "heard the interior door close."[46] Jonathan Cox, however, told investigators that he spoke to Udell on the phone the night of the shooting, and reported that Udell told him he came out of the building and told Vinberg to "[h]old up for a little bit. Where are you going?" before Vinberg turned and approached Udell.[47]

---

[40] N-71 Vestibule 2-102 at 09:44:52-09:54:50.

[41] N-71 Vestibule 2-102 at 09:54:43-09:54:50.

[42] N-71 Vestibule 2-102 at 09:54:50-09:55:08.

[43] N-71 South Porch at 09:55:08-09:55:30; N-71 Vestibule 2-102 at 09:55:08-09:55:20; Docket 61-2 (Udell NCIS Interview Tr.) at 56-57; Docket 162, Ex. B (Udell Depo.) at 29.

[44] Docket 190-28 (Reiner Suppl. Rep.) at 10-11.

[45] Docket 162, Ex. B (Udell Depo.) at 30.

[46] Docket 61-2 (Udell NCIS Interview Tr.) at 57-58.

[47] Docket 190-33 at 10. The United States, in its reply, argues that Mr. Cox's statement would be inadmissible hearsay and therefore the Court should not consider it at summary judgment.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 8 of 29

As Vinberg starts to walk back towards the building, Udell puts his phone in his left pocket, unholsters his gun with his right hand, and twice puts his left hand up with his palm facing Vinberg.[48]  Udell then raises his gun in both hands as Vinberg reenters the view of the surveillance cameras.[49]  At about ████████ away from Udell, Vinberg slows or stops his advance toward Udell, who is still standing in the open doorway.[50]  Vinberg's hands are empty and at his sides.[51]  As Vinberg slows, Udell fires his pistol.[52]  Vinberg spins and stumbles back out of view of the surveillance cameras.[53]  Udell ultimately fired at Vinberg seven times, with several bullets hitting Vinberg in the back.[54]  Vinberg was pronounced dead shortly thereafter.[55]  Udell told a responding Alaska State Trooper shortly after the incident that he came outside of the building to try to "reason with" Vinberg, or at least

---

Docket 202 at 3 (first citing Fed. R. Civ. P. 56(c)(2); and then citing *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002)).  While a definitive ruling on whether the statement is inadmissible hearsay is beyond the scope of this order, the Court finds that the statement could be admissible for either a non-hearsay purpose or as non-hearsay pursuant to Federal Rule of Evidence 801(d)(2)(D).

[48] N-71 South Porch at 09:55:27-09:55:41; N-71 Vestibule 2-102 at 09:55:21-09:55:41.

[49] N-71 South Porch at 09:55:42; N-71 Vestibule 2-102 at 09:55:41-09:55:53.

[50] N-71 South Porch at 09:55:53; N-71 Vestibule 2-102 at 09:55:51-09:55:53. It is unclear from the video whether Vinberg was indeed coming to a full stop or merely slowing his advance toward Udell.

[51] N-71 South Porch at 09:55:48-09:55:53; N-71 Vestibule 2-102 at 09:55:51-09:55:53.

[52] N-71 South Porch at 09:55:53-09:56:00; N-71 Vestibule 2-102 at 09:55:52-09:56:00.

[53] N-71 South Porch at 09:55:53-09:55:58.

[54] Docket 162, Ex. B (Udell Depo.) at 32; Docket 190-40 at 6-8.

[55] Docket 190-42 (Autopsy Rep.) at 1.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 9 of 29

Case 3:22-cv-00135-SLG     Document 211     Filed 07/20/26     Page 9 of 29

"convince him to leave the property while physically watching him do so."[56] He also told the Trooper that Vinberg advanced toward him with a knife in each hand and that he continued firing his weapon because Vinberg was continuing to advance on him.[57]

Mr. Vinberg's Estate sued the United States pursuant to the Federal Tort Claims Act ("FTCA").[58] After this Court ruled on the United States' Motion to Dismiss, two of Plaintiff's claims remain: Claim III for negligence based on the actions and omissions of the United States and Claim IV for assault and battery for Udell's shooting and killing of Vinberg.[59] The United States now seeks summary judgment on both claims.[60]

## LEGAL STANDARD

### I. Summary Judgment

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden of

---

[56] Docket 190-43 (Alaska Dep't of Pub. Safety Incident Rep.) at 10. As described above, the surveillance video shows that Vinberg's hands were empty and at his sides when he came back into view of the surveillance camera.

[57] Docket 190-43 at 10. As described above, after the first shot, Vinberg spins away from Udell and out of view of the surveillance cameras.

[58] Docket 1; Docket 56 at ¶¶ 48-66 (Second Am. Compl.); 28 U.S.C. §§ 1346(b)(1), 2680(h).

[59] Docket 100 at 31.

[60] Docket 162.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 10 of 29

showing the absence of a genuine dispute of material fact lies with the movant.[61]

"A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit."[62]

If the movant meets this burden, the non-moving party must demonstrate "specific facts showing that there is a genuine issue for trial."[63] The non-moving party may not rely on "mere allegations or denials"; rather, to reach the level of a genuine dispute, the evidence must be such "that a reasonable [trier of fact] could return a verdict for the non-moving party."[64] In sum, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant."[65]

When considering a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party and draws "all justifiable inferences" in the non-moving party's favor.[66] And yet "to the extent that the uncontested video evidence . . . establishes the timing and occurrence of events,

---

[61] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[62] *T. W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

[63] *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e) (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[64] *Anderson*, 477 U.S. at 248-49 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)).

[65] *Id.* at 255.

[66] *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 11 of 29

Case 3:22-cv-00135-SLG     Document 211     Filed 07/20/26     Page 11 of 29

[courts] 'view[] the facts in the light depicted by the videotape.'"[67]

## II. Federal Tort Claims Act

The FTCA provides for a limited waiver of sovereign immunity by granting federal district courts jurisdiction over "civil actions on claims against the United States . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."[68] However, the FTCA is subject to several exceptions.

One such exception is the discretionary function exception.[69] Under that exception, the FTCA does not waive sovereign immunity for "'[a]ny claim' based on the exercise of an official's 'discretionary function.'"[70] "The discretionary function exception . . . forbids suits challenging decisions that 'involv[e] an element of judgment or choice' of a 'kind that the . . . exception was designed to shield.'"[71] "The 'discretionary function' exception insulates certain governmental decision-making from 'judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action

---

[67] *Spencer v. Pew*, 117 F.4th 1130, 1133 (9th Cir. 2024) (third alteration in original) (quoting *Scott*, 550 U.S. at 380-81).

[68] 28 U.S.C. § 1346(b)(1).

[69] 28 U.S.C. § 2680(a).

[70] *Martin v. United States,* 605 U.S. 395, 401 (2025) (quoting 28 U.S.C. § 2680(a)).

[71] *Id.* (alteration in original) (quoting *United States v. Gaubert*, 499 U.S. 315, 322-323 (1991)).

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 12 of 29

Case 3:22-cv-00135-SLG     Document 211     Filed 07/20/26     Page 12 of 29

in tort.'"[72] "The government bears the burden of proving that the discretionary function exception applies."[73]

To determine whether the discretionary function exception applies, courts apply a two-prong test, asking "(1) whether challenged actions involve an element of judgment or choice; and (2) if a specific course of action is *not* specified, whether the discretion left to the government is of the kind that the discretionary function exception was designed to shield . . . ."[74] The first prong "is not met where 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'"[75] "If there is such a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee has no rightful option but to adhere to the directive.'"[76]

The FTCA also contains an exception for certain intentional torts, including those "arising out of assault, battery, [or] false imprisonment."[77] However, this intentional tort exception does not apply if committed by "investigative or law

---

[72] *Myers v. United States*, 652 F.3d 1021, 1028 (9th Cir. 2011) (quoting *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008)).

[73] *Id.* (quoting *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002)).

[74] *Id.* (emphasis in original) (citing *Terbush*, 516 F.3d at 1129).

[75] *Id.* (quoting *Berkovitz by Berkovitz v. United States,* 486 U.S. 531, 536 (1988)).

[76] *Id.* (quoting *Berkovitz by Berkovitz,* 486 at 536).

[77] 28 U.S.C. § 2680(h).

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 13 of 29
Case 3:22-cv-00135-SLG     Document 211     Filed 07/20/26     Page 13 of 29

enforcement officers of the United States Government."[78]   This so-called law enforcement proviso defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."[79]

## DISCUSSION

### I. Count III – Negligence

The United States contends that Plaintiff's negligence claim is barred by the discretionary function exception.[80]   Plaintiff disagrees, maintaining that "the Government violated specific, mandatory military instructions and directives regarding the security measures at the Detachment and the training and supervision of Udell."[81]

One such directive identified by Plaintiff is OPNAVINST 5530.14E § 207 ("Section 207"), which is titled "Physical Security of Activities Not Located Aboard

---

[78] *Id.*

[79] *Id.; see Martin,* 605 U.S. at 401 ("Located in subsection (h) of § 2680, [the intentional tort exception] prohibits claims alleging any of 11 enumerated torts. But the exception is itself subject to a 'law enforcement proviso.' That proviso countermands the exception with respect to six intentional torts (including assault, battery, false imprisonment, and false arrest) by 'investigative or law enforcement officers.' So if a plaintiff alleges that a federal law enforcement officer committed one or more of those six torts, the proviso will ensure those claims survive an encounter with the intentional-tort exception." (first quoting *Millbrook v. United States*, 569 U.S. 50, 55 (2013); then quoting 28 U.S.C. § 2680(h); and then citing *Millbrook*, 569 U.S. at 55-56)).

[80] Docket 162 at 18-22.

[81] Docket 186 at 45.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 14 of 29
Case 3:22-cv-00135-SLG     Document 211     Filed 07/20/26     Page 14 of 29

Navy Installation."[82]  Section 207(a) provides that:

> Activities located aboard other DoD service/agency sites shall coordinate PS [physical security] requirements with the host. Navy organizations should establish Inter-Service Support Agreements (ISSAs) /Memoranda of Understanding (MOUs) /Memoranda of Agreement (MOAs) with the host service or nation via the chain of command. *Topics that shall be addressed in these agreements include* establishment and identification of property boundaries, intrusion detection system monitoring, available response forces, *use of force (including deadly force) training and issues*, PS support, etc.[83]

Plaintiff maintains that the MOU that the Navy entered into with the Coast Guard does not contain any guidance on use of force training or issues, contrary to the requirements of Section 207.[84]

The United States responds that the MOU requires the Coast Guard, not the Navy, to train its personnel in use of force because, pursuant to the MOU, the Coast Guard is the entity providing protection for the Detachment.[85]  As such, the United States contends that Section 207 does not require any use of force training for Navy servicemembers such as Udell.[86]  In addition, the United States maintains that "subsection 4.b [of the MOU] discusses the training of the Coast Guard personnel providing force protection in three sections" and then refers to

---

[82] Docket 186 at 46 & n.262; Docket 190-46 at 20-21.

[83] Docket 190-46 at 20 (emphasis added).

[84] Docket 186 at 46 (citing Docket 190-12).

[85] Docket 202 at 7 (citing Docket 190-12).

[86] Docket 202 at 7 (citing Docket 162, Ex. A (Ragan Dep.) at 33)).

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 15 of 29

Case 3:22-cv-00135-SLG   Document 211   Filed 07/20/26   Page 15 of 29

subsections 1, 3, and 6.[87]  Those subsections state:



Further, the Court does not read Section 207 to require only that an MOU include an agreement on use of force training only for the supporting unit—here, the Coast Guard—and not Navy servicemembers, as the United States suggests.  Indeed, given that only a Navy watchstander is present at the facility when it is not in operation, with the Coast Guard to respond within 15 minutes, it would appear that Section 207 would require that some use of force training be provided to Navy personnel serving as

---

[87] Docket 202 at 7-8.

[88] Docket 190-12 at 2.

[89] *See* Docket 190-12 at 1-3.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 16 of 29

Case 3:22-cv-00135-SLG    Document 211    Filed 07/20/26    Page 16 of 29

watchstanders—i.e. what to do before the Coast Guard arrives when there is a threat to the physical security of personnel or property on the Detachment.[90]

Because the United States has not demonstrated that the MOU between the Navy and the Coast Guard complies with Section 207's requirement that it "shall . . . address[] use of force (including deadly force) training and issues,"[91] the Court next considers whether this provision is discretionary such that the discretionary function exception would apply.

In *Myers v. United States*, the Environmental Protection Agency ("EPA") had "placed the United States Marine Corps Base at Camp Pendelton on the 'National Priorities List' of sites requiring environmental cleanup."[92] The Navy entered into a comprehensive environmental cleanup plan for Camp Pendleton, known as a Federal Facility Agreement ("FFA").[93] The Naval Facilities Engineering Command ("Command") uses a Safety and Health Program Manual ("the Manual") for all environmental cleanup operations.[94] The Manual specified that "[e]ach [Command] activity shall ensure that plans are reviewed and accepted prior

---

[90] *See* Docket 192-2.

[91] Docket 190-46 at 20.

[92] 652 F.3d at 1024. The facts regarding Camp Pendleton are as described in the Ninth Circuit's opinion. *See id.* at 1024-27.

[93] *Id.* at 1024.

[94] *Id.*

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 17 of 29

Case 3:22-cv-00135-SLG    Document 211    Filed 07/20/26    Page 17 of 29

to issuing the Notice to Proceed."[95]  Paragraph 0407.c of the Manual also provided that

> c. *Reviews*. All HASPs [ (health and safety plans) ] shall be reviewed prior to initiating site work by a competent person. Competent person shall mean a certified industrial hygienist [ (CIH) ] or equivalent by training and/or experience. In addition, an EFD/EFA Construction Safety Manager or designated representative who has sufficient knowledge and authority to review and accept construction safety procedures shall review HASPs for construction safety requirements.[96]

However, there was no evidence that either of the Navy's certified industrial hygienists had approved the HASP for the cleanup of one identified site.[97]

As part of the cleanup, 240,000 cubic yards of contaminated soil were dumped in a landfill, including soil that was contaminated with thallium.[98]  The plaintiff's backyard, located on Camp Pendelton, was 50 feet from the landfill.[99] The landfill was also only 200 feet from an elementary school where the plaintiff played and was eventually a student.[100]  Soon after the contaminated soil was dumped into the adjacent landfill, the plaintiff became ill, suffering from gastrointestinal distress, peripheral neuropathy, cognitive deficits, and alopecia, all

---

[95] *Id.* at 1029 (citation omitted).

[96] *Id.* at 1024 (alterations in original).

[97] *Id.* at 1026.

[98] *Id.*

[99] *Id.*

[100] *Id.*

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 18 of 29
Case 3:22-cv-00135-SLG     Document 211     Filed 07/20/26     Page 18 of 29

of which are known side-effects of exposure to thallium.[101]

The plaintiff's guardian ad litem sued the Navy for its handling of the cleanup pursuant to the FTCA.[102] The district court found that the Navy's actions fell within the discretionary function exception; the plaintiff appealed.[103]

On appeal, the Ninth Circuit reversed.[104] The Circuit held that provisions in the Manual—that health and safety plans "shall" be reviewed "by a competent person" and that "[e]ach [Command] activity shall ensure that plans are reviewed and accepted prior to issuing the Notice to Proceed"—"imposed upon the Navy itself a 'mandatory and specific' duty to ensure that plans were reviewed and accepted."[105] The Circuit held that the policy in the Manual "'specifically prescribes a course of action for an employee to follow,' review by the Navy of a contractor's HASP by a competent person, such that 'the employee has no rightful option but to adhere to the directive.'"[106] Thus, the Manual left "nothing to the Navy's discretion" and the discretionary function exception did not apply.[107]

In support of its holding, the *Myers* Court relied on *Bolt v. United States*, 509

---

[101] *Id.*

[102] *Id.* at 1027.

[103] *Id.*

[104] *Id.*

[105] *Id.* at 1028-29 (alteration in original) (citing *Terbush,* 516 F.3d at 1129).

[106] *Id.* at 1029 (quoting *Berkovitz by Berkovitz*, 486 U.S. at 536).

[107] *Id.* (quoting *Kelly v. United States,* 241 F.3d 755, 761 (9th Cir. 2001)).

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 19 of 29

F.3d 1028 (9th Cir. 2007), in which the Ninth Circuit "held that the Army's Snow Removal Policy was sufficiently 'specific and mandatory' to avoid application of the 'discretionary function' exception, where it required that snow be removed from family housing parking areas 'once per year in late February or March.'"[108]  The *Bolt* Court held that the snow removal policy "'expressly impose[d] a specific and mandatory duty to clear Family Housing Parking Areas of snow and ice once a year, before the end of March,' so that the Army had failed its burden under the first prong of the 'discretionary function' analysis."[109]  "This was so, even though the policy did not specify how the snow was to be removed or the training or qualifications of the person to perform the snow removal."[110]

Comparing *Bolt* to the facts before it, the *Myers* Court reasoned that "[e]ven supposing that the Navy had some discretion in the fulfillment of its duty to review HASPs, it had no discretion under the policy expressed in the Manual about whether or not to review the HASP *at all* and no discretion for such a review to be performed by anyone other than *a Navy* [certified industrial hygienist] or other competent person."[111]

The Court finds that Section 207 is substantially similar to the Manual

---

[108] *Id.* at 1029-30 (quoting *Bolt*, 509 F.3d at 1032-33).

[109] *Id.* at 1030 (alterations in original) (quoting *Bolt*, 509 F.3d at 1033).

[110] *Id.* (citing *Vickers v. United States,* 228 F.3d 944 (9th Cir. 2000))

[111] *Id.* (emphasis in original).

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 20 of 29

Case 3:22-cv-00135-SLG     Document 211     Filed 07/20/26     Page 20 of 29

provisions in *Myers* and the snow removal policy in *Bolt*.  Section 207 uses mandatory language—"shall"—and is specific that "use of force (including deadly force) training and issues" must be addressed in MOUs regarding physical security between the Navy and other host agencies or nations.[112]  "Even supposing that the Navy had some discretion in the fulfillment of its duty to [include use of force training and issues in its MOUs], it had no discretion under [Section 207 not to include an agreement on that topic]."[113]

Therefore, the Court finds that Section 207 leaves "nothing to the Navy's discretion" as to whether to include use of force training and issues in its MOU with the Coast Guard regarding physical security at the Detachment.  The discretionary function exception therefore does not apply.[114]

Because the United States has not shown that it is entitled to summary judgment on Plaintiff's negligence claim as a matter of law, the United States' motion for summary judgment on Count III is **DENIED**.

---

[112] Docket 190-46 at 20-21.

[113] *Myers*, 652 F.3d at 1030.

[114] Plaintiff argues that the United States violated other non-discretionary policies, including Sections 201, 208, 210, and 212 of OPNAVINST 5530.14E  and Department of Defense Directive 5210.56. Docket 186 at 47-48 (citing Docket 190-46 at 17, 21-24, and 32); Docket 186 at 48-49 (citing Docket 190-49 at 22).  The Court need not address these other policies for purposes of this motion.  Further, the Court also need not address Plaintiff's alternative argument that even if there was no violation of a mandatory policy, the discretionary function exception would still not apply because the United States' alleged "failures did not involve the element of judgment the discretionary function exception was designed to shield because they arose from the negligent implementation of policy choices already made." *See* Docket 186 at 51-58.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 21 of 29

## II. Count IV – Assault and Battery

As an initial matter, the United States resurrects an argument that this Court rejected in its Order on the United States' Motion to Dismiss: that Udell was not an "investigative or law enforcement officer" and therefore the law enforcement proviso waiving sovereign immunity does not apply.[115] In its prior order, this Court applied the Ninth Circuit's guidance from *Leuthauser v. United States* to find that the law enforcement proviso waived sovereign immunity for Plaintiff's intentional tort claim for assault and battery against the United States.[116]

The United States now asks the Court to "revisit this finding now that the factual record has been fully developed."[117] The United States first maintains that Udell was not an "officer of the United States."[118] The United States relies on the definition of "officer" from Webster's Third New International Dictionary that the Ninth Circuit referred to in *Leuthauser* to determine the meaning of "officer" in the FTCA.[119] Specifically, the United States contends that Webster's definition of "officer"—"one charged with a duty" and "one who is appointed or elected to serve in a position of trust, authority, or command esp. as specif. provided for by law"—

---

[115] Docket 162 at 8.

[116] Docket 100 at 23-29 (applying *Millbrook*, 569 U.S. 50 and *Leuthauser v. United States*, 71 F.4th 1189 (9th Cir. 2023)).

[117] Docket 162 at 8.

[118] Docket 162 at 8-9.

[119] Docket 162 at 8-9 (first citing *Officer*, Webster's Third New International Dictionary (1971); and then citing *Officer*, Black's Law Dictionary (4th ed. Rev. 1968)).

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 22 of 29

demonstrates that Udell was not an officer of the United States because there are no facts suggesting that Udell "was either appointed or elected to a position of trust, authority, or command."[120]

The United States reads the definitions relied on by the Ninth Circuit too narrowly. As more thoroughly discussed in this Court's prior order, in *Leuthauser*, the Ninth Circuit applied a two-part analysis to determine whether an individual was an "officer" under the law enforcement proviso: (1) Is the employee an "officer" as that term was ordinarily understood at the time Congress enacted the statute?; and (2) If so, is the officer "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law?"[121]

Regarding the first part of the analysis, the Circuit held that Transportation Security Officers ("TSOs") "easily satisf[y] dictionary definitions of *officer* at the time of the proviso's enactment in 1974," "not[ing] that the use of the term *any* before *officer* counsels toward defining the latter broadly."[122] The Ninth Circuit provided little else by way of analysis as to why TSOs are "officers" but the panel did not hold that an "officer" must be appointed or elected.[123]

The United States also maintains that Udell was not an "officer" because

---

[120] Docket 162 at 9 (citing *Officer*, Webster's Third New International Dictionary (1971)).

[121] *Leuthauser*, 71 F.4th at 1194-98; *see* Docket 100 at 23-29.

[122] *Id.* at 1194 (emphasis in original) (citing *Officer*, Webster's Third New International Dictionary (1971); and then citing *Officer*, Black's Law Dictionary (4th ed. Rev. 1968)).

[123] *Id.*

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 23 of 29

"[t]here is zero evidence to suggest that he would be expected to interact with the public in any fashion."[124]  But *Leuthauser* did not impose any such limitation on the definition of "officer," and imposing one here would disregard the Ninth Circuit's holding that "any officer" should be defined "broadly."[125]  The Court is similarly unpersuaded by the United States' argument that because members of the military are prohibited from engaged in domestic law enforcement they categorically cannot qualify as an "officer."[126]

The United States also contends that Udell does not satisfy the second part of the *Leuthauser* analysis as it is undisputed that Udell was not a law enforcement officer.[127]  But that is not the standard that *Leuthauser* demands; rather, courts are to evaluate whether the government employee was "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."[128] The United States does not engage with this question and the Court is therefore unpersuaded that it should revisit its prior finding.  At the time the events giving rise to this case occurred, Udell was an "investigative or law enforcement officer

---

[124] Docket 162 at 9.

[125] *Leuthauser*, 71 F.4th at 1194 (citing *United States v. Gonzales*, 520 U.S. 1, 5 (1997)).

[126] Docket 162 at 9-10 (first citing 18 U.S.C. § 1385; and then citing *United States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000)).

[127] Docket 162 at 10.

[128] *Leuthauser*, 71 F.4th at 1194-98.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 24 of 29
Case 3:22-cv-00135-SLG     Document 211     Filed 07/20/26     Page 24 of 29

of the United States Government."[129]

Alternatively, the United States maintains that "[i]f the Court is inclined to find that the law enforcement proviso applies," "Plaintiff's claim for assault and battery must be dismissed as Udell was acting lawfully in self-defense."[130]

As set forth in the relevant Alaska Civil Pattern Jury Instruction, under Alaska law, a defendant claiming self-defense must show that (1) "the defendant reasonably believes that he was in danger of death or serious bodily harm; and (2) this danger can safely be prevented only by the immediate use of deadly force."[131] Further, "[a] person cannot use deadly force if there is a reasonable way for him to escape the danger by retreating."[132] The standard of reasonableness is objective, requiring the defendant to show that he used "no more or greater force or means than would appear to a reasonable person, in similar circumstances, to be necessary . . . to prevent [imminent] bodily injury."[133]

---

[129] 28 U.S.C. § 2680(h).

[130] Docket 162 at 10.

[131] Alaska Civ. Pattern Jury Instr. 12.08 (2023) (alteration in original).

[132] *Id.* (also providing that under Alaska law a person need not retreat from his own home if he is not the initial aggressor) (citing Restatement (Second) of Torts § 65).

[133] *Merrill v. Faltin*, 430 P.2d 913, 918 n.13 (Alaska 1967). The Alaska Supreme Court held that the following jury instruction "adequately cover[ed]" the issue of self-defense:

> In this case the defendant claims he acted in keeping with his right of self-defense.
>
> A person upon whom an unprovoked assault is being made, or a person who has reasonable ground for believing and does believe that another person is about to inflict bodily injury upon him, need not retreat but may stand his ground and defend the integrity of his person; and where in such self defense of his person

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 25 of 29

Case 3:22-cv-00135-SLG   Document 211   Filed 07/20/26   Page 25 of 29

To be entitled to summary judgment on Plaintiff's assault and battery claim, the United States must show that there are no disputes of material fact and that the United States has proven its affirmative defense of self-defense as a matter of law. The United States contends that "the question before the Court is whether Udell's actions were reasonable."[134] As Plaintiff points out, "summary judgment is generally an inappropriate way to decide questions of reasonableness."[135] "However, summary judgment is not precluded altogether on questions of reasonableness. It is appropriate 'when only one conclusion about the conduct's reasonableness is possible.'"[136]

The Court finds that summary judgment is improper as more than one conclusion is possible as to whether Udell reasonably believed that he was in

---

he injures his assailant, the law holds there is legal justification provided he used no more or greater force or means than that which he in fact believed to be reasonably necessary, and no more or greater force or means than would appear to a reasonable person, in similar circumstances, to be necessary, in order to prevent the bodily injury which then appears to be imminent.

The burden of proving this defense by a preponderance of the evidence rests upon the defendant.

*Id.* at 918 & n.13; *see also* Restatement (Second) of Torts § 63, cmt. i ("*Reasonableness of actor's belief*. In determining whether the actor's apprehension of the intentional infliction of bodily harm or an offensive contact is reasonable, the circumstances which are known, or should be known, to the actor must be such as would lead a reasonable man to entertain such an apprehension.").

[134] Docket 162 at 13.

[135] Docket 186 at 28 (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994)).

[136] *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009) (quoting *In re Software Toolworks Inc.*, 50 F.3d at 622).

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 26 of 29

Case 3:22-cv-00135-SLG    Document 211    Filed 07/20/26    Page 26 of 29

danger of death or serious bodily harm and whether any danger posed by Vinberg could safely be prevented only by shooting Vinberg seven times. Viewing the facts in the light most favorable to Plaintiff for purposes of summary judgment, Vinberg and Udell had a conversation during which Udell told Vinberg to go downstairs. Vinberg complied. Then, for about ten minutes, Vinberg lingered and paced near the door, knocking or banging on the door twice. During this time, he also took two knives, one in each hand, out of his jacket pockets three times, once holding them near the window. Then Vinberg heeded Udell's instructions to leave and began walking toward the front gate. As he walked toward the front gate of the Detachment, Udell came out of the building and called out to Vinberg to "hold up for a little bit."[137] Vinberg then turned and began walking back toward Udell. Vinberg's hands were visible at his sides and out of his pockets and he did not have the knives in his hands when he came back into view of the surveillance camera, walking towards Udell. Further, Vinberg slowed or stopped his advance toward Udell when he was ███████ away from Udell. When Vinberg was ███████ in front of Udell with his hands empty and arms down, Udell shot him. Vinberg then spun around and Udell continued firing into Vinberg's back.

The Court finds that more than one conclusion is possible as to whether Udell reasonably believed that he was in danger of death or serious bodily harm

---

[137] Docket 190-33 at 10.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 27 of 29
Case 3:22-cv-00135-SLG    Document 211    Filed 07/20/26    Page 27 of 29

and whether any danger posed by Vinberg could safely be prevented only by Udell's use of deadly force.

Further, there is at least one disputed material fact: whether Udell called out to Vinberg as Vinberg was 150 feet away and said, "hold up for a little bit." The United States contends that this fact is not material.[138] However, the Court finds that it is. If Udell suggested to Vinberg that he should "hold up," and Vinberg interpreted that to mean that he should walk back toward Udell, a reasonable fact finder could conclude that those facts rendered Udell's use of deadly force less reasonable. Therefore, whether Udell said something to Vinberg that could have induced him to turn back "is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit."[139]

Because at least one dispute of material fact remains, the United States' Motion for Summary Judgment on Plaintiff's assault and battery claim is **DENIED**.

## CONCLUSION

In light of the foregoing, the United States' Motion for Summary Judgment at Docket 162 is **DENIED**.

This order is being issued under seal. The parties shall promptly meet and confer and, **within seven days of the date of this order**, file a notice indicating those portions of this order, if any, that should remain under seal. Thereafter, this

---

[138] Docket 202 at 3.

[139] *T. W. Elec. Serv., Inc.*, 809 F.2d at 630.

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 28 of 29

Case 3:22-cv-00135-SLG     Document 211     Filed 07/20/26     Page 28 of 29

order will be made public with any appropriate redactions.

Further, a Trial Scheduling Conference is set for **July 16, 2026, at 10:00 a.m.** in Anchorage Courtroom 2.

DATED this 17th day of July, 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:22-cv-00135-SLG, *Estate of Jayson Vinberg v. United States*
Order on the United States' Motion for Summary Judgment
Page 29 of 29

Case 3:22-cv-00135-SLG    Document 211    Filed 07/20/26    Page 29 of 29